UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**SUSAN SEVEN-SKY,**
263 Columbus Avenue
West Harrison, NY 10604,

**PEGGY LEE MEAD,**
205 South English Hill Lane
Hillsborough, NC 27278,

**CHARLES "EDDIE" LEE,**
7726 Clear Ridge Dr.
San Antonio, TX 78239,

**KENNETH RUFFO,**
715 Oban Drive
San Antonio, TX 78216,

**GINA RODRIGUEZ,**
705 Westbrook Drive
Plano, TX 75075,

      *Plaintiffs,*

    -vs.-

**ERIC H. HOLDER, JR.,**
Attorney General of the United States, *in his
official capacity,*
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001,

**UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,**
200 Independence Avenue, SW
Washington, DC 20201,

**KATHLEEN SEBELIUS,**
Secretary of the United States Department of
Health and Human Services, *in her official
capacity,*
200 Independence Avenue, SW
Washington, DC 20201,

**CIVIL ACTION**

**NO.** _____

**UNITED STATES DEPARTMENT OF
THE TREASURY,**
1500 Pennsylvania Avenue, NW
Washington, DC 20220,

**TIMOTHY F. GEITHNER,**
Secretary of the Treasury of the United States,
*in his official capacity,*
1500 Pennsylvania Avenue, NW
Washington, DC 20220,

      *Defendants.*

## COMPLAINT FOR DECLARATORY
## AND INJUNCTIVE RELIEF

    Plaintiffs Susan Seven-Sky, Peggy Lee Mead, Charles "Eddie" Lee, Kenneth Ruffo, and

Gina Rodriguez, by and through their undersigned counsel, bring this complaint against the

above-named Defendants, their officers, agents, servants, employees, and successors in office,

and in support thereof allege the following on information and belief:

## I.
## INTRODUCTION

    1.    Plaintiffs bring this action seeking a declaration pursuant to 28 U.S.C. §§ 2201-

2202 that certain provisions of the Patient Protection and Affordable Care Act, 111 Pub. L. No.

148, 124 Stat. 119, 111th Cong., 2d Sess., Mar. 23, 2010, as amended by the Health Care and

Education Reconciliation Act, 111 Pub. L. No. 152, 124 Stat. 1029, 111th Cong., 2d Sess., Mar.

30, 2010 (hereafter "Patient Protection and Affordable Care Act" or "Act"), are unconstitutional

on their face, and to obtain injunctive relief against enforcement of those provisions, which

require individual Americans to purchase an approved health insurance policy (known as the

"individual mandate").

2

2.     Unless Plaintiffs purchase minimum health insurance coverage, as mandated by the Act, they will be subject to annual "shared responsibility payments" to the government. Through 2020, Plaintiffs will be required to pay, *at a minimum*, a total of $27,265 in shared responsibility payments for their lack of minimum essential coverage ($11,685 for Plaintiff Rodriguez on behalf of herself and her household, and $3,895 each for Plaintiffs Seven-Sky, Mead, Ruffo, and Lee).

3.     The total amount of shared responsibility payments that Plaintiffs must prepare themselves to pay through 2020 *may be greater* than $27,265 depending upon their income levels during each taxable year and cost of living adjustments. Furthermore, the government will continue to require Plaintiffs' households to make shared responsibility payments in 2021 and beyond.

4.     Plaintiffs are presently and concretely harmed by the Act because they are compelled to adjust their fiscal affairs now to prepare themselves to pay thousands of dollars over the next several years as required by the individual mandate and the separate shared responsibility payment provisions.

5.     Health insurance contracts deal with a particular set of risks over a set period of time that may, or may not, materialize, and both parties take a calculated risk based on the uncertainty of future events. A determination that the individual mandate is unconstitutional months or years *after* numerous individuals have involuntarily entered insurance contracts would leave both the individuals and the insurance companies without an effective remedy. Individuals who, in hindsight, received more benefits than they paid to the company during the life of the contract would want their policies upheld, while individuals who, in hindsight, paid more to the company than they received in benefits during the life of the contract would want their policies

invalidated. Allowing the validity of the individual mandate to be determined before individuals are required to purchase health insurance policies will ensure that all persons injured by it will be made whole should a court hold it invalid.

6.     The Act's individual mandate, along with the imposition of shared responsibility payments for failing to buy and maintain qualifying health insurance, exceeds the power of Congress under Article I of the Constitution of the United States and is, therefore, unconstitutional and cannot be enforced.

7.     The Act also violates the rights of Plaintiffs Seven-Sky, Mead, and Lee as set forth in the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb *et seq.*

## II.
## JURISDICTION AND VENUE

8.     This is an action arising under the United States Constitution, 42 U.S.C. § 2000bb *et seq.*, and 28 U.S.C. §§ 2201-2202 seeking declaratory and injunctive relief to cure deprivations of the federal rights of Plaintiffs, which have been and will be violated by Defendants. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1346.

9.     Venue is appropriate in this Court, pursuant to 28 U.S.C. § 1391(e), because a substantial part of the acts giving rise to Plaintiffs' claims have occurred in the District of Columbia and because Defendants reside in the District of Columbia.

## III.
## PARTIES

### PLAINTIFFS

#### Plaintiff Susan Seven-Sky

10.     Plaintiff Susan Seven-Sky is a United States citizen, a resident of the State of New York, and a federal taxpayer.

11.    Seven-Sky is fifty-three years of age and is not eligible for Medicare, and when she is eligible for Medicare, she will not enroll in it. She does not qualify for Medicaid.

12.    Seven-Sky is single, self-employed as a chiropractor and massage therapist, and is generally in good health.

13.    Seven-Sky could afford health insurance coverage, but she has elected not to purchase such insurance and desires not to do so now or in the future. She is not covered by anyone else's health insurance, pays for any health care expenses as they arise, and has not had health insurance coverage for at least six years.

14.    Seven-Sky does not qualify for any of the exemptions under the Act, and it is highly likely that she will not qualify for any of the exemptions over the next several years. She strongly objects to being required by the Act to either buy minimum essential coverage or pay an annual shared responsibility payment.

15.    Seven-Sky believes in natural forms of healing and trusting in God to protect her from illness or injury and to heal her of any afflictions, no matter the severity of the health issue, and does not need, or want to be forced to buy, health insurance coverage.

16.    In addition, Seven-Sky has a sincerely held religious belief that God will provide for her physical, spiritual, and financial well-being. Being forced to buy health insurance conflicts with Seven-Sky's religious faith because she believes that she would be indicating that she is not really sure whether God will, in fact, provide for her needs, so she needs to rely on a health insurance policy as a backup plan.

17.    Seven-Sky also strongly believes that the federal government lacks the authority to force her to buy a health insurance policy or any other good or service.

18.     Because Seven-Sky believes in relying on God to preserve her health and provide for her physical, spiritual, and financial needs, and objects to participation in the health insurance system, the Act imposes direct and substantial religious and financial burdens upon Seven-Sky by requiring her to either 1) purchase and maintain "minimum essential coverage," without any consideration of her individual needs, Christian faith, and financial situation, or 2) pay the annual shared responsibility payment.

19.     Although Seven-Sky strongly opposes being mandated to purchase minimum essential coverage as well as being penalized for failing to do so, she views being forced to pay the annual shared responsibility payment as the lesser of two evils from a religious and financial standpoint.  Therefore, she will be forced to pay—under strong objection—the annual shared responsibility payment.

20.     As a direct result of the Act's inevitable impact upon Seven-Sky's finances and lifestyle, she is compelled to adjust her finances now, by setting aside money, and will continue to do so, to pay the annual shared responsibility payment.  As a result, she will be unable to use that money for other purposes now, such as discretionary spending, charitable donations, or paying debts, and will have to adjust her lifestyle accordingly, all of which will unjustly and adversely burden her and continue to do so while the Act is in existence, and either is threatened to be enforced, or is enforced against her.

21.     Under the shared responsibility payment provisions of the Act, Seven-Sky will be required to pay, at a minimum, $3,895 to the Government through 2020 for her lack of minimum essential coverage (a minimum shared responsibility payment of $95 in 2014, $325 in 2015, $695 in 2016, and $695 or greater in 2017 or later).  The total amount of shared responsibility payments that the government will require Seven-Sky to pay through 2020 *may be greater*

depending upon her income levels during each taxable year, and Seven-Sky will be required to continue making shared responsibility payments in 2021 and beyond.

22.     The Act will also negatively impact Seven-Sky's business because health insurance generally does not cover the services that she provides, and her clients and prospective clients will have less money to pay for her services out-of-pocket if they have to buy minimum essential coverage or pay an annual shared responsibility payment.

23.     As a direct and proximate result of the Act, Seven-Sky is concretely and continuously harmed by both the specter of the inevitable enforcement of the Act against her— through either a coerced commercial transaction or a shared responsibility payment—and also the present need to currently arrange her fiscal affairs to prepare herself to pay thousands of dollars over the next several years as required by the individual mandate.

<u>Plaintiff Peggy Lee Mead</u>

24.     Plaintiff Peggy Lee Mead is a United States citizen, a resident of the State of North Carolina, and a federal taxpayer.

25.     Mead is sixty-two years of age and is not eligible for Medicare.  When she is eligible for Medicare, she will not enroll in it.  She does not qualify for Medicaid.

26.     Mead is single, self-employed, and also works part-time.  She is generally in good health.

27.     Mead could afford health insurance coverage, but she has elected not to purchase such insurance and desires not to do so now or in the future.  She is not covered by anyone else's health insurance.  She has not had health insurance for approximately eighteen years.

28.     Mead does not qualify for any of the exemptions under the Act, and it is highly likely that she will not be exempted from the individual mandate over the next several years.

She strongly objects to being required by the Act to either buy minimum essential coverage or pay an annual shared responsibility payment.

29.     Mead believes in trusting in God to protect her from illness or injury, and to heal her of any afflictions, no matter the severity of the health issue, and she does not need, or want to be forced to buy, health insurance coverage.

30.     In addition, Mead has a sincerely held religious belief that God will provide for her physical, spiritual, and financial well-being. Being forced to buy health insurance conflicts with Mead's religious faith because she believes that she would be indicating that she is not really sure whether God will, in fact, provide for her needs, so she needs to rely on a health insurance policy as a backup plan.

31.     Mead also strongly believes that the federal government lacks the authority to force her to buy a health insurance policy or any other good or service.

32.     Because Mead believes in relying on God to preserve her health and provide for her physical, spiritual, and financial needs, and objects to participation in the health insurance system, the Act imposes direct and substantial religious and financial burdens upon Mead by requiring her to either 1) purchase and maintain minimum essential coverage, without any consideration of her individual needs, Christian faith, and financial situation, or 2) pay an annual shared responsibility payment.

33.     Although Mead strongly opposes being mandated to purchase minimum essential coverage as well as being penalized for failing to do so, she views being forced to pay the annual shared responsibility payment as the lesser of two evils from a religious and financial standpoint. Therefore, she will be forced to pay—under strong objection—the annual shared responsibility payment.

8

34. As a direct result of the Act's inevitable impact upon Mead's finances and lifestyle, she is compelled to adjust her finances now, by setting aside money, and will continue to do so, to pay the annual shared responsibility payment. As a result, she will be unable to use that money for other purposes now, such as discretionary spending, charitable donations, or paying debts, and will have to adjust her lifestyle accordingly, all of which will unjustly and adversely burden her and continue to do so while the Act is in existence, and either is threatened to be enforced, or is enforced against her.

35. Under the shared responsibility payment provisions of the Act, Mead will be required to pay, at a minimum, $3,895 to the Government through 2020 for her lack of minimum essential coverage (a minimum shared responsibility payment of $95 in 2014, $325 in 2015, $695 in 2016, and $695 or greater in 2017 or later). The total amount of shared responsibility payments that the government will require Mead to pay through 2020 *may be greater* depending upon her income levels during each taxable year, and Mead will be required to continue making shared responsibility payments in 2021 and beyond.

36. As a direct and proximate result of the Act, Mead is concretely and continuously harmed by both the specter of the inevitable enforcement of the Act against her—through either a coerced commercial transaction or a shared responsibility payment—and also the need to currently arrange her fiscal affairs now to prepare herself to pay thousands of dollars over the next several years as required by the individual mandate.

Plaintiff Charles "Eddie" Lee

37. Plaintiff Charles "Eddie" Lee is a United States citizen, a resident of the State of Texas, and a federal taxpayer.

38.     Lee is sixty years of age and is not eligible for Medicare. When he is eligible for Medicare, he will not enroll in it. He does not qualify for Medicaid.

39.     Lee is married, currently unemployed, and is generally in good health. His wife is currently employed and they could afford to buy health insurance coverage for Lee, but he has elected not to purchase such insurance, and does not desire to do so now or in the future.

40.     Although Lee's wife is covered by insurance through her employer, Lee is not covered by anyone's health insurance.

41.     Lee's household does not qualify for any of the exemptions under the Act, and it is highly likely that Lee will not be exempted from the individual mandate over the next several years. He objects to being required by the Act to either buy minimum essential coverage or pay an annual shared responsibility payment.

42.     Lee believes in trusting in God to protect him from illness or injury, and to heal him of any afflictions, no matter the severity of the health issue, and does not need, or want to be forced to purchase, health insurance because he relies on prayer and personal life choices to maintain his health. He has not had health insurance for approximately twenty-two years or had any major health concerns during that time period as a result of his faith and his personal life choices regarding health maintenance.

43.     In addition, Lee has a sincerely held religious belief that God will provide for his physical, spiritual, and financial well-being. Being forced to buy health insurance conflicts with Lee's religious faith because he believes that he would be indicating that he is not really sure whether God will, in fact, provide for his needs, so he needs to rely on a health insurance policy as a backup plan.

44.     Lee so firmly believes in the importance of relying on God to maintain his health that he has instructed his family and friends that, should he be stricken with a serious health issue, for example, a heart attack or traumatic injury, they should only pray for him and not provide him with emergency medical care.  Lee believes that, if it is God's will for him to continue to be alive and healthy, God will heal him of any conditions or diseases that may affect him or prevent them from occurring in the first place.

45.     Lee also strongly believes that the federal government lacks the authority to force him to buy a health insurance policy or any other good or service.

46.     Because Lee believes in relying on God to preserve his health and provide for his physical, spiritual, and financial needs, and objects to participation in the health insurance system, the Act imposes direct and substantial religious and financial burdens upon Lee by requiring him to either 1) purchase and maintain "minimum essential coverage," without any consideration of his individual needs, Christian faith, and financial situation, or 2) pay the annual shared responsibility payment.

47.     Although Lee strongly opposes both being mandated to purchase minimum essential coverage and being penalized for failing to do so, he views being forced to pay the annual shared responsibility payment as the lesser of two evils from a religious and financial standpoint.  Therefore, he will be forced to pay—under strong objection—the annual shared responsibility payment.

48.     As a direct result of the Act's inevitable impact upon Lee's household finances and lifestyle, he and his wife are compelled to adjust their household finances now, by setting aside money, and will continue to do so, to pay the annual shared responsibility payment.  As a result, Lee will be unable to use that money for other purposes now, such as discretionary

spending, charitable donations, or paying debts, and will have to adjust his lifestyle accordingly, all of which will unjustly and adversely burden him and continue to do so while the Act is in existence, and either is threatened to be enforced, or is enforced against him.

49.     Under the shared responsibility payment provisions of the Act, Lee and his wife will be responsible to pay, at a minimum, $3,895 to the Government through 2020 for his lack of minimum essential coverage (a minimum shared responsibility payment of $95 in 2014, $325 in 2015, $695 in 2016, and $695 or greater in 2017 or later).   The total amount of shared responsibility payments that the government will require Lee to pay through 2020 *may be greater* depending upon his household income levels during each taxable year, and Lee will be required to continue making shared responsibility payments in 2021 and beyond.

50.     As a direct and proximate result of the Act, Lee is concretely and continuously harmed by both the specter of the inevitable enforcement of the Act against him—through either a coerced commercial transaction or a shared responsibility payment—and also the need to currently arrange his household's fiscal affairs now to prepare himself to pay thousands of dollars over the next several years as required by the individual mandate.

Plaintiff Kenneth Ruffo

51.     Plaintiff Kenneth Ruffo is a United States citizen, a resident of the State of Texas, and a federal taxpayer.

52.     Ruffo is forty-nine years of age and is not eligible for Medicare or Medicaid.

53.     Ruffo is single, self-employed, and is generally in good health.

54.     Ruffo could afford health insurance coverage, but he has elected not to purchase such insurance and desires not to do so.  He is not covered by anyone else's health insurance,

pays for health care expenses as they arise, and has not had health insurance for at least five years.

55.     Ruffo does not qualify for any of the exemptions under the Act, and it is highly likely that he will not qualify for any of the exemptions over the next several years.  He strongly objects to being required by the Act to either buy minimum essential coverage or pay an annual shared responsibility payment.

56.     Ruffo believes in a holistic or eastern approach to health care and does not need, or want to be forced to purchase, health insurance coverage.

57.     Ruffo also strongly believes that the federal government lacks the authority to force him to buy a health insurance policy or any other good or service.

58.     The Act imposes direct and substantial financial burdens upon Ruffo by requiring him to either 1) purchase and maintain minimum essential coverage, without any consideration of his individual needs and financial situation, or 2) pay a shared responsibility payment.

59.     Although Ruffo strongly opposes being mandated to purchase minimum essential coverage as well as being penalized for failing to do so, he views being forced to pay the annual shared responsibility payment as the lesser of two evils from a financial standpoint.  Therefore, he will be forced to pay—under strong objection—the annual shared responsibility payment.

60.     As a direct result of the Act's inevitable impact upon Ruffo's finances and lifestyle, he is compelled to adjust his finances now, by setting aside money, and will continue to do so, to pay the annual shared responsibility payment.  As a result, he will be unable to use that money for other purposes now, such as discretionary spending, charitable donations, or paying debts, and will have to adjust his lifestyle accordingly, all of which will unjustly and adversely

burden him and continue to do so while the Act is in existence, and either is threatened to be enforced, or is enforced against him.

61.     Under the shared responsibility payment provisions of the Act, Ruffo will be required to pay, at a minimum, $3,895 to the Government through 2020 for his lack of minimum essential coverage (a minimum shared responsibility payment of $95 in 2014, $325 in 2015, $695 in 2016, and $695 or greater in 2017 or later). The total amount of shared responsibility payments that the government will require Ruffo to pay through 2020 *may be greater* depending upon his income levels during each taxable year, and Ruffo will be required to continue making shared responsibility payments in 2021 and beyond.

62.     As a direct and proximate result of the Act, Ruffo is concretely and continuously harmed by both the specter of the inevitable enforcement of the Act against him—through either a coerced commercial transaction or a shared responsibility payment—and also the need to currently arrange his fiscal affairs now to prepare himself to pay thousands of dollars over the next several years as required by the individual mandate.

<u>Plaintiff Gina Rodriguez</u>

63.     Plaintiff Gina Rodriguez is a United States citizen, a resident of the State of Texas, and a federal taxpayer.

64.     Rodriguez is thirty-six years of age and is not eligible for Medicare or Medicaid.

65.     Rodriguez is a married stay-at-home mother of three minor children, and is generally in good health.

66.     Rodriguez could afford health insurance coverage, but she has elected not to purchase such insurance and desires not to do so. She is not covered by anyone else's health

14

insurance. She pays for health care expenses as they arise for her and her family and she has not had health insurance for about ten years.

67.    Rodriguez does not qualify for any of the exemptions under the Patient Protection and Affordable Care Act, and it is highly likely that she will not qualify for any of the exemptions over the next several years. She objects to being required by the Act to either buy minimum essential coverage or pay an annual shared responsibility payment.

68.    Rodriguez believes in a holistic approach to medical care and does not need, or want to be forced to purchase, health insurance coverage.

69.    Health insurance does not cover many of the medical services and health products that Rodriguez currently pays for out of pocket.

70.    Rodriguez also strongly believes that the federal government lacks the authority to force her to buy a health insurance policy or any other good or service.

71.    The Act imposes direct and substantial financial burdens upon Rodriguez by requiring her to either 1) purchase and maintain "minimum essential coverage" for her and her family, without any consideration of her individual and family needs and financial situation, or 2) pay annual shared responsibility payments.

72.    Although Rodriguez strongly opposes being mandated to purchase minimum essential coverage as well as being penalized for failing to do so, she views being forced to pay the annual shared responsibility payment as the lesser of two evils from a financial standpoint. Therefore, she will be forced to pay—under strong objection—the annual shared responsibility payment.

73.    As a direct result of the Act's inevitable impact upon Rodriguez's household finances and lifestyle, she and her family are compelled to adjust their finances now, by setting

15

aside money, and will continue to do so, to pay the annual shared responsibility payment. As a result, she will be unable to use that money for other purposes now, such as discretionary spending, charitable donations, paying debts, or including that money in her children's college fund, and will have to adjust her lifestyle accordingly, all of which will unjustly and adversely burden her household while the Act is in existence, and either is threatened to be enforced, or is enforced against her.

74.     Under the shared responsibility payment provisions of the Act, Rodriguez and her husband will be responsible to pay—on behalf of themselves and their three children—at a minimum, $11,685 to the Government through 2020 for their lack of minimum essential coverage (a minimum shared responsibility payment of $285 in 2014, $975 in 2015, $2,085 in 2016, and $2,085 or greater in 2017 or later). The total amount of shared responsibility payments that the government will require Rodriguez to pay through 2020 *may be greater* depending upon her household's income levels during each taxable year, and Rodriguez will be required to continue making shared responsibility payments in 2021 and beyond.

75.     As a direct and proximate result of the Act, Rodriguez is concretely and continuously harmed by both the specter of the inevitable enforcement of the Act against her— through either a coerced commercial transaction or a shared responsibility payment—and also the need to currently arrange her household's fiscal affairs now to prepare herself and her family to pay thousands of dollars over the next several years as required by the individual mandate.

## DEFENDANTS

### Defendant Eric H. Holder, Jr.

76.     Defendant Eric H. Holder, Jr., is the Attorney General of the United States and is the chief law enforcement officer of the federal government. As such, he will be responsible for

16

the enforcement of the Patient Protection and Affordable Care Act. He is sued in his official capacity.

### Defendant United States Department of Health and Human Services

77.     Defendant United States Department of Health and Human Services (HHS) is established by 5 U.S.C. § 101 and is an executive department of the United States government charged with the principal protection of the health of all Americans. HHS's duties involve administering portions of the Patient Protection and Affordable Care Act.

### Defendant Kathleen Sebelius

78.     Defendant Kathleen Sebelius is the Secretary of the Department of Health and Human Services and is the principal authority within HHS. She is responsible for enforcing and administering the Patient Protection and Affordable Care Act. She is sued in her official capacity.

### Defendant United States Department of the Treasury

79.     Defendant United States Department of the Treasury is an executive department of the United States government charged with collecting federal taxes and enforcing federal tax laws. The United States Treasury's duties include administering portions of the Patient Protection and Affordable Care Act.

### Defendant Timothy F. Geithner

80.     Defendant Timothy F. Geithner is the Secretary of the Department of the Treasury and is responsible for overseeing the duties of the Department of the Treasury, including the collection of taxes and the enforcement of tax laws. He is responsible for enforcing the shared responsibility payment provisions of the Patient Protection and Affordable Care Act. He is sued in his official capacity.

## IV.
## ALLEGATIONS OF FACT AND LAW

81.     The Patient Protection and Affordable Care Act was signed into law by President Barack Obama on March 23, 2010, and the Health Care and Education Reconciliation Act, which amended it, became law on March 30, 2010.

82.     Section 1501 of the Patient Protection and Affordable Care Act requires individuals and their dependents to purchase and maintain a level of minimum health insurance coverage.

83.     Through the individual mandate, Section 1501 seeks to further Congress' stated purpose of forcing millions of Americans who do not have health insurance, but could afford such insurance if they re-adjusted their fiscal affairs and lifestyles, to purchase health insurance policies from private companies.

84.     The individual mandate requires individuals to pay money to private insurance companies, not the government, and such coerced payments to private insurance companies are not a tax.

85.     Among the Act's other provisions that have some connection to the individual mandate is a provision stating that those who do not meet the requirements of the individual mandate will be subject to an annual shared responsibility payment to the government.

86.     In general, the shared responsibility payment is imposed for any month in a given year that an applicable individual fails to maintain minimum essential coverage and is included on a taxpayer's income tax return for that taxable year.

87.     Taxpayers are liable for any shared responsibility payment imposed upon their dependents, and spouses are jointly liable for any shared responsibility payments if they file a joint return.

88.     Under the Act's complicated shared responsibility payment structure, the *minimum* shared responsibility payment amount per year for each adult who lacks minimum essential coverage will be $95 for 2014, $325 for 2015, $695 for 2016, and $695 or more for 2017 or later, increased due to cost-of-living adjustments. The minimum shared responsibility payment amount per year for minors under age eighteen who lack minimum essential coverage is one half of the amounts previously listed.  When this calculation is used, the total shared responsibility payment amount per household for each taxable year cannot exceed 300 percent of the applicable dollar amount for that calendar year (disregarding the rule for minors under 18).

89.     The above-mentioned shared responsibility payment calculation is disregarded when a certain percentage of the taxpayer's household income that exceeds the applicable threshold for filing a tax return is greater than the amounts listed above for the taxable year. The applicable percentages are 1 percent of the excess amount in 2014, 2.0 percent of the excess in 2015, and 2.5 percent in 2016 or later.

90.     When the percentage of the excess over the filing threshold is greater than the specific amounts listed above for the taxable year—which will often be the case for Plaintiffs and many other Americans—the taxpayer must pay the amount of the excess *with no specific dollar cap.*  For example, where a taxpayer's household income (minus the amount of the applicable threshold for filing a tax return) is $50,000, the shared responsibility payment amount per year would be, at a minimum, $500 for 2014, $1,000 for 2015, and $1,250 for 2016 or later.

91.     The authority of the federal government, including Congress, is limited to those powers stated in the Constitution of the United States.  Rather than possessing a general police power to pass any and every law that it deems advisable, Congress must act within the limited, enumerated powers afforded to it by the Constitution.

19

92.     The Tenth Amendment highlights the inherent limitations upon the authority of the federal government, including Congress, by stating: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

93.     The relevant sections of the Patient Protection and Affordable Care Act are beyond the power granted to Congress under the Constitution and are, therefore, unconstitutional and unenforceable.

94.     The only power under which Congress claimed to have the constitutional authority to impose an individual mandate to purchase health insurance coverage is the power to regulate interstate commerce found in Article I, Section 8.

95.     No power enumerated or implied by Article I, Section 8, including the Commerce Clause or the Necessary and Proper Clause, grants Congress the power to enact a law that requires individuals who are not engaging in economic or commercial activity to enter a commercial transaction against their will.

96.     In addition, the Act violates the rights of Plaintiffs Seven-Sky, Mead, and Lee as set forth in RFRA, 42 U.S.C. § 2000bb *et seq.*, by forcing them to participate in an insurance system that is based upon principles that are diametrically opposed to their religious beliefs.

97.     Although invalidation of the individual mandate would indirectly affect numerous other provisions of the Act, including the shared responsibility provisions of Section 1501, the present suit seeking the invalidation of the requirement that individuals pay money to private companies is not a "suit for the purpose of restraining the assessment or collection of any tax . . . ." within the meaning of the Anti-Injunction Act, 26 U.S.C. § 7421.

98.     The Anti-Injunction Act's primary purpose—to ensure the prompt collection of taxes that are currently due without pre-collection judicial interference—is not implicated here because, among other things, Plaintiffs are currently injured by a *non-taxing provision* (the individual mandate), and no tax penalties are currently due to the government (or will be in the next few years) such that their collection would be delayed by this lawsuit.

99.     Furthermore, improper application of the Anti-Injunction Act to delay a ruling on the constitutionality of the individual mandate until months or years *after* numerous individuals have involuntarily entered insurance contracts would leave those individuals, and the insurance companies, without an effective remedy due to the time-specific nature of insurance contracts.

100.     Similarly, the Declaratory Judgment Act, 28 U.S.C. § 2201, is coterminous with the Anti-Injunction Act and, as such, this case is not a controversy "with respect to federal taxes" within the meaning of the Declaratory Judgment Act.

## V.
## CAUSES OF ACTION

### COUNT ONE:
### THE INDIVIDUAL MANDATE IS UNCONSTITUTIONAL
### BECAUSE IT EXCEEDS CONGRESS' AUTHORITY
### (AS TO ALL PLAINTIFFS)

101.     The allegations of the preceding paragraphs are hereby incorporated by reference.

102.     The Commerce Clause of Article I, Section 8 gives Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."

103.     Section 1501 of the Patient Protection and Affordable Care Act relies exclusively upon Congress's power to regulate interstate commerce as the sole basis for Congressional authority to enact the individual mandate, and sets forth congressional findings regarding the

effects of health spending and health insurance regulation on the national economy and interstate commerce.

104.    These findings do not alter the fact that the Commerce Clause does not provide Congress with the authority to enact an individual mandate to purchase health insurance.

105.    The Supreme Court of the United States has held that the Commerce Clause allows Congress to regulate three categories of activity:  1) the channels of interstate commerce, 2) the instrumentalities of interstate commerce, or persons or things in interstate commerce, and 3) economic or commercial activities that substantially affect interstate commerce.

106.    Additionally, Congress may enact laws that are necessary and proper to the carrying out of its enumerated powers, including its power to regulate interstate commerce.

107.    Mandating that individuals purchase health insurance is an unprecedented and unconstitutional expansion of congressional power, as Congress has never before required individuals to involuntarily buy a good or service under the guise of its Commerce Clause authority.

108.    The Congressional Research Service has stated regarding the Commerce Clause basis for mandating the purchase of health insurance that,

> [d]espite the breadth of powers that have been exercised under the Commerce Clause, it is unclear whether the clause would provide a solid constitutional foundation for legislation containing a requirement to have health insurance. Whether such a requirement would be constitutional under the Commerce Clause is perhaps the most challenging question posed by such a proposal, as *it is a novel issue whether Congress may use this clause to require an individual to purchase a good or service.*

Cong. Research Serv., *Requiring Individuals to Obtain Health Insurance: A Constitutional Analysis*, at 3, July 24, 2009, *available at* http://assets.opencrs.com/rpts/R40725_20090724.pdf (emphasis added).

109.    The individual mandate exceeds Congress' authority under the Commerce Clause, as it does not regulate economic or commercial activities that substantially affect interstate commerce.

110.    The Supreme Court has never held that Congress' power to regulate commercial or economic activities that substantially affect interstate commerce includes the much broader power to reach *inactivity* and require persons who are not engaged in economic or commercial activities to become so engaged.

111.    Merely existing in the United States without health insurance is not an economic or commercial "class of activity" that falls within Congress' authority to regulate under the Commerce Clause.

112.    In addition, the Supreme Court's Commerce Clause cases do not support the claim that the individual mandate falls within Congress' authority as an essential part of a larger regulation of economic activity.

113.    If Congress succeeds in asserting this unprecedented claim of authority, it would set a sweepingly broad standard unsupported by the Constitution that would allow Congress to dictate to individuals that they must, or must not, buy countless other goods or services in the marketplace. To interpret the Commerce Clause to afford Congress such vast, all-encompassing authority over the daily lives of Americans would eviscerate the idea of a federal government of limited powers.

114.    The individual mandate is not supported by Congress' authority to "make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the Government of the United States, or in any department or officer thereof." U.S. Const. Art. I, Sec. 8.

115.    The individual mandate is not supported by any other enumerated power of Congress set forth in Article I of the Constitution, nor did Congress invoke any other power in support of the mandate that individuals must purchase and maintain health insurance.

116.    Furthermore, the coerced payment of money to private insurance companies, as the individual mandate requires, is not a "tax" and, as such, does not invoke Congress' authority under Article I, Section 8 of the Constitution "[t]o lay and collect Taxes, Duties, Imposts and Excises."

117.    The imposition of shared responsibility payments upon individuals who do not comply with the individual mandate is not a constitutional exercise of Congress' taxing authority.  If such payments are deemed to be a tax, they constitute an unlawful capitation or direct tax in violation of Article I, Section 2, Clause 3 and Article I, Section 9, Clause 4 of the Constitution.

118.    As a direct and proximate result of Defendants' violation of the Constitution, Plaintiffs are suffering immediate and continuing harm, entitling them to the relief sought in their Prayer for Relief.

**COUNT TWO:**
**THE INDIVIDUAL MANDATE VIOLATES**
**PLAINTIFFS' RIGHTS AS PROTECTED BY RFRA**
**(AS TO PLAINTIFFS SEVEN-SKY, MEAD, AND LEE)**

119.    The allegations of the preceding paragraphs 1 through 100 are hereby incorporated by reference.

120.    The Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*, prohibits the Federal Government from substantially burdening a person's exercise of religion—even through neutral laws of general applicability—unless the Government demonstrates that imposing the

burden upon the person is the least restrictive means of advancing a compelling governmental interest.

121.   RFRA states that "[a] person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000bb-1(c).

122.   The individual mandate provisions of the Act violate the rights of Plaintiffs Seven-Sky, Mead, and Lee as set forth in RFRA.

123.   The Act's requirement that Plaintiffs Seven-Sky, Mead, and Lee purchase health insurance, under the threat of significant financial penalties, substantially burdens the exercise of their religion. They are forced to either join a health insurance system that contradicts the tenets of their faith or pay substantial penalties for following the tenets of their faith.

124.   The substantial burden that the individual mandate imposes upon Plaintiffs Seven-Sky, Mead, and Lee is immediate and concrete, as their financial affairs and lifestyles are presently affected because they are compelled to start preparing themselves now to pay thousands of dollars over the next several years as the individual mandate requires.

125.   The individual mandate does not advance a compelling governmental interest, and imposing a substantial burden upon Plaintiffs Seven-Sky, Mead, and Lee is not the least restrictive means of advancing any interest the government might have.

126.   As a direct and proximate result of Defendants' violation of RFRA, Plaintiffs Seven-Sky, Mead, and Lee are suffering immediate and continuing harm, entitling them to the relief sought in their Prayer for Relief.

## VI.
## PRAYER FOR RELIEF

127.   Wherefore, based on the foregoing causes of action as set forth in this Complaint, Plaintiffs respectfully pray that the Court grant them the following relief:

A.   That the Court enter a declaratory judgment in favor of all Plaintiffs, declaring unconstitutional the individual mandate provisions contained in the Patient Protection and Affordable Care Act;

B.   That the Court enter a declaratory judgment in favor of Plaintiffs Seven-Sky, Mead, and Lee, declaring that Defendants violated the Religious Freedom Restoration Act;

C.   That the Court enter a permanent injunction against the enforcement of the individual mandate provisions contained in the Patient Protection and Affordable Care Act;

D.   That the Court invalidate the Patient Protection and Affordable Care Act in its entirety and enjoin its enforcement should the Court determine that the individual mandate provisions are not severable from the rest of the Act;

E.   That the Court award all Plaintiffs their reasonable attorneys' fees, costs, and expenses pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and other applicable laws; and

F.   That the Court award all Plaintiffs such other and further relief as the Court deems just and proper.

Respectfully submitted this 9th day of June, 2010,

Edward L. White III*
American Center for Law & Justice
5068 Plymouth Road
Ann Arbor, MI 48105
Tel. 734-662-2984; Fax. 734-302-1758
ewhite@aclj.org

Erik M. Zimmerman*
American Center for Law & Justice
1000 Regent University Dr.
Virginia Beach, VA 23464
Tel. 757-226-2489; Fax. 757-226-2836
ezimmerman@aclj.org

*Pro hac vice motions pending
**Bar admission applications forthcoming

Jay Alan Sekulow**
(D.C. Bar No. 496335)
Stuart J. Roth**
(D.C. Bar No. 475937)
Colby M. May
(D.C. Bar No. 394340)

James Matthew Henderson Sr.
(D.C. Bar No. 452639)
*Counsel of Record*
American Center for Law & Justice
201 Maryland Avenue, NE
Washington, DC 20002
Tel. 202-546-8890; Fax. 202-546-9309
sekulow@aclj.org
sjr@aclj-dc.org
cmmay@aclj-dc.org
jmhenderson@aclj-dc.org

*Counsel for Plaintiffs*