# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARGARET PEGGY LEE MEAD;
CHARLES EDWARD LEE; SUSAN
SEVEN-SKY; KENNETH RUFFO; and
GINA RODRIGUEZ,

    *Plaintiffs,*

    -vs.-

ERIC H. HOLDER, JR.; UNITED STATES
DEPARTMENT OF HEALTH AND
HUMAN SERVICES; KATHLEEN
SEBELIUS; UNITED STATES
DEPARTMENT OF THE TREASURY;
and TIMOTHY F. GEITHNER,

    *Defendants*.

**CASE NO.  1:10-CV-00950 (GK)**

**ORAL HEARING REQUESTED**
(LCvR 7(f))

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN RESPONSE TO DEFENDANTS' MOTION TO DISMISS

Edward L. White III (adm. phv)
American Center for Law & Justice
5068 Plymouth Road
Ann Arbor, MI 48105
Tel. 734-662-2984; Fax. 734-302-1758
ewhite@aclj.org

Erik M. Zimmerman (adm. phv)
American Center for Law & Justice
1000 Regent University Dr.
Virginia Beach, VA 23464
Tel. 757-226-2489; Fax. 757-226-2836
ezimmerman@aclj.org

Miles Landon Terry (adm. phv)
American Center for Law & Justice
1305 Clinton Street, Suite 230
Nashville, TN 37203
Tel. 864-569-9344; Fax. 615-327-0007
mterry@aclj.org

Jay Alan Sekulow
(D.C. Bar No. 496335)
Stuart J. Roth
(D.C. Bar No. 475937)
Colby M. May
(D.C. Bar No. 394340)
James Matthew Henderson Sr.
(D.C. Bar No. 452639)
  *Counsel of Record*
American Center for Law & Justice
201 Maryland Avenue, NE
Washington, DC 20002
Tel. 202-546-8890; Fax. 202-546-9309
sekulow@aclj.org
sjr@aclj-dc.org
cmmay@aclj-dc.org
jmhenderson@aclj-dc.org


Dated:  September 10, 2010

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION ............................................................................................................ 1

ISSUES PRESENTED ..................................................................................................... 1

KEY ALLEGATIONS OF FACT .................................................................................... 2

MOTION TO DISMISS STANDARDS ........................................................................... 3

ARGUMENT .................................................................................................................... 4

I.     PLAINTIFFS HAVE STANDING TO CHALLENGE SECTION 1501 OF
THE PPACA AND THEIR CHALLENGE IS RIPE BECAUSE THEY ARE
PRESENTLY INJURED, AND WILL CONTINUE TO BE INJURED, DUE
TO THE EXISTENCE AND THREATENED ENFORCEMENT OF
SECTION 1501 ..................................................................................................... 4

II.    SECTION 1501 OF THE PPACA IS UNCONSTITUTIONAL BECAUSE IT
EXCEEDS CONGRESS'S AUTHORITY UNDER ARTICLE I OF THE
UNITED STATES CONSTITUTION ................................................................... 11

     A.    Section 1501 is not authorized by the Commerce Clause ...................... 11

          1.    *Wickard v. Filburn*, 317 U.S. 111 (1942). ................................. 12

          2.    *United States v. Lopez*, 514 U.S. 549 (1995). ............................. 14

          3.    *United States v. Morrison*, 529 U.S. 598 (2000). ...................... 20

          4.    *Gonzalez v. Raich*, 545 U.S. 1 (2005). ....................................... 21

     B.    Section 1501 is not authorized by the Necessary and Proper Clause. .................. 25

     C.    Section 1501 is not authorized by the taxing power. .............................. 29

          1.    Congress relied exclusively upon its assertion of Commerce Clause
power in Section 1501 and included the "penalty" as a regulatory
measure expressly tied to the individual mandate, not a tax ..................... 29

2.      Section 1501's penalty provisions exceed Congress's taxing power because they exist solely to further a regulatory provision— the individual mandate—that is "extraneous to any tax need" and exceeds Congress's Commerce Clause power...........................................32

3.      The penalty for being lawfully present in the United States without health insurance is an unconstitutional direct or capitation tax, not an income or excise tax...........................................................................34

III.    THE EXISTENCE AND THREATENED ENFORCEMENT OF SECTION 1501 OF THE PPACA AGAINST PLAINTIFFS MEAD, SEVEN-SKY, AND LEE VIOLATES THEIR RIGHTS UNDER THE RELIGIOUS FREEDOM RESTORATION ACT.....................................................................................36

IV.     PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE ANTI-INJUNCTION ACT. ...40

A.      A decision on the merits of Plaintiffs' claims is consistent with the AIA's text..........................................................................................41

B.      A decision on the merits of Plaintiffs' claims is consistent with the AIA's purpose. ...................................................................................42

C.      Cases in which claims were barred by the AIA are distinguishable from the present case. .........................................................................44

CONCLUSION....................................................................................................45

CERTIFICATE OF SERVICE .................................................................................46

# TABLE OF AUTHORITIES

## Supreme Court Cases

\* *Abbott Labs. v. Gardner,*
    387 U.S. 136 (1967) ............................................................................. 3, 7-9

*Alexander v. "Americans United,"*
    416 U.S. 752 (1974) ...................................................................................41

*Assoc. of Data Processing Serv. Orgs., Inc. v. Camp,*
    397 U.S. 150 (1970) ...................................................................................11

*Bailey v. Drexel Furniture Co. (Child Labor Tax Case),*
    259 U.S. 20 (1922) .....................................................................................33

*Bd. of Trs. of the Univ. of Ill. v. United States,*
    289 U.S. 48 (1933) .....................................................................................29

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) .....................................................................................3

\* *Blanchette v. Connecticut General Insurance Corp.*
    *(Regional Rail Reorganization Act Cases),*
    419 U.S. 102 (1974) ................................................................................. 6-7

*Bob Jones University v. Simon,*
    416 U.S. 725 (1973) ............................................................................33, 44

*City of Pittsburgh v. Alco Parking Corp.,*
    417 U.S. 369 (1974) ...................................................................................33

*Clinton v. City of New York,*
    524 U.S. 417 (1998) ...................................................................................10

*Dep't of Revenue v. Kurth Ranch,*
    511 U.S. 767 (1994) ...................................................................................33

*Enochs v. Williams Packing & Navigation Co.,*
    370 U.S. 1 (1962) .......................................................................................42

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,*
    528 U.S. 167 (2000) ...................................................................................10

*Gibbons v. Ogden*,
    22 U.S. (9 Wheat.) 1 (1824) ............................................................11, 14, 16

\* *Gonzales v. Raich*,
    545 U.S. 1 (2005) ................................................................... 21, 23-24

*Hibbs v. Winn*,
    542 U.S. 88 (2004) ...........................................................................43

*Hylton v. United States*,
    3 U.S. (3 Dall.) 171 (1796) ...........................................................35-36

*Lake Carriers' Ass'n v. Macmullan*,
    406 U.S. 498 (1972) ...........................................................................8

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ...........................................................................5

*McConnell v. FEC*,
    540 U.S. 93 (2003) ............................................................................8

*McCulloch v. Maryland*,
    17 U.S. (4 Wheat.) 316 (1819) .....................................................25, 28

*Nelson v. Sears, Roebuck & Co.*,
    312 U.S. 359 (1941) .........................................................................31

*NLRB v. Jones & Laughlin Steel Corp.*,
    301 U.S. 1 (1937) ............................................................................14

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
    461 U.S. 190 (1983) ...........................................................................8

*Printz v. United States*,
    521 U.S. 898 (1997) .........................................................................25

*Rosenberger v. Rector & Visitors of the Univ. of Virginia.*,
    515 U.S. 819 (1995) .........................................................................33

*Ry. Execs. Ass'n v. Gibbons*,
    455 U.S. 457 (1982) .........................................................................29

*Sherbert v. Verner*,
    374 U.S. 398 (1963) .........................................................................37

*Sonzinsky v. United States*,
   300 U.S. 506 (1937)................................................................33

*South Dakota v. Dole*,
   483 U.S. 203 (1987) ...............................................................33

*United States v. American Friends Serv. Comm.*,
   419 U.S. 7 (1974) (per curiam)...............................................44

*United States v. Butler*,
   297 U.S. 1 (1936)...............................................................32-33

*United States v. Clintwood Elkhorn Mining Co.*,
   553 U.S. 1 (2008)...................................................................41

* *United States v. Comstock*,
   130 S. Ct. 1949 (2010)...............................................25, 27-28

*United States v. Darby*,
   312 U.S. 100 (1941)................................................................16

*United States v. Kahriger*,
   345 U.S. 22 (1953)..................................................................32

*United States v. Lee*,
   455 U.S. 252 (1982) ...............................................................39

* *United States v. Lopez*,
   514 U.S. 549 (1995)...............................11, 14, 16-17, 19-20, 24

*United States v. Morrison*,
   529 U.S. 598 (2000)...........................................................20, 27

*United States v. Wrightwood Dairy Co.*,
   315 U.S. 110 (1942)................................................................16

* *Wickard v. Filburn*,
   317 U.S. 111 (1942)..........................................12-13, 22-24

*Wisconsin v. Yoder*,
   406 U.S. 205 (1972)................................................................37

## District of Columbia Cases

*Brooks v. Air Line Pilots Ass'n, Int'l,*
  630 F. Supp. 2d 52 (D.D.C. 2009) ..............................................................................9

*Bryant v. Pepco,*
  2010 U.S. Dist. LEXIS 79968 (D.D.C. 2010) ....................................................... 3-4

*Cohen v. United States,*
  599 F.3d 652 (D.C. Cir. 2010) ...............................................................................41

*Davis v. United States,*
  569 F. Supp. 2d 91 (D.D.C. 2008) ..........................................................................44

*Foodservice & Lodging Inst. v. Regan,*
  809 F.2d 842 (D.C. Cir. 1987) (per curiam) ...........................................................44

*Gulf Restoration Network, Inc. v. Nat'l Marine Fisheries Serv.,*
  2010 U.S. Dist. LEXIS 81897 (D.D.C. 2010) ...........................................................4

*Int'l Union of Bricklayers & Allied Craftsmen v. Meese,*
  761 F.2d 798 (D.C. Cir. 1985) .................................................................................6

*Investment Annuity v. Blumenthal,*
  609 F.2d 1 (D.C. Cir. 1979) ............................................................................. 41-42

*Kaemmerling v. Lappin,*
  553 F.3d 669 (D.C. Cir. 2008) ......................................................................... 37-38

*McNeil v. Comm'r of Internal Revenue,*
  2010 U.S. Dist. LEXIS 39404 (D.D.C. 2010) .........................................................44

*Mountain States Legal Found. v. Glickman,*
  92 F.3d 1228 (D.C. Cir. 1996) .................................................................................5

\* *Murphy v. IRS,*
  493 F.3d 170 (D.C. Cir. 2007) ...............................................................................34

*Rasul v. Myers,*
  563 F.3d 527 (D.C. Cir. 2009) ...............................................................................40

*St. John's United Church of Christ v. FAA,*
  520 F.3d 460 (D.C. Cir. 2008) .................................................................................5

*Stewart v. United States,*
  578 F. Supp. 2d 30 (D.D.C. 2008) ..........................................................................44

*Stilwell v. Office of Thrift Supervision*,
   569 F.3d 514 (D.C. Cir. 2009) ...............................................................................9

*United Church of Christ v. FCC*,
   826 F.2d 101 (D.C. Cir. 1987) ...............................................................................6

*We the People Found., Inc. v. United States*,
   485 F.3d 140 (D.C. Cir. 2007) .............................................................................44


**Other Cases**

*Barr v. United States*,
   736 F.2d 1134 (7th Cir. 1984) .............................................................................44

*Florida State Conference of NAACP v. Browning*,
   522 F.3d 1153 (11th Cir. 2008) .............................................................................5

*Goehring v. Brophy*,
   94 F.3d 1294 (9th Cir. 1996) .......................................................................... 39-40

\* *Riva v. Massachusetts*,
   61 F.3d 1003 (1st Cir. 1995)............................................................................. 8-9

*Triple G Landfills, Inc. v. Bd. of Comm'rs*,
   977 F.2d 287 (7th Cir. 1992) .................................................................................8

\* *Virginia ex rel. Cuccinelli v. Sebelius*,
   No. 3:10-cv-188, Memorandum Opinion Denying Motion to Dismiss,
   2010 U.S. Dist. LEXIS 77678, slip op. (E.D. Va. Aug. 2, 2010) ............................ 7, 19, 31-32


**Constitutions, Statutes, and Rules**

\* Anti-Injunction Act,
   26 U.S.C. § 7421(a) ............................................................................ 40-41, 43, 45

Emergency Medical Treatment and Labor Act (EMTALA),
   42 U.S.C. § 1395dd...............................................................................................18

\* Patient Protection and Affordable Care Act,
    111 Pub. L. No. 148, 124 Stat. 119, 111th Cong., 2d Sess., Mar. 23, 2010,
    as amended by Health Care and Education Reconciliation Act ("HCERA"),
    111 Pub. L. No. 152, 124 Stat. 1029, 111th Cong., 2d Sess., Mar. 30, 2010 ................... passim

    § 1201.............................................................................................................................35

    § 1501(a) .................................................................................................................. 2, 29-30

    § 1501(a)(1) ......................................................................................................................30

    § 1501(a)(2) ...............................................................................................17-19, 27-28, 30

    § 1501(b), at § 5000A(a)...............................................................................................2, 31

    § 1501(b), at § 5000A(b) ..............................................................................................2, 31

    § 1501(b), at § 5000A(c)...................................................................................................3

    § 1501(b), at § 5000A(d) ..................................................................................................3

    § 1501(b), at § 5000A(g) ..............................................................................................2, 32

\* Religious Freedom Restoration Act of 1993 (RFRA),
    42 U.S.C. § 2000bb *et seq.*................................................................. 1, 2, 36-37, 40, 43

Tax Injunction Act ("TIA") of 1937 .......................................................................43

U.S. Const. amend. XVI ........................................................................................34

U.S. Const. art. I, § 2..............................................................................................34

\* U.S. Const. art. I, § 8...............................................................................11, 13, 34

U.S. Const. art. I, § 9..............................................................................................34

**Other Authorities**

Brief of the United States, *United States v. Lopez*, 514 U.S. 549 (No. 93-1260),
1994 U.S. S. Ct. Briefs LEXIS 410 .......................................................................10

Congressional Budget Office, *The Budgetary Treatment of an Individual Mandate to
Buy Health Insurance*, Aug. 1994, http://www.cbo.gov/ftpdocs/48xx/doc4816/doc38.pdf ...........1

Ellen Overmyer Lloyd, Comment, *The Taxman Cometh: The Constitutionality of Taxing Compensatory Damages for Non-Physical Injuries*, 54 LOY. L. REV. 375 (2008) ...........36

Joint Comm. on Taxation, JCX-16-10, Mar. 18, 2010 ................................................33

Joint Comm. on Taxation, JCX-17-10, Mar. 20, 2010 ................................................33

Joint Comm. on Taxation, JCX-18-10, Mar. 21, 2010 ................................................33

Joint Comm. on Taxation, JCX-55-09, Nov. 18, 2009 ................................................33

Joint Comm. on Taxation, JCX-61-09, Dec. 19, 2009 ................................................33

Joseph M. Dodge, *What Federal Taxes are Subject to the Rule of Apportionment Under the Constitution?*, 11 U. PA. J. CONST. L. 839 (2009)............................................................ 35-36

Randy E. Barnett, *Is health-care reform constitutional?*, WASH. POST., Mar. 21, 2010..............19

Randy E. Barnett, *The Insurance Mandate in Peril*, WALL ST. J., Apr. 29, 2010 ........................30

\* indicates a primary authority relied upon

## INTRODUCTION

Defendants' Motion to Dismiss should be denied because this Court has jurisdiction to hear Plaintiffs' claims, and Plaintiffs have set forth claims in their Amended Complaint on which this Court can grant them relief against Defendants.

In 1994, the Congressional Budget Office stated, "[a] mandate requiring all individuals to purchase health insurance would be an unprecedented form of federal action.  The government has never required people to buy any good or service as a condition of lawful residence in the United States."[1]/  Sixteen years later, Congress took that unprecedented step by enacting Section 1501 of the Patient Protection and Affordable Care Act (hereinafter "PPACA" or "Act"),[2]/ which requires Plaintiffs and many other Americans to buy and maintain health insurance under the threat of financial penalties.  This individual mandate exceeds the authority granted to Congress by Article I of the United States Constitution and is, therefore, unconstitutional.  It also violates the rights of Plaintiffs Mead, Seven-Sky, and Lee as set forth in the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb *et seq.*  Because there is no jurisdictional or statutory bar to this action, this Court should deny Defendants' Motion to Dismiss and proceed to the merits of Plaintiffs' claims.

## ISSUES PRESENTED

I.      Whether this Court has jurisdiction to decide the merits of Plaintiffs' claims.

II.      Whether Section 1501 of the PPACA, which requires Plaintiffs to buy and maintain health insurance under the threat of penalties, exceeds Congress's authority.

---

[1]/ Congressional Budget Office, *The Budgetary Treatment of an Individual Mandate to Buy Health Insurance*, Aug. 1994, at 1, http://www.cbo.gov/ftpdocs/48xx/doc4816/doc38.pdf.

[2]/ 111 Pub. L. No. 148, 124 Stat. 119, 111th Cong., 2d Sess., Mar. 23, 2010, as amended by Health Care and Education Reconciliation Act ("HCERA"), 111 Pub. L. No. 152, 124 Stat. 1029, 111th Cong., 2d Sess., Mar. 30, 2010.

III.     Whether the imminent, threatened enforcement of Section 1501 against Plaintiffs

Mead, Seven-Sky, and Lee violates their rights under RFRA, 42 U.S.C. § 2000bb *et seq.*

IV.     Whether the Anti-Injunction Act bars Plaintiffs' claims.

## KEY ALLEGATIONS OF FACT

Section 1501 of the PPACA begins with a findings section that focuses *exclusively* upon

the purported Commerce Clause authority to enact the "individual responsibility requirement,"

that is, the requirement that every person buy and maintain health insurance.  (*See* Doc. 10 at ¶¶

95, 104); PPACA § 1501(a), as amended by § 10106(a).[3]/  The first substantive provision of

Section 1501 is the individual mandate, which states that "[a]n applicable individual shall for

each month beginning after 2013 ensure that the individual, and any dependent of the individual

who is an applicable individual, is covered under minimum essential coverage for such month."

(*See* Doc. 10 at ¶¶ 82, 89); PPACA § 1501(b), at § 5000A(a).

Under the heading of "shared responsibility payment," a separate subsection of Section

1501 imposes a "penalty" upon a taxpayer for each applicable individual within his or her

household who lacks health insurance coverage.  (*See* Doc. 10 at ¶¶ 85-86); PPACA § 1501(b),

at § 5000A(b)(1), as amended by § 10106(b)(1).  The "administration and procedure" subsection

of Section 1501 creates "special rules" ensuring that key traditional methods of tax enforcement

are not available for the Section 1501 penalty.  PPACA § 1501(b), at § 5000A(g).  Section 1501

sets a "flat dollar amount" of the penalty per uninsured person per year—$95 in 2014, $325 in

2015, $695 in 2016 and later (increased in 2017 and later in relation to cost-of-living

adjustments)—although the amount may be raised or lowered in certain circumstances.  (*See*

---

[3]/ In addition to the allegations in the Amended Complaint, (Doc. 10), copies of the
provisions of the PPACA and HCERA referred to in this memorandum are attached to Plaintiffs'
Motion for Summary Judgment at Doc. 12, Exs. A-B.

Doc. 10 at ¶¶ 89-91); PPACA § 1501(b), at § 5000A(c), as amended by § 10106(b)(2), (3), and as amended by HCERA § 1002.  Section 1501 then excludes certain persons from the definition of "applicable individual" and provides a few exemptions.  PPACA § 1501(b), at § 5000A(d), (e), as amended by § 10106(c), (d), and as amended by HCERA § 1002(b).  None of these provisions excuse Plaintiffs from having to comply with the individual mandate.  *See id.*; (Doc. 10 at ¶¶ 14, 27, 41, 55, 67).  Also, the PPACA does not include a severability provision.

Plaintiffs are United States citizens who do not currently have health insurance and do not want or need such insurance.  (Doc. 10 at ¶¶ 10, 13, 15, 23, 25, 37, 40, 51, 54, 56, 63, 66.) Plaintiffs are not exempted from Section 1501's requirements, and it is highly likely that they will be required to either maintain health insurance or pay significant annual penalties on a continuing, indefinite basis beginning in 2014.  (*Id.* at ¶¶ 14, 27, 41, 55, 67.)  For example, it is highly likely that Plaintiff Rodriguez will be required to pay, at a minimum, *$11,685 in penalties* on behalf of herself and her household through 2020.  (*Id.* at ¶ 74.)  As a direct result of Section 1501's inevitable impact upon Plaintiffs' finances and lifestyle, they are compelled to adjust their finances now, by setting aside money, and will continue to do so, to pay the annual penalty.  (*Id.* at ¶¶ 20-22, 34-36, 47-48, 50, 60-62, 73-75.)  Plaintiffs will be unable to use that money for other purposes now, directly limiting their ability to prudently plan for the future.  (*Id.*)

## MOTION TO DISMISS STANDARDS

"Under the standard set forth in [*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)], a 'court deciding a motion to dismiss must . . . assume all the allegations in the complaint are true (even if doubtful in fact). . . [and] must give the plaintiff the benefit of all reasonable inferences derived from the facts alleged.'"  *Bryant v. Pepco*, 2010 U.S. Dist. LEXIS 79968, at *6 (D.D.C. 2010) (Kessler, J.) (quoting *Aktieselskabet AF 21 November 2001 v. Fame Jeans, Inc.*, 525 F.3d

8, 18 (D.C. Cir. 2008)).  "In reviewing a motion to dismiss for lack of subject matter jurisdiction, the Court must accept as true all of the factual allegations set forth in the Complaint," although "the plaintiff bears the burden of proving by a preponderance of the evidence that the Court has subject matter jurisdiction to hear the case."  *Gulf Restoration Network, Inc. v. Nat'l Marine Fisheries Serv.*, 2010 U.S. Dist. LEXIS 81897, at *14 (D.D.C. 2010) (Kessler, J.).  "Under Fed. R. Civ. P. 12(b)(6), a plaintiff need only plead 'enough facts to state a claim to relief that is plausible on its face to nudge[] [his or her] claims across the line from conceivable to plausible.'"  *Bryant*, 2010 U.S. Dist. LEXIS 79968, at *5 (quoting *Twombly*, 550 U.S. at 570). Based on the governing standards and the allegations in the Amended Complaint, this Court should deny Defendants' Motion to Dismiss.

## ARGUMENT

**I.    PLAINTIFFS HAVE STANDING TO CHALLENGE SECTION 1501 OF THE PPACA AND THEIR CHALLENGE IS RIPE BECAUSE THEY ARE PRESENTLY INJURED, AND WILL CONTINUE TO BE INJURED, DUE TO THE EXISTENCE AND THREATENED ENFORCEMENT OF SECTION 1501.**

The Amended Complaint alleges that Plaintiffs would be forced to purchase and maintain health insurance or pay annual penalties for failing to do so if Section 1501 were effective immediately, and it is highly likely that each Plaintiff will continue to be subject to Section 1501's requirements for the indefinite future.  (Doc. 10 at ¶¶ 14, 27, 41, 55, 67.)  Plaintiffs have no reason to believe that their present situations will change so drastically that they would fall within one of Section 1501's narrow exemptions.[4]/  As such, they are compelled to adjust their

---

[4]/ Defendants' irrelevantly speculate whether Plaintiff Mead will effectuate her objection to being forced to have health insurance through declining to enroll in Medicare or promptly opting out after being automatically enrolled.  (Doc. 15 at 11, n.4.)  Mead clearly alleges that her religious convictions concerning health insurance squarely conflict with the requirements of Section 1501.  (Doc. 10 at ¶¶ 10-22.)  Defendants' red-herring argument is an attempt to obscure the fact that their standing arguments are unfounded; Plaintiffs have alleged facts sufficient to

*(Text of footnote continues on following page.)*

financial affairs now to prepare to pay thousands of dollars to the government.  The imminent threat of annual penalties, coupled with the immediate and significant impact upon Plaintiffs' financial priorities, gives rise to current, ripe injuries.  As such, in contrast to Defendants' assertions, Plaintiffs are not asking this Court to referee a mere "political dispute[]," (*see* Doc. 15 at 1), nor is Section 1501's application to them a "remote contingency," (*see id.* at 12.)

> The Supreme Court has explained that Article III standing consists of three elements:
>
> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'"  Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court."  Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations omitted).  "The party invoking federal jurisdiction bears the burden of establishing these elements."  *Id.* at 561.

A "particularized" injury is one that "affect[s] the plaintiff in a personal and individual way," *id.* at 560, n.1, while the element of "imminent" harm is "a somewhat elastic concept," *id.* at 564 n.2, that "requires only that the anticipated injury occur within some fixed period of time in the future, not that it happen in the colloquial sense of soon or precisely within a certain number of days, weeks, or months."  *Florida State Conference of NAACP v. Browning*, 522 F.3d 1153, 1161 (11th Cir. 2008).  The likelihood needed to establish the elements of standing, as explained by the D.C. Circuit, is a "substantial probability," not absolute certainty.  *St. John's United Church of Christ v. FAA*, 520 F.3d 460, 462 (D.C. Cir. 2008) (citing *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002)).  Regarding the second and third elements, the D.C. Circuit

---

demonstrate that at least one Plaintiff has standing to raise each claim, which is all that is required. *See Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996).

has stated that "[t]he requirement is only that the injury be 'fairly' traceable to governmental action and that it is 'likely' to be assuaged by judicial resolution.  Certainty is not a prerequisite." *Int'l Union of Bricklayers & Allied Craftsmen v. Meese*, 761 F.2d 798, 803 (D.C. Cir. 1985).

Concerning the ripeness of a plaintiff's injury, courts "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967).  The primary rationale of the ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements. . . ."  *Id.* at 148.  A case presenting *purely legal questions* (such as the present case) *is more fit for immediate review* than one with key unresolved factual issues.  *Id.* at 149; *United Church of Christ v. FCC*, 826 F.2d 101, 105 (D.C. Cir. 1987).

In addition, hardship to the parties is present when the law places the plaintiff in a "very real dilemma," "has a direct effect on the [plaintiff's] day-to-day business," or "requires an immediate and significant change in the plaintiffs' conduct of their affairs."  *Abbott Labs.*, 387 U.S. at 152-53.   In *Blanchette v. Connecticut General Insurance Corp. (Regional Rail Reorganization Act Cases)*, 419 U.S. 102 (1974), the Supreme Court stated, "[w]here the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect."  *Id.* at 143 (citations omitted).  Two factors leading the Court to hold that a challenge to provisions governing the conveyance of rail properties was ripe, despite the lack of an immediate threat of enforcement, were the absence of key factual disputes and the fact that "decisions to be made now or in the short future may be affected by whether or not the 'conveyance taking' issues are now decided."  *Id.* at 143-44 (citations omitted).

For Plaintiffs, maintaining the pre-PPACA status quo for their personal finances is not an

option.  Section 1501 forces Plaintiffs to choose now between two financially burdensome

alternatives:  restructure their finances to free up money to buy unwanted health insurance that

must be maintained indefinitely, or restructure their finances to free up money to pay penalties to

the government indefinitely on an annual basis.[5]  As in *Blanchette*, Plaintiffs' financial decisions

"to be made now or in the short future" are directly affected by whether the merits of their claims

are decided now.  *See id*.  A federal judge in Virginia recently recognized the present impact of

Section 1501 on States and individuals alike in denying the government's motion to dismiss:

> While the mandatory compliance provisions of the Minimum Essential Coverage
> Provision do not go into effect until 2014, that does not mean that its effects will not
> be felt by the Commonwealth in the near future.  *This provision will compel scores
> of people who are not currently enrolled to evaluate and contract for insurance
> coverage.*  Individuals currently insured will be required to be sure that their present
> plans comply with this regulatory regimen. . . . Unquestionably, this regulation
> radically changes the landscape of health insurance coverage in America.

*Virginia ex rel. Cuccinelli v. Sebelius*, No. 3:10-cv-188, Memorandum Opinion Denying Motion

to Dismiss, 2010 U.S. Dist. LEXIS 77678, slip op. at 16 (E.D. Va. Aug. 2, 2010) (emphasis

added).[6]  As such, Defendants' claim that "the jurisdictional ruling in [*Sebelius*] sheds no light

on the jurisdictional issues here" is unfounded.  (*See* Doc. 15 at 9, n.2.)

Consistent with *Abbott Labs.* and *Blanchette*, many cases have held that hardship is

---

[5]/ Defendants' speculation that something could conceivably happen between now and
the time that Section 1501 is enforced against Plaintiffs to place them within an exemption
demonstrates Defendants' misunderstanding of the *Blanchette* line of cases.  (*See* Doc. 15 at 10-
13.)  *Blanchette* and similar cases hold that a plaintiff has a ripe injury for purposes of Article III
standing when the statute at issue poses an imminent, unwelcome dilemma for the plaintiff
which, coupled with the realities of plaintiff's economic situation, leads the plaintiff to alter his
or her current behavior.  The ripe injury—*the impact on the plaintiff's current financial decision-
making*—is not made unripe simply because it is theoretically possible that something could
happen to prevent the statute's full enforcement against the plaintiff, as enforcement causes a
separate injury distinct from the impact on the plaintiff's financial decision-making.

[6]/ A copy of the *Sebelius* decision is attached to Plaintiffs' Motion for Summary
Judgment at Doc. 12, Ex. H.

present for ripeness purposes when a statute poses an imminent, unwelcome dilemma for the plaintiff, even when the government's enforcement of the provision will be delayed.  *See, e.g.*, *Pac. Gas & Elec. Co. v. State Energy Res. Conser. & Dev. Comm'n*, 461 U.S. 190 (1983) (holding a statutory challenge ripe because uncertainty over its legality affected the plaintiff's financial planning); *Lake Carriers' Ass'n v. Macmullan*, 406 U.S. 498 (1972) (holding a claim ripe because the plaintiff was compelled by practical circumstances to make changes to its sewage disposal systems to comply with a state law); *Triple G Landfills, Inc. v. Bd. of Comm'rs.*, 977 F.2d 287, 290 (7th Cir. 1992) (holding a claim ripe because the plaintiff's decisions "now or in the short future may be affected" by the court's decision to hear the case, while "[p]ostponing judicial action . . . would force an unwarranted dilemma upon [the plaintiff]").[7]/

The present case is similar to *Riva v. Massachusetts*, 61 F.3d 1003 (1st Cir. 1995), in which the court held that plaintiff Robert Keenan's challenge to a state accidental disability retirement scheme was ripe.  In 1994, Keenan (age 56 at the time) was notified that the monthly amount of accidental disability benefits that he received would likely be reduced in 2002 when he reached age 65 due to the law.  *Id.* at 1006.  Keenan promptly joined a suit challenging the law despite the seven-year gap until his benefits would be reduced; as the court phrased it, he "subscrib[ed] to the adage that an ounce of prevention is sometimes worth a pound of cure."  *Id.*

In discussing *Abbott Labs*, the court noted that the hardship prong entailed an analysis of whether "the challenged action creates a 'direct and immediate' dilemma for the parties'" and whether "the sought-after declaration would be of practical assistance in setting the underlying

---

[7]/ *McConnell v. FEC*, 540 U.S. 93, 224-26 (2003), is distinguishable because there is a key difference between a challenge to a provision that might affect decisions that the plaintiff *will make five years later* (such as the decisions that Senator McConnell would make immediately before a future election) and a challenge to a provision that has a *direct impact on the plaintiffs' decision-making now* (such as Plaintiffs' current financial planning in this case).

controversy to rest." *Id.* at 1009-10 (citations omitted).  The government argued that whether Keenan's benefits would actually be reduced was speculative because he could die before age 65, he could no longer be disabled at that age, or the state law could be amended over the next seven years.  *Id.* at 1011.  The court held that, despite these potential contingencies, Keenan's injury was "highly probable."  *Id.*  The court explained:

> In all events, *a litigant seeking shelter behind a ripeness defense must demonstrate more than a theoretical possibility that harm may be averted.*  The demise of a party or the repeal of a statute will always be possible in any case of delayed enforcement, yet it is well settled that a time delay, without more, will not render a claim of statutory invalidity unripe if the application of the statute is otherwise sufficiently probable. . . .  The degree of contingency is an important barometer of ripeness in this respect. . . .

*Id.* (emphasis added) (citing *Blanchette*, 419 U.S. at 143; *Macmullan*, 406 U.S. at 503-08).

Additionally, the court held that "the most immediate harm to Keenan comes in the form of an inability prudently to arrange his fiscal affairs."  *Id.* at 1012.  The court explained:

> If Keenan anticipates that his benefits will not be reduced, and guesses wrong, he may find himself inadequately prepared to subsist on the unwanted birthday present—a drastically reduced pension—that will accompany his attainment of age 65. Conversely, if he anticipates that the statute will be upheld, and guesses wrong, he may needlessly deprive himself in the intervening seven years, preparing for a rainy day that never dawns. We believe that this uncertainty and the considerations of utility that we have mentioned coalesce to show that Keenan is suffering a sufficient present injury to satisfy the second prong of the *Abbott Labs* paradigm.

*Id.* (citing, *inter alia*, *Pac. Gas*, 461 U.S. at 201).[8]/

Moreover, the harm to Plaintiffs' ability to arrange their fiscal affairs is similar in principle to forms of ripe economic injuries recognized in other cases.  For example, in *Stilwell*

---

[8]/ *Riva* is consistent with cases within the D.C. Circuit recognizing that various forms of economic harm can give rise to a ripe injury for standing purposes.  *See generally Brooks v. Air Line Pilots Ass'n, Int'l*, 630 F. Supp. 2d 52 (D.D.C. 2009) (stating that the harm in *Riva* of the receipt of less benefits was more likely to occur than the speculative harm alleged in *Brooks*; the court did not question or criticize *Riva*'s holdings concerning ripeness).  *Riva* also illustrates that Defendants' allegation that Plaintiffs' ripeness arguments "would nullify the imminence requirement of Article III" is baseless.  (*See* Doc. 15 at 1.)

*v. Office of Thrift Supervision*, 569 F.3d 514 (D.C. Cir. 2009), an investor challenged a regulation allowing subsidiaries of mutual holding companies to prevent any person from acquiring more than 10% of the subsidiary's stock within five years of the stock's issuance. The government argued that the plaintiff's claim was speculative because, although he had acquired more than 10% of minority stock in certain subsidiaries in the past and wanted to do so again in the future, it was impossible to determine at that time whether any specific mutual holding companies the plaintiff might decide to invest in would choose to adopt a 10% rule in the future. The D.C. Circuit Court held that the plaintiff could show a "'substantial probability' of injury as a result of the rule" in light of his "past practice and future investment plans." *Id.* at 518 (quoting *St. John's*, 520 F.3d at 462). The court concluded that it was likely that at least some mutual holding companies would adopt the 10% rule which would, in turn, likely "harm Stilwell's investment prospects" and "economic interests" because he expressed an intent to continue to obtain more than 10% of certain subsidiaries. *Id.* at 518-19.

Similarly, Plaintiffs' allegations, viewed in Plaintiffs' favor as they must be at this stage of these proceedings, indicate that there is a substantial probability that Plaintiffs will be required to pay thousands of dollars to the government in penalties due to their unwillingness to purchase and maintain health insurance. (Doc. 10 at ¶¶ 14, 27, 41, 55, 67.) This imposes a direct and substantial harm upon Plaintiffs' economic interests because they are required to readjust their fiscal affairs now to prepare to pay these penalties. (Doc. 10 at ¶¶ 20-22, 34-36, 47-48, 50, 60-62, 73-75.) The injury to Plaintiffs' economic interests falls within the class of economic or aesthetic injuries that courts have held to be sufficient to establish Article III standing.[9] As

---

[9] *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 183-84 (2000) (noting that a negative impact upon a plaintiff's "recreational, aesthetic, and economic interests" can constitute an injury-in-fact); *Clinton v. City of New York*, 524 U.S. 417, 432-33

*(Text of footnote continues on following page.)*

such, Plaintiffs' claims are ripe, and they have standing to proceed with their claims which present pure questions of law.  Defendants' Motion to Dismiss should be denied.

## II.   SECTION 1501 OF THE PPACA IS UNCONSTITUTIONAL BECAUSE IT EXCEEDS CONGRESS'S AUTHORITY UNDER ARTICLE I OF THE UNITED STATES CONSTITUTION.

The Supreme Court has noted that "[t]he Constitution creates a Federal Government of enumerated powers.  *See* U.S. Const. art. I, § 8.  As James Madison wrote, 'the powers delegated by the proposed Constitution to the federal government are few and defined.  Those which are to remain in the State governments are numerous and indefinite.'"  *United States v. Lopez*, 514 U.S. 549, 552 (1995) (quoting *The Federalist No. 45*, pp. 292-93 (C. Rossiter ed. 1961)).  The Amended Complaint sets forth plausible claims that Section 1501 of the PPACA exceeds the "few and defined" powers of Congress, including those provided by the Commerce, Necessary and Proper, and Taxing Clauses, and is therefore unconstitutional.  *See id.*

### A.   Section 1501 is not authorized by the Commerce Clause.

Article I, Section 8 of the Constitution grants Congress the power "[t]o regulate commerce with foreign nations, and among the several States, and with the Indian tribes." Although the scope of this power has been broadened from the original understanding of a power to "prescribe the rule by which commerce is to be governed," *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 196 (1824), the Supreme Court has consistently held that Congress's assertion and exercise of this power is not unlimited.

A review of four key Commerce Clause cases demonstrates that Section 1501 of the

_____

(1998) (finding a "sufficient likelihood of economic injury" and noting that the Court "routinely recognizes probable economic injury resulting from [governmental actions] that alter competitive conditions as sufficient to satisfy [Article III]"); *Assoc. of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 152 (1970) (holding that standing can be based on non-economic or economic injuries, such as increased competition that "might entail some future loss of profits").

PPACA exceeds the outer bounds of this power.  In particular, the Commerce Clause does not authorize Congress to "regulate" inactivity by requiring individuals to buy a good or service (such as health insurance) as a condition of their lawful residence in the United States, nor does it ignore the line between abstract *decision-making* and concrete economic or commercial *activity* that substantially affects interstate commerce.  In addition, the Commerce Clause does not license Congress to force new participants into a market in order to benefit existing, willing market participants, nor does it give Congress *carte blanche* to include unconstitutional provisions within a larger scheme of regulation of commercial activity.

### 1.  *Wickard v. Filburn*, 317 U.S. 111 (1942).

In *Wickard v. Filburn*, 317 U.S. 111 (1942), the Supreme Court upheld provisions of the Agricultural Adjustment Act that authorized a penalty to be imposed on the plaintiff for growing more wheat than the marketing quota set for his farm.  The Act limited wheat production to limit supply and stabilize market prices.  *Id.* at 115-16.  The plaintiff grew more than twice the quota for his farm; he typically sold a portion of his wheat in the marketplace, used a portion for feeding his livestock and home consumption, and kept the rest for future use.  *Id.* at 114-15.  He argued that the Act exceeded Congress's Commerce Clause power because the activities regulated were local and had only an indirect effect upon interstate commerce.  *Id.* at 119.  The Court upheld the Act, stating "even if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce."  *Id.* at 125.

The Court reviewed a summary of the economics of the wheat industry, which outlined the interrelationship between market prices and wheat supply in local communities, the United States, and the world, *id.* at 125-28, and observed that "[t]he effect of the statute before us is to

restrict the amount [of wheat] *which may be produced for market* and the extent as well to which one may forestall resort to the market by producing to meet his own needs." *Id.* at 127 (emphasis added). In other words, the penalty targeted farmers who, like the plaintiff, grew far more wheat than the amount needed to fill their own demand in order to *sell most of the excess in the market*; as such, *Wickard* does not stand for the proposition that Congress may regulate *non-economic activity*, or *inactivity*, that may have some relationship to interstate commerce. Rather, the Court held that Congress may regulate purely local *economic activity* (growing a marketable commodity that may be sold in the market or consumed by the grower) when that economic activity, taken in the aggregate, is directly tied to and substantially effects interstate commerce.

    *Wickard* provides no support for Section 1501 of the PPACA. The statute in *Wickard* targeted a specific *economic activity*—the over-production of wheat, the excess of which was often sold in the market—which substantially affected prices in the interstate market for that commodity. Congress could not have dealt with the issue of low wheat prices by declaring that all Americans must buy a specific amount of wheat or pay a penalty for failing to do so. An individual's decision to not buy a specific amount of wheat, when viewed in the aggregate, would certainly have impacted overall demand for wheat as well as wheat prices, yet the power "[t]o regulate commerce . . . among the several States," U.S. Const. art. I, § 8, would not authorize a mandate that individuals who do not want to buy wheat must do so. Similarly, *Wickard* provides no support for Section 1501's mandate that individuals who do not want to engage in a commercial transaction (purchasing health insurance) must do so. Contrary to Defendants' claim, Section 1501 does not "regulate[] economic activity far more directly" than the provisions upheld in *Wickard*. (*See* Doc. 15 at 27.)

2.      *United States v. Lopez*, **514 U.S. 549 (1995).**

*United States v. Lopez*, 514 U.S. 549 (1995), illustrates that Section 1501 exceeds Congress's authority.  In *Lopez*, the Court held that the Gun Free School Zones Act, which prohibited the possession of a firearm within 1,000 feet of a school, exceeded Congress's Commerce Clause authority because it had "nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms."  *Id.* at 561.  The Court discussed *Gibbons v. Ogden*—the Court's first comprehensive review of the Commerce Clause—which stated, "'[c]ommerce, undoubtedly, is traffic, but it is something more:  it is intercourse.  It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse.'"  *Id.* at 553 (quoting *Gibbons*, 22 U.S. at 189-90).  The *Gibbons* Court observed that the power to "regulate" commerce is the power to "'prescribe the rule by which commerce is to be governed'" and noted that "'[t]he enumeration [of the power] presupposes something not enumerated.'" *Id.* (quoting *Gibbons*, 22 U.S. at 194-95, 196); *see also id.* at 585-88 (Thomas, J., concurring) (noting that the original understanding of the Commerce Clause was much more limited than the Court's modern interpretation).

The *Lopez* Court reiterated the observation made in *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937), that the Commerce Clause "'must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government.'"  *Id.* at 557 (citation omitted).  The Court identified three "categories of activity" that the Commerce Clause authorizes Congress to regulate:

> First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities . . . that substantially affect interstate commerce.

*Id.* at 558-59 (citations omitted).

The Court summarized cases dealing with the third category of activity as holding that, "[w]here *economic activity* substantially affects interstate commerce, legislation regulating that activity will be sustained." *Id.* at 560 (emphasis added). The Act exceeded Congress's authority because gun possession was not economic activity, nor was the Act "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated. It cannot, therefore, be sustained under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." *Id.* at 561. The Court found it significant that the Act "'plows thoroughly new ground and represents a sharp break with the long-standing pattern of federal firearms legislation.'" *Id.* at 563 (citation omitted).

The government argued that the Court should focus on whether, through a chain of inferences, possession of guns in a school zone may, in the aggregate, substantially affect interstate commerce, rather than focusing on whether the statute targeted economic activity. For example, the government cited *the cost-shifting impact on the insurance system*, arguing that gun possession may lead to violent crime, and "the costs of violent crime are substantial, and, through the mechanism of insurance, those costs are spread throughout the population." *Id.* at 563-64. In rejecting these arguments, the Court responded by stating:

> We pause to consider the implications of the Government's arguments. The Government admits, under its "costs of crime" reasoning, that Congress could regulate not only all violent crime, but all activities that might lead to violent crime,

regardless of how tenuously they relate to interstate commerce. . . . Similarly, under the Government's "national productivity" reasoning, Congress could regulate any activity that it found was related to the economic productivity of individual citizens: family law (including marriage, divorce, and child custody), for example.  Under the theories that the Government presents in support of § 922(q), it is difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign.  *Thus, if we were to accept the Government's arguments, we are hard pressed to posit any activity by an individual that Congress is without power to regulate.*

*Id.* (emphasis added).

The Court noted, in rejecting the government's unduly expansive view of congressional power, that the Constitution "withhold[s] from Congress a plenary police power that would authorize enactment of every type of legislation," *id*. at 566, and stated,

[t]o uphold the Government's contentions here, we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States. . . .  To [expand the scope of the Commerce Clause] would require us to conclude that the Constitution's enumeration of powers does not presuppose something not enumerated, . . . and that there never will be a distinction between what is truly national and what is truly local. This we are unwilling to do.

*Id.* at 567-68 (citations omitted); *see also id.* at 577-78 (Kennedy, J., concurring) (noting the importance of federalism principles in interpreting the scope of the Commerce Clause).

Section 1501 does not withstand scrutiny under *Lopez*.  Being lawfully present within the United States, like possessing a gun within 1,000 feet of a school, is not a *commercial or economic activity* that substantially affects interstate commerce.  The cases *Lopez* relied upon referred to *ongoing commercial or economic activities* that Congress may regulate,[10]/ and provide no support for the assertion that the power to "'prescribe the rule by which commerce is to be governed'" includes the power to force those who do not want to engage in a commercial or economic activity to do so.  *See id.* at 553 (quoting *Gibbons*, 22 U.S. at 196).  As in *Lopez*,

---

[10]/ *See, e.g., United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 119 (1942); *United States v. Darby*, 312 U.S. 100, 118 (1941); *Gibbons*, 22 U.S. at 196.

"[t]o uphold the Government's contentions here, we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Id.* at 567.

A review of Section 1501's findings illustrates that Congress's assertion of Commerce Clause power is unprecedented in its reach.  First and foremost, Congress sought to obscure entirely the distinction between inactivity and economic activity, stating "[t]he requirement *regulates activity* that is commercial and economic in nature:  economic and financial decisions about how and when health care is paid for, and when health insurance is purchased."  PPACA § 1501(a)(2)(A), as amended by § 10106(a) (emphasis added).  In other words, Congress asserted that being lawfully present in the United States without health insurance is the economic activity of deciding to not buy health insurance; as such, Congress may "regulate" that economic activity by requiring individuals to make a different economic decision, *i.e.*, buy health insurance.  Under this reasoning, virtually any decision to not buy a good or service would be "economic activity" that can be targeted by a law requiring individuals to buy that good or service.

Defendants' attempt to convert inaction into action is fundamentally flawed because it equates abstract economic *decision-making* with concrete economic *activity*.  (*See* Doc. 15 at 4, 19, 21.)  Most American adults make numerous choices on a daily basis concerning when and whether to spend money on an array of goods and services.  A person may choose to buy X and choose not to buy Y.  Under Congress's reasoning, so long as Congress has the authority to regulate the interstate market for Y (which is often the case), it can mandate that all individuals take part in the market for Y as consumers.  Congress would merely need to assert that decisions about whether to purchase Y are commercial and economic in nature, and that individuals'

decisions to not buy Y substantially affect interstate commerce.[11]/

In addition, Congress stated that "[t]he economy loses up to $207,000,000,000 a year because of the poorer health and shorter lifespan of the uninsured," and Section 1501 would "significantly reduce this economic cost." PPACA § 1501(a)(2)(E), as amended by § 10106(a). If the economic impact of Americans' poorer health and shorter lifespans provided a sufficient basis for Congress to mandate that individuals buy health insurance, then Congress could also mandate that individuals take other actions that Congress deems necessary to improve health and lengthen life expectancies—such as requiring Americans to buy a gym membership, maintain a specific body weight, or eat a healthier diet—or pay penalties for failing to do so.

Congress also alleged that Section 1501 would lower the cost of health insurance premiums because "[t]he cost of providing uncompensated care to the uninsured was $43,000,000,000 in 2008," which was passed on to private insurers and individuals who have private insurance. PPACA § 1501(a)(2)(F), as amended by § 10106(a).[12]/ The government

---

[11]/ Defendants' argument that Section 1501 is constitutional because individuals who lack insurance "skew premiums upward for the insured population" is particularly troubling. (*See* Doc. 15 at 26.) Defendants' argument is based on the idea that, if more people joined the insurance market, premiums would be less for members of the insured population because the risk pool would be larger. A similar argument, however, could be made for virtually any market: those who choose to not buy a particular commodity could be said to "skew [prices] upward" for those who choose to buy that commodity because an increased demand would, in theory, lead to lower prices. Such an expansive view of Congressional authority is unprecedented.

[12]/ Mandates that doctors and hospitals provide certain services, regardless of the recipient's ability to pay, are responsible for severely distorting the health care market. *See, e.g.*, Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd. The existence of large sums of so-called "uncompensated" care is unsurprising because, by definition, someone other than the recipient (taxpayers, the health care provider, other health care consumers, insurance companies, etc.) will end up bearing the cost for such care. (*See* Doc. 15 at 25.) Any federal law designed to address how such care is paid for, no matter how well intentioned, must comply with the Constitution, and the PPACA exceeds Congress's authority.

made a virtually identical cost-shifting argument in *Lopez*,[13]/ but the Supreme Court held that Congress can only reach "*economic activity*" that substantially affects interstate commerce; neither gun possession nor lawful presence in the United States is economic activity.

Moreover, Congress declared that requiring individuals to buy health insurance will benefit those who participate in the health insurance market by "increasing the supply of, and demand for, health care services," "reduc[ing] administrative costs and lower[ing] health insurance premiums," "broaden[ing] the health insurance risk pool to include healthy individuals," and "creating effective health insurance markets in which improved health insurance products that are guaranteed issue and do not exclude coverage of pre-existing conditions can be sold."  PPACA § 1501(a)(2)(C), (I), (J), as amended by § 10106(a).  The Commerce Clause has never been understood, however, to allow Congress to force unwilling buyers into a market to remedy perceived market shortcomings, and Congress has never previously tried to do so.  As Judge Henry Hudson recently noted in a case involving the PPACA, Section 1501 "literally forges new ground and extends Commerce Clause powers beyond its current high water mark."  (Doc. 12, Ex. H, *Sebelius*, No. 3:10-cv-188, slip op. at 18.)

There have been many times throughout American history when changing market conditions was a desirable goal, yet

> never before has [Congress] used its commerce power to mandate that an individual person engage in an economic transaction with a private company.  Regulating the auto industry or paying "cash for clunkers" is one thing; making everyone buy a Chevy is quite another.  Even during World War II, the federal government did not mandate that individual citizens purchase war bonds.

Randy E. Barnett, *Is health-care reform constitutional?*, WASH. POST., Mar. 21, 2010, at B2.

---

[13]/ The government stated in its merits brief in *Lopez*, "[t]he economic consequences of criminal behavior are substantial . . . and, through the mechanism of insurance, spread throughout the population."  Brief of the United States, at *28, n.9, *United States v. Lopez*, 514 U.S. 549 (No. 93-1260), 1994 U.S. S. Ct. Briefs LEXIS 410 (footnote omitted).

Although the PPACA is the first federal law to cross the line between *encouraging* increased market activity and *mandating* individual purchases, it will certainly not be the last if it is upheld.

### 3.     *United States v. Morrison*, 529 U.S. 598 (2000).

*United States v. Morrison*, 529 U.S. 598 (2000), also demonstrates that Section 1501 exceeds Congress's power.  In *Morrison*, the Court held that Section 13981 of the Violence Against Women Act, which provided a civil remedy for victims of gender-motivated violence, exceeded Congress's Commerce Clause authority because "[g]ender-motivated crimes of violence are not, in any sense of the phrase, *economic activity*."  *Id.* at 613 (emphasis added). Congress found that gender-motivated violence deters interstate travel and commerce, diminishes national productivity, increases medical costs, and decreases the supply of and demand for interstate products, *id.* at 615, but the Court rejected the argument "that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce."  *Id.* at 617-18.  The Court noted that cases in which it had upheld an assertion of Commerce Clause authority due to the regulated activity's substantial effects on interstate commerce involved the regulation of "commerce," an "economic enterprise," "economic activity," or "some sort of economic endeavor."  *Id.* at 610-11.  The Court observed that the government's attenuated method of reasoning was similar to the reasoning offered in *Lopez* and raised concerns that "Congress might use the Commerce Clause to completely obliterate the Constitution's distinction between national and local authority."  *Id.* at 615.

*Morrison* illustrates that Section 1501 exceeds Congress's Commerce Clause authority for the same reasons cited above with respect to *Lopez*.  Following the attenuated chain of inferences offered in support of Section 1501 would lead to an unchecked federal police power allowing Congress to, for the first time, mandate a host of purchases by individuals.

### 4. *Gonzalez v. Raich*, 545 U.S. 1 (2005).

*Gonzales v. Raich*, 545 U.S. 1 (2005), also does not support Section 1501. In *Raich*, the Court considered "whether Congress' power to regulate interstate markets for medicinal substances encompasses the portions of those markets that are supplied with drugs produced and consumed locally." *Id.* at 9. The Controlled Substances Act (CSA) created a "closed regulatory system" governing the manufacture, distribution, and possession of controlled substances in order to "conquer drug abuse and to control the legitimate and illegitimate traffic in controlled substances." *Id.* at 12-13. Under the CSA, the manufacture, distribution, or possession of marijuana was a criminal offense. *Id.* at 14.

California residents who wanted to use marijuana for medicinal purposes under state law brought an as-applied challenge to the CSA. Importantly, the Court emphasized that

> Respondents in this case do not dispute that passage of the CSA, as part of the Comprehensive Drug Abuse Prevention and Control Act, was well within Congress' commerce power. . . . *Nor do they contend that any provision or section of the CSA amounts to an unconstitutional exercise of congressional authority.* Rather, respondents' challenge is actually quite limited; they argue that the CSA's categorical prohibition of the manufacture and possession of marijuana *as applied to the intrastate manufacture and possession of marijuana for medical purposes* pursuant to California law exceeds Congress' authority under the Commerce Clause.

*Id.* at 15 (emphasis added).

The Court held that "[t]he CSA is a valid exercise of federal power, even as applied to the troubling facts of this case." *Id.* at 9. The Court stated, "[o]ur case law firmly establishes Congress' power to regulate purely local activities that are *part of an economic 'class of activities'* that have a substantial effect on interstate commerce." *Id.* at 17 (citations omitted) (emphasis added). Moreover, "[w]hen Congress decides that the 'total incidence' of a practice poses a threat to a national market, it may regulate the entire class." *Id.* (citing *Perez*, 402 U.S.

at 154-55).   As such, "when 'a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence.'"  *Id.*  (citation omitted).

The Court stated that *Wickard*'s key holding was that "Congress can regulate purely intrastate activity that is not itself 'commercial,' in that it is not produced for sale, if it concludes that failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity."  *Id.* at 18.  The Court declared that in both *Wickard* and the case before it, "the regulation is squarely within Congress' commerce power because production of the commodity meant for home consumption, be it wheat or marijuana, has a substantial effect on supply and demand in the national market for that commodity."  *Id.* at 19.  Moreover, "the activities regulated by the CSA *are quintessentially economic*. . . .  The CSA is a statute that regulates the production, distribution, and consumption of commodities for which there is an established, and lucrative, interstate market."  *Id.* at 25-26 (emphasis added).

The Court reiterated that, "'[w]here the class of activities is regulated and that class is within the reach of federal power, the courts have no power to excise, as trivial, individual instances of the class.'"  *Id.* at 23 (quoting *Perez*, 402 U.S. at 154).  Since the manufacture and distribution of marijuana was an *economic class of activity* that Congress could regulate,

> Congress had a rational basis for believing that failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the CSA. Thus, as in *Wickard*, when it enacted comprehensive legislation to regulate the interstate market in a fungible commodity, Congress was acting well within its authority to "make all Laws which shall be necessary and proper" to "regulate Commerce . . . among the several States." . . .  That the regulation ensnares some purely intrastate activity is of no moment.  As we have done many times before, we refuse to excise individual components of that larger scheme.

*Id.* at 22.  The Court described the marijuana ban as "merely one of many 'essential part[s] of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless

the intrastate activity were regulated.'" *Id.* at 24-25 (quoting *Lopez*, 514 U.S. at 561).

*Raich* provides no support for Section 1501.  Unlike *Raich*, this is not an as-applied challenge to a concededly valid regulatory scheme.  Rather, Plaintiffs contend that Section 1501 exceeds Congress's authority and should be declared unconstitutional.  (Doc. 10 at pp. 21-24, 26-27.)  Thus, *Raich*'s emphasis on the reluctance of courts to prohibit individual applications of a valid statutory scheme due to the *de minimis* nature of the impact of the plaintiff's local conduct is not implicated by this case.

In addition, the statute in *Raich* (like the statute in *Wickard*) sought to discourage an ongoing "quintessentially economic" activity:  "the production, distribution, and consumption of commodities for which there is an established, and lucrative, interstate market."  *Id.* at 25-26. The Court repeatedly emphasized that the substantial effects test governs the authority of Congress to target "activities that are part of an *economic 'class of activities*.'"  *Id.* at 17 (emphasis added) (citation omitted).  Since the statutory scheme was concededly valid, the Court presupposed that "the [regulated] class of activities . . . [was] within the reach of federal power." *Id.* at 23.  By contrast, Section 1501 does not regulate an ongoing economic class of activities "within the reach of federal power."  *See id.*  Lawful presence in the United States, without more, is not an economic class of activities akin to the production and distribution of a marketable commodity.  *Raich* does not support the idea that the targeted economic class of activities does not need to consist of *activity* but includes abstract decisions to not purchase a good or service.

Through the PPACA, Congress is not seeking to regulate existing local economic activity as a necessary component of regulating that type of economic activity nationwide but rather is forcing individuals who are not engaged in the economic activity of buying and maintaining health insurance to do so.  The government can find no support from *Wickard*, *Raich*, or other

cases for the proposition that Congress can—for the first time in our Nation's history—declare

that individuals who are not engaging in a particular economic activity must do so solely because

other statutory provisions are attached to and connected with that mandate.[14]/

In addition, statements in *Lopez* and *Raich* concerning Congress's ability to enact a

regulatory scheme targeting interstate economic activity that encompasses some purely local

economic activity have no bearing upon Section 1501.  Although the Court noted in *Raich* that

the laws upheld in *Wickard* and *Raich* were essential parts of a regulatory scheme, *Raich* does

*not* stand for the broad proposition that Congress has free reign to pass otherwise

unconstitutional laws by including them within a larger regulatory program.  *Wickard* and *Raich*

held only that federal regulation of a particular type of economic activity—the production and

consumption of a marketable commodity—can, in some circumstances, be applied to reach that

type of existing economic activity at a purely local level when doing so is necessary and proper

to the effective national regulation of that economic activity.[15]/  As such, the Amended

---

[14]/ Defendants mask the unprecedented nature of Section 1501 by characterizing it as a modest requirement to pay for expected health care purchases in advance through insurance, rather than paying for them out of pocket as they arise, akin to a choice between paying for something by credit card or check.  (Doc. 15 at 2, 26-27.)  This analogy is flawed.  It is misleading to state that medical care is paid for in advance through the purchase of insurance— or to opine that Congress could "requir[e] that individuals tender their insurance coverage as payment," (Doc. 15 at 27)—because insurance only pays *for a percentage* of any health care services rendered (often a small one) in most instances.  An insured person is still responsible to pay deductibles, co-pays, a percentage of the cost of any care rendered, and other costs out-of-pocket.  As such, Congress has *not* merely chosen the method by which a consumer voluntarily pays for goods or services (check, credit card, etc.) but rather has dictated that all Americans join a distinct, risk-based insurance market in order to lessen, but not eliminate, speculative future out-of-pocket costs of hypothetical health care purchases they may make in the future.

[15]/ *Raich* does not stand for the broad proposition, at Defendants' suggest, that "[i]n exercising its Commerce Clause power, Congress may reach even wholly intrastate, non-commercial matters when it concludes that failure to do so would undercut the operation of a larger program regulating interstate commerce."  (*See* Doc. 15 at 17.)  While Congress lacks the authority to force unwilling participants into a market directly under the guise of the Commerce

*(Text of footnote continues on following page.)*

Complaint sets forth plausible claims that the PPACA exceeds Congress's Commerce Clause authority.  (Doc. 10.)  This Court should deny Defendants' Motion to Dismiss.

### B.    Section 1501 is not authorized by the Necessary and Proper Clause.

Article I, Section 8 of the Constitution grants Congress the power "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."  Section 1501 exceeds Congress's authority under this Clause, a provision that the Supreme Court has characterized as "the last, best hope of those who defend *ultra vires* congressional action."  *Printz v. United States*, 521 U.S. 898, 923 (1997).

In a recent case, *United States v. Comstock*, 130 S. Ct. 1949 (2010), the Court upheld a federal civil commitment statute that authorized the continued detention of mentally ill, sexually dangerous federal prisoners beyond their normal release date.  The Court based its conclusion "on five considerations, taken together":

> (1) the breadth of the Necessary and Proper Clause, (2) the long history of federal involvement in this arena, (3) the sound reasons for the statute's enactment in light of the Government's custodial interest in safeguarding the public from dangers posed by those in federal custody, (4) the statute's accommodation of state interests, and (5) the statute's narrow scope.

*Id.* at 1956, 1965.

Regarding the first factor, the Court stated that "the Necessary and Proper Clause grants Congress broad authority to enact federal legislation."  *Id.* at 1956.  The Court quoted *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819), which stated, "'[l]et the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly

---

Clause, it also cannot bypass the limits on its authority by imposing heavy regulatory burdens upon existing participants in a market that threaten to weaken or destroy that market absent universal participation and then, as a purported "essential" part of a regulatory scheme, force millions of unwilling participants into that market in order to save it.  (*See* Doc. 15 at 6.)

adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.'" *Id.* (quoting *McCulloch*, 17 U.S. at 421).  A statute based upon the Necessary and Proper Clause must be "a means that is rationally related to the implementation of a constitutionally enumerated power." *Id.*  For example, the Clause allows Congress to create federal crimes that are tied to an enumerated power, authorize the creation of federal prisons to hold offenders, and set rules governing prisons and prisoners. *Id.* at 1957-58.

With regard to the second and third factors, the Court characterized the statute as "a modest addition to a set of federal prison-related mental-health statutes that have existed for many decades." *Id.* at 1958.  The statute at issue, enacted in 2006, was a relatively minor supplement to another statute "which, since 1949, has authorized the postsentence detention of federal prisoners who suffer from a mental illness and who are thereby dangerous (whether sexually or otherwise)." *Id.* at 1961.  The statute satisfied "'review for means-end rationality'" because it "represent[ed] a rational means for implementing a constitutional grant of legislative authority." *Id.* at 1962.  The Court held that the statute was "reasonably adapted" to "Congress' power to act as a responsible federal custodian." *Id.* at 1961.

The Court also held that the statute met the fourth factor of "properly account[ing] for state interests." *Id.* at 1962.  The statute "require[d] *accommodation* of state interests" by providing the state in which the prisoner lived or was tried with a right to assume responsibility for the prisoner, which would end federal government involvement. *Id.* at 1962-63.

Finally, the Court held that "the links between [the statute] and an enumerated Article I power are not too attenuated.  Neither is the statutory provision too sweeping in its scope." *Id.* at 1963.  The link between the power to criminalize conduct that interferes with the exercise of an enumerated power and the power to imprison offenders is a close one, as is the link between the

power to imprison and the power to maintain rules that ensure that prisoners do not endanger the safety of other prisoners or the public. *Id.* at 1964. Importantly, the Court's holding would not "confer[] on Congress a general 'police power, which the Founders denied the National Government and reposed in the States'" because the statute was "narrow in scope." *Id.* (quoting *Morrison*, 529 U.S. at 618). The statute had "been applied to only a small fraction of federal prisoners," and its reach was "limited to individuals already in the custody of the Federal Government." *Id.* (citations omitted). As such, the Court concluded that the statute was "a reasonably adapted and narrowly tailored means of pursuing the Government's legitimate interest as a federal custodian in the responsible administration of its prison system." *Id.* at 1965.

*Comstock* illustrates that Section 1501 exceeds Congress's authority under the Necessary and Proper Clause. Unlike the statute at issue in *Comstock*, Section 1501 is not "a modest addition" to previous federal law but rather is "sweeping in its scope." *See id.* at 1958, 1963. There is no long history of federal mandates requiring individuals to purchase health insurance, or to purchase any good or service for that matter. It takes an immense (and unconstitutional) leap to go from imposing regulations upon health insurance companies and providing public insurance programs to mandating individual participation in the health insurance market.

Moreover, Section 1501 tramples upon state interests. Prior to Section 1501, states were free to determine for themselves whether to adopt a mandatory insurance system similar to Massachusetts's or maintain a voluntary free market system. *See* PPACA § 1501(a)(2)(D), as amended by § 10106(a). That is no longer the case. If Section 1501 is upheld, many similar federal laws requiring individuals to buy goods or services would be possible (perhaps likely), further eroding state and local government authority in favor of a broad federal police power.

In addition, the Constitution does not give Congress *carte blanche* to enact any and every

statute of its choosing so long as it bears some rational connection to a larger regulatory scheme.

*See generally Comstock*, 130 S. Ct. at 1970 (Alito, J., concurring) ("The Necessary and Proper

Clause does not give Congress *carte blanche*").  Section 1501's findings section declares:

> Under the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1001 *et seq.*), the Public Health Service Act (42 U.S.C. 201 *et seq.*), and this Act, the Federal Government has a significant role in regulating health insurance.  [Section 1501] is an essential part of this larger regulation of economic activity, and the absence of the requirement would undercut Federal regulation of the health insurance market.

PPACA § 1501(a)(2)(H), as amended by § 10106(a).  Congress made a similar argument with

respect to Section 1501's connection to PPACA provisions prohibiting insurance companies

from denying coverage based upon preexisting medical conditions, arguing that Section 1501

will "broaden the health insurance risk pool to include healthy individuals, which will lower

health insurance premiums."   PPACA § 1501(a)(2)(I), as amended by § 10106(a).   *The

implications of this line of reasoning are stunning*.  Congress has declared that it can mandate

individual participation in an interstate market so long as 1) it has the authority to regulate the

market itself, and 2) mandating individual participation in the market would, in Congress's view,

benefit the market's present participants by, for example, lowering prices, increasing demand, or

making better products available.  Such a broad, unprecedented assertion of power fails the test

for "means-end rationality," *see Comstock*, 130 S. Ct. at 1961-62, and is not "appropriate" or

"consist[ent] with the letter and spirit of the constitution," *McCulloch*, 17 U.S. at 421.

For example, Congressional power to regulate the interstate market for automobiles does

not include the power to mandate that individuals either buy an automobile or pay a penalty,

even though such a mandate would increase demand and likely lower prices, and virtually all

individuals will, at some point, participate in the broader market for transportation.  Similarly,

Congress's authority to regulate banking and the stock market does not give rise to a power to

mandate that all individuals maintain a certain amount of money in a bank account or buy stocks, even though such a mandate could benefit the economy.   Like Section 1501, such broad assertions of Congressional power would greatly exceed the bounds of Congress's authority. Defendants' Motion to Dismiss should be denied.

> **C.**     **Section 1501 is not authorized by the taxing power.**

Congress based Section 1501 solely upon its assertion of Commerce Clause power (coupled with the Necessary and Proper Clause).   PPACA § 1501(a), as amended by § 10106(a). Because Section 1501 exceeds those constitutional grants of authority, Defendants seek to save Section 1501 by invoking Congress's taxing power.   (Doc. 15 at 28-34.)   This attempt to breathe new life into Section 1501 is flawed for several reasons.

It is important to note initially that, when a court is presented with the question of which Congressional power(s) a statute was enacted under, *the character of the statute itself* is determinative, not the federal government's characterization of the statute during litigation.   *See, e.g., Ry. Execs. Ass'n v. Gibbons*, 455 U.S. 457, 465-66 (1982) (rejecting the government's claim that Congress enacted a statute under the Commerce Clause rather than under the Bankruptcy Clause); *Bd. of Trs. of the Univ. of Ill. v. United States*, 289 U.S. 48, 58-59 (1933) (stating that courts should be reluctant to recharacterize a statute that, on its face, has the purpose of imposing a Commerce Clause regulatory penalty as one that is merely a revenue-raising tax measure). This is particularly true where, as here, Plaintiffs' claims need only be plausible at this stage of the proceedings.

> **1.**     **Congress relied exclusively upon its assertion of Commerce Clause power in Section 1501 and included the "penalty" as a regulatory measure expressly tied to the individual mandate, not a tax.**

Several aspects of Section 1501 demonstrate that the "penalty" or "shared responsibility

payment" for failing to maintain health insurance was enacted as a *regulatory penalty* under Congress's assertion of Commerce Clause authority, *not a "tax."*   *See generally* Randy E. Barnett, *The Insurance Mandate in Peril*, WALL ST. J., Apr. 29, 2010, at A19 (discussing the eleventh hour attempt of PPACA supporters to recharacterize the Section 1501 penalty as a "tax" rather than a regulatory penalty, and observing that "the Supreme Court will not consider the penalty enforcing the mandate to be a tax because, in the provision that actually defines and imposes the mandate and penalty, Congress did not call it a tax and did not treat it as a tax").

First, the congressional findings subsection of Section 1501 relies *exclusively upon the Commerce Clause* as the constitutional basis for the "individual responsibility requirement" (the mandate to buy health insurance).   PPACA § 1501(a), as amended by § 10106(a).   The first finding declares that the mandate to purchase health insurance "is commercial and economic in nature, and substantially affects interstate commerce, as a result of the effects described in paragraph (2)."   PPACA § 1501(a)(1).   The second paragraph, entitled "[e]ffects on the national economy and interstate commerce," includes statements made to bolster Congress's assertion of Commerce Clause power and focuses exclusively on the goal of forcing people into the insurance market.   PPACA § 1501(a)(2), as amended by § 10106(a).   The findings do not mention the tax power, which is unsurprising since Section 1501's obvious purpose is to force millions of Americans into the health insurance market rather than generate tax revenue.   *See id.*

Second, Congress linked the penalty to the individual mandate such that the penalty *becomes meaningless and unenforceable* if the individual mandate is declared invalid.   The first substantive provision of Section 1501 is the individual mandate which states, "[a]n applicable individual shall for each month beginning after 2013 ensure that the individual, and any dependent of the individual who is an applicable individual, is covered under minimum essential

coverage for such month."  PPACA § 1501(b), at § 5000A(a).  The penalty provision states:

> If a taxpayer who is an applicable individual, or an applicable individual for whom the taxpayer is liable under paragraph (3), *fails to meet the requirement of subsection (a)* [*i.e.*, the individual mandate] for 1 or more months, then, except as provided in subsection (e) [which provides certain exemptions], there is hereby imposed on the taxpayer a *penalty with respect to such failures* in the amount determined under subsection (c).

PPACA § 1501(b), at § 5000A(b)(1), as amended by § 10106(b)(1) (emphasis added).  Since Congress rested both the individual mandate and the penalty provision exclusively on its assertion of Commerce Clause power, a holding that the individual mandate exceeds the Commerce Clause power would invalidate the penalty provision as well.

In addition, Congress distinguished between a "tax" and a "penalty" throughout the PPACA.  While Section 1501 imposes a "penalty" while expressly relying upon the Commerce Clause, other sections of the PPACA impose a "tax" on particular activities or entities.  PPACA §§ 9001, 9004, 9015, 9017.  Contrary to Defendants' suggestion, Congress's choice to impose a "penalty" in Section 1501 and a "tax" elsewhere *does matter*.  (*See* Doc. 15 at 30, n.14.)

> "[A] tax is a pecuniary burden laid upon individuals or property for the purpose of supporting the Government."  *United States v. Reorganized CF&I Fabricators of Utah, Inc.*, 518 U.S. 213, 224, 116 S. Ct. 2106, 2112 (1996) (internal citations omitted).  On the other hand, a penalty imports the notion of a punishment for an unlawful act or omission.  *Id.*  "The two words [tax vs. penalty] are not interchangeable . . . and if an exaction [is] clearly a penalty it cannot be converted into a tax by the simple expedient of calling it such."  *United States v. La Franca*, 282 U.S. 568, 572, 51 S. Ct. 278, 280 (1931).

(Doc. 12, Ex. H, *Sebelius*, No. 3:10-cv-188, slip op. at 26, n.7.)  Although the "practical operation" of a provision is more informative than "the precise form of descriptive words which may be applied to it," *Nelson v. Sears, Roebuck & Co.*, 312 U.S. 359, 363 (1941), it is telling that both the practical operation of the penalty *and* the words Congress used to create it are tied to the congressional purpose of forcing many more Americans into the health insurance market.  (*See*

Doc. 12, Ex. H, *Sebelius*, No. 3:10-cv-188, slip op. at 1, 4, 11, 15, 16, 24, 30, 31) (referring to the Section 1501 penalty as a "penalty," "fine," or "monetary assessment" rather than as a "tax").

Moreover, Congress prohibited the use of key traditional tax enforcement measures to limit the government's ability to collect the Section 1501 penalty.  The Special Rules subsection of Section 1501 declares that a person "shall not be subject to any criminal prosecution or penalty" for failing to timely pay the penalty.  PPACA § 1501(b), at § 5000A(g)(2)(A).  In addition, "[t]he Secretary shall not . . . file notice of lien with respect to any property of a taxpayer by reason of any failure to pay the penalty imposed by this section," or "levy on any such property with respect to such failure."  PPACA § 1501(b), at § 5000A(g)(2)(B).

> **2.     Section 1501's penalty provisions exceed Congress's taxing power because they exist solely to further a regulatory provision—the individual mandate—that is "extraneous to any tax need" and exceeds Congress's Commerce Clause power.**

The key question concerning the alleged tax authority for Section 1501 is whether the PPACA's text demonstrates that the penalty 1) is primarily regulatory in nature, in furtherance of regulatory provisions "extraneous to any tax need" that exceed Congress's power to regulate, *see United States v. Kahriger*, 345 U.S. 22, 31 (1953), *overruled in part on other grounds by Marchetti v. United States*, 390 U.S. 39 (1968); or 2) is in the nature of a true tax, that is, an "exaction for the support of the Government," *see United States v. Butler*, 297 U.S. 1, 61 (1936).

As discussed previously, Section 1501's text clearly indicates that Congress included the penalty for failing to maintain health insurance as a regulatory penalty under its assertion of Commerce Clause authority, not as "an exaction for the support of the Government" divorced from any purely regulatory provisions.  *See Butler*, 297 U.S. at 61.  The key part of Section 1501 is the individual mandate, which exceeds Congress's power under the Commerce Clause.  The individual mandate is a regulatory provision "extraneous to any tax need," *see Kahriger*, 345

U.S. at 31, since requiring individuals to buy private health insurance does not produce revenues

for the government.[16]/   Section 1501's penalty exists solely to further the individual mandate,

and courts should not look past the text for other "hidden motives."   *See Sonzinsky v. United*

*States*, 300 U.S. 506, 513-14 (1937).   As such, Section 1501 exceeds Congress's taxing power.[17]/

This Court should deny Defendants' Motion to Dismiss.

---

[16]/ Defendants' citation to snippets of legislative history cannot override the wholly regulatory nature of Section 1501's text.  (*See* Doc. 15 at 30-31.)  Congress's Joint Committee on Taxation has treated the individual mandate and related penalty provisions as separate and distinct from the "revenue provisions" of the PPACA.  In four different reports issued from November 2009 to March 2010, the Committee estimated the revenue effects of roughly two dozen "revenue provisions" of the PPACA (as amended by the Manager's Amendment and the reconciliation act) such as, for example, the excise tax on indoor tanning services.  Section 1501's penalty provisions were *not* included as a revenue provision in these reports.  Joint Comm. on Taxation, JCX-17-10, Mar. 20, 2010; Joint Comm. on Taxation, JCX-16-10, Mar. 18, 2010; Joint Comm. on Taxation, JCX-61-09, Dec. 19, 2009; Joint Comm. on Taxation, JCX-55-09, Nov. 18, 2009.  Although an eleventh hour report dated the same day that the House approved the PPACA attempted to recast Section 1501's penalty as an "excise tax," it tellingly included Section 1501 in a discussion of *regulatory provisions* rather than in the discussion of "revenue provisions."  Joint Comm. on Taxation, JCX-18-10, Mar. 21, 2010.

[17]/ A footnote in *Bob Jones University v. Simon*, 416 U.S. 725 (1973), stating that the Court had abandoned "distinctions between regulatory and revenue-raising taxes" in *Sonzinsky* did not signal the demise of *Bailey v. Drexel Furniture Co. (Child Labor Tax Case)*, 259 U.S. 20 (1922), or *Butler*, cited in the text above.  416 U.S. at 741 n.12.  Given that *Sonzinsky* cited *Bailey* with approval, the footnote merely reiterated what *Sonzinsky* itself held:  that a court should not look for a regulatory "hidden motive" when a statute's text does not reveal one. *Bailey* and *Butler* have continued to be quoted or cited with approval on various points since *Bob Jones University.  See, e.g., Rosenberger v. Rector & Visitors of the Univ. of Virginia.*, 515 U.S. 819, 840-41 (1995) (quoting *Butler*, 297 U.S. at 61) (distinguishing a university student activities fee program from "an exaction for the support of the Government"); *Dep't of Revenue v. Kurth Ranch*, 511 U.S. 767, 779 (1994) (stating, "we have . . . recognized that 'there comes a time in the extension of the penalizing features of the so-called tax when it loses its character as such and becomes a mere penalty with the characteristics of regulation and punishment'") (quoting *Magnano Co. v. Hamilton*, 292 U.S. 40, 44, 46 (1934) (quoting *Bailey*, 259 U.S. at 38)); *South Dakota v. Dole*, 483 U.S. 203, 206-07, 209-10 (1987) (citing with approval *Butler*'s discussion of the scope of Congress's spending authority); *id.* at 212-13, 216-17 (O'Connor, J., dissenting) (noting that *Butler*'s discussion of the spending power is still instructive, although its view of the Commerce Clause is questionable); *City of Pittsburgh v. Alco Parking Corp.*, 417 U.S. 369, 375-78 (1974) (citing *Bailey* and *Sonzinsky* in holding that an ordinance that recited as its purpose "to provide for the general revenue by imposing a tax" was valid).

3.   **The penalty for being lawfully present in the United States without health insurance is an unconstitutional direct or capitation tax, not an income or excise tax.**

Even if this Court considers the Section 1501 penalty to be a tax, it is an unconstitutional, unapportioned capitation or direct tax.  (Doc. 10 at ¶ 118.)  The Constitution authorizes Congress to impose income taxes, direct taxes that are apportioned, and indirect taxes (excises, duties, and imposts) that are uniform.  U.S. Const. art. I, §§ 2, 8, 9, amend. XVI.  The case of *Murphy v. IRS*, 493 F.3d 170 (D.C. Cir. 2007), provides the relevant framework for considering whether Section 1501's penalty provisions impose a direct or capitation tax or an income or excise tax.

In *Murphy*, the court held that a tax imposed on compensatory damages for emotional distress was within Congress's taxing power.  *Id.* at 171.  The court explained:

> [Article I, Section 9 of the Constitution states,] "No capitation, or other direct, tax shall be laid, unless in proportion to the census or enumeration herein before directed to be taken."  *See also* U.S. CONST. art. I, § 2, cl. 3 ("direct taxes shall be apportioned among the several states which may be included within this union, according to their respective numbers").
> . . . .
> Only three taxes are definitely known to be direct:  (1) a capitation, U.S. CONST. art. I, § 9, (2) a tax upon real property, and (3) a tax upon personal property. . . . Such direct taxes are laid upon one's "general ownership of property," . . . as contrasted with excise taxes laid "upon a particular use or enjoyment of property or the shifting from one to another of any power or privilege incidental to the ownership or enjoyment of property." . . .

*Id.* at 180-81 (citations omitted).

The *Murphy* court considered "whether the tax [on emotional distress damages] . . . is more akin, on the one hand, to a capitation or a tax upon one's ownership of property, or, on the other hand, more like a tax upon a use of property, a privilege, an activity, or a transaction."  *Id.* at 184.  Similarly, this Court must determine whether Section 1501's penalty is triggered by a particular use of property, or an activity, privilege, or transaction, or by one's ownership (or non-ownership) of property or one's existence.  Section 1501's penalty is not an excise tax upon the

occurrence of a specific event or a particular use of property, but rather applies to persons who have done nothing other than be lawfully present in the United States without health insurance. *See id.* at 180-81 (listing examples of excise taxes). The penalty can be properly characterized as a penalty for one's *non-ownership of property* (a health insurance policy) rather than on any use of property, privilege, activity, or transaction.[18]/

Put another way, "a direct tax is a tax directly on objects having geographical locations. Capitation taxes, requisitions, and taxes on tangible property all satisfy this definition, because in all three cases, the *subjects are taxed because they are 'there' (as opposed to because of what they do)*, and all are geographically located."  Joseph M. Dodge, *What Federal Taxes are Subject to the Rule of Apportionment Under the Constitution?*, 11 U. PA. J. CONST. L. 839, 922 (2009) (emphasis added).  Section 1501 penalizes individuals because they "are 'there'" and have not taken the affirmative step of buying health insurance, and taxes non-existent health insurance policies because they are not there.  *See id.*  There is no transaction or use of property that makes a person subject to the penalty, as it applies to all individuals simply because they exist unless they can demonstrate that they have taken the affirmative step of obtaining a health insurance policy (or that they fall within an exemption).  As such, if Section 1501's penalty is characterized as a "tax," it is a direct tax that must be apportioned throughout the United States.[19]/

---

[18]/ Also, Section 1501's penalty is not an income tax.  A person's income level is just one of many factors that determine whether he or she must pay the penalty and, if so, what the amount is.  Other factors include the number of people within the taxpayer's household, their age, their state of residence, *see* PPACA § 1201 (rates will be affected by which "rating area" of a state a person lives in), their affiliation with particular religious groups or health care sharing ministries, and whether each person in the household is lawfully present in the United States.

[19]/ In addition, Section 1501's penalty has key aspects of a capitation tax, which is "a tax on a person because of the person's existence."  Dodge, 11 U. PA. J. CONST. L. at 841; *Hylton v. United States*, 3 U.S. (3 Dall.) 171, 175 (1796) (opinion of Chase, J.) (stating that a capitation tax is imposed "without regard to property, profession, or any other circumstances"); Ellen

*(Text of footnote continues on following page.)*

III.   **THE EXISTENCE AND THREATENED ENFORCEMENT OF SECTION 1501 OF THE PPACA AGAINST PLAINTIFFS MEAD, SEVEN-SKY, AND LEE VIOLATES THEIR RIGHTS UNDER THE RELIGIOUS FREEDOM RESTORATION ACT.**

The Amended Complaint alleges that Section 1501 requires Plaintiffs Mead, Seven-Sky, and Lee to choose between adhering to their religious beliefs about relying on God for their continued health and well-being and paying significant penalties to the government.  (Doc. 10 at ¶¶ 10-50.)  Since application of Section 1501 to these three Plaintiffs is not the least restrictive means of furthering a compelling governmental interest, it violates their rights as set forth in RFRA, 42 U.S.C. § 2000bb *et seq.*

RFRA states that the federal government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," 42 U.S.C. § 2000bb-1(a), unless the government "demonstrates that application of the burden to the person . . . 1) is in furtherance of a compelling governmental interest; and 2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1(b).  Defendants' speculation regarding the importance (that is, centrality) of Plaintiffs' beliefs concerning health insurance is baseless, (Doc. 15 at 37-38), because the Amended Complaint must be read in Plaintiffs' favor, and the religious exercise protected by RFRA "includes any exercise of

---

Overmyer Lloyd, Comment, *The Taxman Cometh: The Constitutionality of Taxing Compensatory Damages for Non-Physical Injuries*, 54 LOY. L. REV. 375, 411 (2008) (noting that a capitation tax under *Hylton* is "levied on a person just for being a person" and is "based on the simple fact of a person's existence"). Section 1501's penalty has two key elements of a capitation tax. First, it is "a tax on a person because of the person's existence." *See* Dodge, 11 U. PA. J. CONST. L. at 841.  Simply being lawfully present in the United States triggers the penalty; the onus is on the individual to demonstrate that he or she is exempted.  That no affirmative conduct is necessary to trigger Section 1501's penalty distinguishes it from the vast majority of taxes or penalties that are accrued due to some event or transaction.  Second, Section 1501 lists specific head tax amounts per person; that some individuals will end up paying a greater or smaller amount does not take away from the fact that the listed amount is what many Americans will end up having to pay simply because they exist.

religion, whether or not compelled by, or central to, a system of religious belief," 42 U.S.C. § 2000bb-2 (citing 42 U.S.C. § 2000cc-5(7)(A)). RFRA "restore[s] the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972)." 42 U.S.C. §§ 2000bb(b). "A substantial burden exists when government action puts 'substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008) (quoting *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981)).

Although Defendants state that "[a] conflict between an individual's *subjective beliefs* and government action . . . does not establish a substantial burden on belief," (Doc. 15 at 36) (emphasis added), they ignore the fact that Section 1501 will require Plaintiffs Mead, Seven-Sky, and Lee to *engage in conduct* that conflicts with their Christian faith.[20]/ Plaintiffs object on religious grounds to being required to take part in the health insurance system or, in the alternative, to being required to pay a penalty designed to coerce them into joining the health insurance system. (*See* Doc. 10 at ¶¶ 14-16, 18, 19, 27-30, 32, 33, 41-43, 45, 46.)

For example, the Amended Complaint alleges that "[b]eing forced to buy health insurance conflicts with [Plaintiff] Lee's religious faith because he believes that he would be indicating that he needs a backup plan and is not really sure whether God will, in fact, provide for his needs." (Doc. 10 at ¶ 29.) As such, Section 1501 does not pose a mere "conflict between an individual's subjective beliefs and government action" as Defendants suggest, (Doc. 15 at 36), *but rather requires Plaintiffs to take action that conflicts with their religious beliefs*. In

---

[20]/ Although Defendants state that "plaintiffs do not mention what their religion is in the Complaint," (Doc. 15 at 38), Paragraphs 18, 32, and 45 of the Amended Complaint clearly state that Section 1501 requires Plaintiffs Mead, Lee, and Seven-Sky to buy health insurance "without any consideration of [their] individual needs, *Christian faith*, and financial situation" or pay annual penalties. (Doc. 10 at ¶¶ 18, 32, 45) (emphasis added).

particular, Section 1501 substantially burdens Plaintiffs Mead, Seven-Sky, and Lee's religious exercise because it "puts 'substantial pressure on [them] to modify [their] behavior and to violate [their] beliefs.'"  *See Kaemmerling*, 553 F.3d at 678 (citation omitted).[21]/

Moreover, Defendants have not demonstrated that application of Section 1501 to Plaintiffs Mead, Seven-Sky, and Lee is the least restrictive means of furthering a compelling government interest.  "RFRA demands that 'the compelling interest test [be] satisfied through application of the challenged law '*to the person*'—the particular claimant whose sincere exercise of religion is being substantially burdened.'"  *Id.* at 682 (citation omitted) (emphasis added).  "A statute or regulation is the least restrictive means if 'no alternative forms of regulation would [achieve the compelling interest] without infringing [free exercise] rights.'"  *Id.* at 684 (quoting *Sherbert*, 374 U.S. at 407).  Defendants cannot prove the existence of any compelling interest that can be furthered only by requiring Plaintiffs Mead, Seven-Sky, and Lee to maintain health insurance.  The justifications offered for Section 1501, such as a desire to lower insurance premiums for those who are voluntarily insured, are not "compelling" government interests, and forcing Plaintiffs to buy health insurance is not the least restrictive way to further such interests.

In addition, Defendants misunderstand Plaintiff Mead, Lee, and Seven-Sky's religious objections; they do not object to any *expenditure of public funds* but rather to Section 1501's requirement that they maintain health insurance or pay a regulatory penalty under Congress's claim of Commerce Clause power.  (*See* Doc. 10 at ¶¶ 14, 27, 41, 124.)  Plaintiffs' objection to

_____

[21]/ Defendants' reference to Section 1501's exceedingly narrow religious exemptions is irrelevant.  (*See* Doc. 15 at 36.)  Plaintiffs have no reason to anticipate joining an Amish community or seeking and finding a health care sharing ministry eligible for an exemption whose religious tenets match their own.  More importantly, Plaintiffs object to being forced by the government to join a health insurance system against their will, regardless of whether that system is run by the government, a private company, or a religious organization to which Plaintiffs do not belong.  Section 1501's narrow religious exemptions are not a one-size-fits-all means of relieving any and all substantial burdens imposed by Section 1501.

being required to have health insurance or pay a regulatory penalty is *fundamentally different* than an objection to being required to pay a general tax that the government uses to make payments to persons who are elderly, disabled, or poor or spends in a manner that the religious claimant objects to (supporting war, subsidizing abortion, etc.).  As such, Defendants' statement that "the collection of tax revenues for expenditures that offend the religious beliefs of individual taxpayers does not violate the Free Exercise Clause of the First Amendment," (Doc. 15 at 38-39), misses the point.  The government's interest in ensuring that Americans who cannot provide for themselves receive public support of some kind is much stronger than its interest in forcing Plaintiffs to have health insurance.  *See generally United States v. Lee*, 455 U.S. 252 (1982) (rejecting a free exercise challenge to the payment of Social Security taxes because the tax was indistinguishable from the payment of general income taxes, the income tax system could not function if all individuals who object to any use of public funds on religious grounds were exempted, and the Social Security system could not function if contributions were voluntary).

Defendants' reliance on *Goehring v. Brophy*, 94 F.3d 1294 (9th Cir. 1996), is misplaced. (*See* Doc. 15 at 40-41.)  In *Goehring*, the plaintiffs alleged that a public university's mandatory student registration fee "violate[d] their right to free exercise of religion because the fee [was] used, in part, to subsidize the University's health insurance program, which covers abortion services." *Id.* at 1297.  As noted previously, however, an objection to how a government actor spends public funds is fundamentally different than an objection to mandatory participation in the health insurance system.  The plaintiffs in *Goehring* did *not* have a religious objection to health insurance *per se*, and they were *not* required to buy the University's subsidized health insurance to which they objected.  *Id.* at 1299-1300.  As such, Defendants' reliance upon *Goehring* to state that "the rationale of the tax cases has been extended to the context of a

mandatory state requirement that individuals purchase health insurance" is irrelevant because the instant action does not involve an objection to how public funds are spent.

Additionally, in holding that the plaintiffs' religious exercise was not substantially burdened, the *Goehring* court declared that a substantial burden exists only where there is "'interference with a tenet or belief that is central to religious doctrine.'" *Id.* at 1299 (citation omitted). Congress, however, expanded RFRA's definition of "exercise of religion" four years *after Goehring* was decided in order to "expand RFRA's protections to a broader range of religious practices." *Rasul v. Myers*, 563 F.3d 527, 533-34 (D.C. Cir. 2009) (Brown, J., concurring). Defendants cannot escape RFRA's clear command that its protections extend to "any exercise of religion, whether or not compelled by, or central to, a system of religious belief" by resorting to pre-2000 cases. *See* 42 U.S.C. § 2000bb-2 (citing 42 U.S.C. § 2000cc-5(7)(A)).[22]/ This Court should deny Defendants' Motion to Dismiss.

## IV. PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE ANTI-INJUNCTION ACT.

The Anti-Injunction Act ("AIA") does not preclude Plaintiffs' claims. Neither the AIA's text nor its purpose justify applying it to a case in which, as here, the provision at issue has not yet taken effect, no tax-incurring conduct is yet possible, and no collection, assessment, withholding, or investigatory activities relating to currently owed or past due revenues are ongoing or even possible. Simply put, the present action cannot possibly be "for the purpose of restraining the assessment or collection of any tax," *see* 26 U.S.C. § 7421(a), because the

---

[22]/ Similarly, a generalized interest in public health is not sufficient to justify application of Section 1501 to Plaintiffs. The *Goehring* court focused on the unique nature of a *university* health insurance program, citing a need to "prevent the spread of communicable diseases which pose a serious problem on university campuses where students eat, sleep, and study in such close quarters" as well as a desire to "prevent[] students from being distracted from their studies by undiagnosed illnesses and medical bills which they cannot afford to pay." *Id.* at 1300.

individual mandate and the separate penalty provisions do not become effective until 2014.[23]/

**A.      A decision on the merits of Plaintiffs' claims is consistent with the AIA's text.**

The AIA states, in relevant part, that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed."  26 U.S.C. § 7421(a).  This lawsuit is not brought "for the purpose of restraining the assessment or collection of any tax. . . ."  *See id.*  Rather, the purpose of this suit is to challenge the constitutionality of the individual mandate, that is, the requirement that all Americans (with few exceptions) must purchase and maintain health insurance policies that meet the government's standards.  The payment of money to a private insurance company as required by the individual mandate *is not a tax*, and a suit seeking to invalidate the individual mandate is not a suit "for the purpose of restraining the assessment or collection of any tax. . . ."  *See id.;* (Doc. 10 at ¶¶ 98-99.)

By its nature, the individual mandate is fundamentally different from the tax provisions typically found in cases involving the Anti-Injunction Act.  The PPACA's principal goal is to force individuals into the insurance market by requiring them to purchase and maintain health insurance policies from private companies.  A determination that the individual mandate is unconstitutional months or years *after* numerous individuals have involuntarily entered insurance contracts would leave millions of individuals and the insurance companies without an effective remedy.  Health insurance contracts deal with a particular set of risks over a set period of time

---

[23]/ The constitutional nature of Plaintiffs' claims also does not affect the AIA's inapplicability.  *See, e.g., United States v. Clintwood Elkhorn Mining Co.*, 553 U.S. 1, 10 (2008); *Alexander v. "Americans United,"* 416 U.S. 752, 759-60 (1974).  In addition, the Declaratory Judgment Act, 28 U.S.C. § 2201, is coterminous in its coverage with the Anti-Injunction Act.  *See, e.g., Investment Annuity v. Blumenthal*, 609 F.2d 1, 4 (D.C. Cir. 1979).  *But see Cohen v. United States*, Case No. 08-5088, 599 F.3d 652 (D.C. Cir. 2010) (petition for rehearing en banc granted) (issues to be considered include "should D.C. Circuit precedent interpreting the Anti-Injunction Act and the Declaratory Judgment Act as 'coterminous' be overruled?").

that may, or may not, materialize, and both parties take a calculated risk based on the uncertainty of future events.  Individuals who, in hindsight, received more benefits than they paid to the company during the life of the contract would want their policies upheld, while individuals who, in hindsight, paid more to the company than they received in benefits during the life of the contract would want their policies invalidated.  Allowing the validity of the individual mandate to be determined before individuals are required to purchase health insurance policies will ensure that all persons injured by it will be made whole should a court hold it invalid.

The fact that Plaintiffs in this case are preparing to involuntarily pay a penalty to the government for not obtaining health insurance, rather than preparing to involuntarily pay insurance premiums under the individual mandate, does not bring their claims within the scope of the Anti-Injunction Act.  The AIA is not implicated where, as here, there is no tax-related law or policy relevant to Plaintiffs' conduct *currently in effect* that can give rise to any present collection, assessment, withholding, or investigatory activities.  In other words, a suit cannot be "for the purpose of restraining the assessment or collection of any tax" if no current assessment or collection of any tax related to the suit is possible.  *See id.*[24]/  If Congress intended to bar all suits that may potentially have the indirect effect of precluding the collection of certain penalties in the future, regardless of whether any past due taxes or ongoing assessment, collection, withholding, or investigatory activities were at issue, it would have drafted the AIA to do so.

**B.**   **A decision on the merits of Plaintiffs' claims is consistent with the AIA's purpose.**

This case does not implicate the AIA's key purpose—to ensure that the government may promptly assess and collect taxes *alleged to be currently or past due*.  In *Enochs v. Williams*

---

[24]/ Defendants' reliance upon *Investment Annuity v. Blumenthal*, 609 F.2d 1 (D.C. Cir. 1979), is misplaced.  (*See* Doc. 15 at 16, n.7.)  Unlike the instant action, *Blumenthal* involved a tax-generating policy in effect long before the trial and appellate courts considered the case.

*Packing & Navigation Co.*, 370 U.S. 1 (1962), the Supreme Court held that the AIA barred a lawsuit seeking to prevent the collection of allegedly *past due* social security and unemployment taxes.  The Court observed that "[t]he manifest purpose of § 7421(a) is to permit the United States to assess and collect taxes *alleged to be due* without judicial intervention, and to require that the legal right to the disputed sums be determined in a suit for a refund. In this manner the United States is assured of prompt collection of its lawful revenue."  *Id.* at 7 (emphasis added).  In addition, "the Act prohibits suits for injunctions barring the collection of federal taxes when the collecting officers have made the assessment and claim that it is valid."  *Id.* at 8.

A review of the purpose of the Tax Injunction Act ("TIA") of 1937, which the *Williams Packing* Court characterized as "comparable" to the AIA, is instructive.  *See id.* at 6.   The *Williams Packing* Court cited a Senate Report concerning the TIA which stated:

> The existing practice of the Federal courts in entertaining tax-injunction suits against State officers makes it possible for foreign corporations doing business in such States to withhold from them and their governmental subdivisions, taxes in such vast amounts and for such long periods of time as to seriously disrupt State and county finances.  The pressing needs of these States for this tax money is so great that in many instances they have been compelled to compromise these suits, as a result of which substantial portions of the tax have been lost to the States without a judicial examination into the real merits of the controversy.

*Id.* at 7, n.6 (citation omitted).  The Court made a similar statement about the TIA in *Hibbs v. Winn*, 542 U.S. 88 (2004), noting that Congress "trained its attention on taxpayers who sought to avoid paying their tax bill" and sought "to stop taxpayers, with the aid of a federal injunction, from withholding large sums, thereby disrupting state government finances."  *Id.* at 104-105.

While cases discussing the AIA note that it typically applies when an assessment has already occurred, or where allegedly current or past due taxes are at issue, they provide no support for the claim that the AIA applies to the present case.  A suit brought years before any

collection or assessment activities could occur does not implicate the AIA's chief purpose.[25]/

**C.      Cases in which claims were barred by the AIA are distinguishable from the present case.**

The inapplicability of the AIA to this case is further illustrated by the fact that, in the typical case in which the AIA bars a claim, one or more of the following three key events occurred *before* the plaintiff sued:   1) a tax-related law or policy relevant to the plaintiff's conduct *took effect*; 2) an activity or event allegedly triggering application of that law or policy to the plaintiff *occurred*; or 3) the government or an income-providing entity *began the process* of collecting, assessing, or withholding funds, investigating current or past tax liability, or otherwise establishing the plaintiff's tax liability.   This case is much different from a situation in which the tax code enforcement and collection process is already underway before the lawsuit is filed.   Suits that have been barred by the AIA have typically involved past due taxes or existing tax liens or collection activities,[26]/ ongoing or imminent withholding or garnishment,[27]/ or ongoing investigatory activities or litigation.[28]/   None of these elements are present here and, as

---

[25]/ That the Tax Code requires some penalties to be assessed or collected in the manner of a "tax" does not determine whether the AIA applies, as there must be *an assessment, collection, withholding, investigation, etc.* relative to that penalty, or at least the occurrence of a potentially tax-incurring event, to trigger the AIA's applicability.   *See, e.g., Barr v. United States*, 736 F.2d 1134 (7th Cir. 1984) (emphasis added) (holding that the AIA barred a suit filed after the government had "determined that Barr's representations [on his withholding statement] were false, and *assessed a $500 penalty*").   Unlike in *Barr*, Plaintiffs have *not* been assessed any penalties, nor could any such assessment occur until 2014 or later.

[26]/ *See, e.g.*, *We the People Found., Inc. v. United States*, 485 F.3d 140 (D.C. Cir. 2007); *McNeil v. Comm'r of Internal Revenue*, 2010 U.S. Dist. LEXIS 39404 (D.D.C. 2010); *Stewart v. United States*, 578 F. Supp. 2d 30 (D.D.C. 2008).

[27]/ *See, e.g.*, *United States v. American Friends Serv. Comm.*, 419 U.S. 7 (1974) (per curiam); *Foodservice & Lodging Inst. v. Regan*, 809 F.2d 842 (D.C. Cir. 1987) (per curiam).

[28]/ *See, e.g.*, *Bob Jones University v. Simon*, 416 U.S. 725, 739-40, n.10 (1974); *Davis v. United States*, 569 F. Supp. 2d 91 (D.D.C. 2008).

such, this case is not brought "for the purpose of restraining the assessment or collection of any tax." *See* 26 U.S.C. § 7421(a).

## CONCLUSION

Accordingly, Plaintiffs respectfully request that this Court deny Defendants' Motion to Dismiss.   (Doc. 15.)   Plaintiffs' Amended Complaint states claims on which relief can be granted, and this Court has jurisdiction to grant Plaintiffs their requested relief. (Doc. 10.)

Respectfully submitted on this 10th day of September, 2010,

/s/ Edward L. White III
Edward L. White III (adm. phv)
American Center for Law & Justice
5068 Plymouth Road
Ann Arbor, MI 48105
Tel. 734-662-2984; Fax. 734-302-1758
ewhite@aclj.org


/s/ Erik M. Zimmerman
Erik M. Zimmerman (adm. phv)
American Center for Law & Justice
1000 Regent University Dr.
Virginia Beach, VA 23464
Tel. 757-226-2489; Fax. 757-226-2836
ezimmerman@aclj.org


Miles Landon Terry (adm. phv)
American Center for Law & Justice
1305 Clinton Street, Suite 230
Nashville, TN 37203
Tel. 864-569-9344; Fax. 615-327-0007
mterry@aclj.org

Jay Alan Sekulow
(D.C. Bar No. 496335)
Stuart J. Roth
(D.C. Bar No. 475937)
Colby M. May
(D.C. Bar No. 394340)

/s/ James Matthew Henderson Sr.
James Matthew Henderson Sr.
(D.C. Bar No. 452639)
   *Counsel of Record*
American Center for Law & Justice
201 Maryland Avenue, NE
Washington, DC 20002
Tel. 202-546-8890; Fax. 202-546-9309
sekulow@aclj.org
sjr@aclj-dc.org
cmmay@aclj-dc.org
jmhenderson@aclj-dc.org


*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on September 10, 2010, a true and correct copy of the foregoing Plaintiffs' Memorandum of Points and Authorities in Response to Defendants' Motion to Dismiss was filed electronically with this Court through the CM/ECF filing system.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's CM/ECF system.  Parties may access this filing through the Court's CM/ECF system.  The following counsel for Defendants will receive notice of this filing through the Court's CM/ECF system:

Eric R. Womack
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, D.C. 20530
eric.womack@usdoj.gov
Tel: (202) 514-4020; Fax: (202) 616-8470

/s/ Edward L. White III
Edward L. White III (adm. phv)
American Center for Law & Justice
5068 Plymouth Road
Ann Arbor, MI 48105
Tel. 734-662-2984; Fax. 734-302-1758
ewhite@aclj.org