## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARGARET PEGGY LEE MEAD, et al.,    )
    )
                  Plaintiffs,    )
    )  Case No. 1:10-CV-00950 (GK)
        v.    )
    )
ERIC H. HOLDER, JR.,    )
Attorney General of the United States, *in his*    )
*official capacity*, et al.,    )
    )
                  Defendants.    )
_____)

## REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

Page(s)

PRELIMINARY STATEMENT……………………………………………………………1

ARGUMENT………………………………………………………………………...2

I.  PLAINTIFFS LACK STANDING TO CHALLENGE THE OPERATION OF THE  MINIMUM COVERAGE PROVISION IN 2014…………………………...2

II.  PLAINTIFFS' CHALLENGES ARE NOT RIPE…………………………………6

III.  THE ANTI-INJUNCTION ACT BARS PLAINTIFFS' CLAIMS……………..7

IV.  PLAINTIFFS FAIL TO STATE A CLAIM FOR RELIEF………………………9

    A.  The Minimum Coverage Provision Is a Valid Exercise of Congress's Commerce Power……………………………………………………….9

    B.  The Minimum Coverage Provision Is Valid Under the Necessary and Proper Clause……………………………………………………………16

    C.  The Minimum Coverage Provision Is Independently Justified Under the General Welfare Clause…………………………………………...18

        1.  The Regulatory Effect of the Minimum Coverage Provision Does Not Remove It from the Reach of the General Welfare Clause…….18

        2.  The Minimum Coverage Provision Is Not a Direct or Capitation Tax……………………………………………………………..21

    D.  The Allegations of Plaintiffs Mead, Lee, and Seven-Sky Are Insufficient to State a Claim Under the Religious Freedom Restoration Act ("RFRA")……………………………………………………...22

CONCLUSION…………………………………………………………………..25

i

# TABLE OF AUTHORITIES

**CASES**                                                                                    **Page(s)**

*Alexander v. "Americans United" Inc.,*
  416 U.S. 752 (1974) ........................................................................................ 8, 9

*Am. Fed'n of Gov't Employees v. United States,*
  104 F. Supp. 2d 58 (D.D.C. 2000) ...................................................................... 3

*\*Baldwin v. Sebelius,*
  Civ. No. 3:10-cv-01033, Dkt. No. 37 (S.D. Cal. Aug. 27, 2010) .................... 1, 6, 7

*Berman v. Parker,*
  348 U.S. 26 (1954) ........................................................................................... 15

*Blanchette v. Connecticut General Ins. Corps.,*
  419 U.S. 102 (1974) ........................................................................................... 6

*\*Bob Jones Univ. v. Simon,*
  416 U.S. 725 (1974) ................................................................................... 1, 9, 20

*Branch Ministries v. Rossotti,*
  211 F.3d 137 (D.C. Cir. 2000) .......................................................................... 23

*Carter v. Carter Coal Co.,*
  298 U.S. 238 (1936) .......................................................................................... 21

*Child Labor Tax Case,*
  259 U.S. 20 (1922) ....................................................................................... 20, 21

*Church of Scientology v. United States,*
  920 F.2d 1481 (9th Cir. 1990) ............................................................................ 8

*City of Pittsburgh v. Alco Parking Corp.,*
  417 U.S. 369 (1974) .......................................................................................... 20

*Fair Employment Council of Greater Wash., Inc. v. BMC Mktg. Corp.,*
  28 F.3d 1268 (D.C. Cir. 1994) ............................................................................ 4

*\*Goehring v. Brophy,*
  94 F.3d 1294 (9th Cir. 1996) ............................................................................ 24

*\*Gonzales v. Raich,*
  545 U.S. 1 (2005) .......................................................................................... 9, 19

*Graham v. United States,*
  573 F. Supp. 848 (E.D. Pa. 1983) .......................................................... 8

*\*Gulf Restoration Network v. Nat'l Marine Fisheries Serv.,*
  --- F.Supp.2d -- 2010 WL 3184327 (D.D.C. Aug. 12, 2010) .......................................... passim

*Henderson v. Kennedy,*
  265 F.3d 1072 (D.C. Cir. 2001) ........................................................... 24

*Hill v. Wallace,*
  259 U.S. 44 (1922) ......................................................................... 21

*Hylton v. United States,*
  3 U.S. (3 Dall.) 171 (1796) .............................................................. 21

*Kaemmerling v. Lappin,*
  553 F.3d 669 (D.C. Cir. 2008) ......................................................... 23, 24

*Lake Carriers' Ass'n v. MacMullan,*
  406 U.S. 498 (1972) ...................................................................... 5

*Luxton v. North River Bridge Co.,*
  153 U.S. 525 (1894) ...................................................................... 15

*M'Culloch v. Maryland,*
  17 U.S. (4 Wheat.) 316 (1819) ........................................................... 17

*McConnell v. FEC,*
  540 U.S. 93 (2003) ........................................................................ 4

*Metzenbaum v. FERC,*
  675 F.2d 1282 (D.C. Cir. 1982) ........................................................... 6

*Minor v. United States,*
  396 U.S. 87 (1969) ....................................................................... 20

*\*Murphy v. IRS,*
  493 F.3d 170 (D.C. Cir. 2007) ........................................................ 21, 22

*Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales,*
  468 F.3d 826 (D.C. Cir. 2006) ............................................................ 4

*Nat'l Treasury Union v. United States,*
  101 F.3d 1423 (D.C. Cir. 1996) ........................................................... 6

*Navegar, Inc. v. United States,*
    192 F.3d 1050 (D.C. Cir. 1999) ............................................................... 11

*Nelson v. Sears, Roebuck & Co.,*
    312 U.S. 359 (1941) ...................................................................... 19, 20

*Network Project v. Corp. for Pub. Broad.,*
    561 F.2d 963 (D.C. Cir. 1977) ............................................................... 19

*Nurad, Inc. v. William E. Hooper & Sons Co.,*
    966 F.2d 837 (4th Cir. 1992) ................................................................ 14

*Pac. Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm.,*
    461 U.S. 190 (1983) ............................................................................ 3

*Pac. Ins. Co. v. Soule,*
    74 U.S. 443 (1868) ............................................................................ 21

*Pub. Citizen v. NHTSA,*
    489 F.3d 1279 (D.C. Cir.  2007) ............................................................ 2

*Riva v. Commonwealth of Mass.,*
    61 F.3d 1003 (1st Cir. 1995) ................................................................. 3

*Ross v. United States,*
    460 F. Supp. 2d 139 (D.D.C. 2006) ........................................................ 8

*Sabri v. United States,*
    541 U.S. 600 (2004) .......................................................................... 17

*Sanner v. Bd. of Trade,*
    62 F.3d 918 (7th Cir. 1995) .................................................................. 3

*Smith v. Rich,*
    667 F.2d 1228 (5th Cir.1982) ................................................................ 8

*South Carolina v. Regan,*
    465 U.S. 367 (1984) ............................................................................ 8

*Tenn. Gas Pipeline Co. v. FERC,*
    736 F.2d 747 (D.C. Cir. 1984) ............................................................... 4

*Terry v. Reno,*
    101 F.3d 1412 (D.C. Cir. 1996) ............................................................. 11

iv

*Triple G Landfills Inc. v. Bd. of Com'rs of Fountain Cnty., Indiana,*
   977 F.2d 287 (7th Cir. 1992) ............................................................. 3, 4

*United States v. Collins,*
   921 F. Supp. 1028 (W.D.N.Y. 1996) .................................................... 13

*United States v. Comstock,*
   130 S. Ct. 1949 (2010) ...................................................................17, 18

*United States v. Gould,*
   568 F.3d 459 (4th Cir. 2009) ............................................................... 13

*United States v. Lee,*
   455 U.S. 252 (1982)............................................................................. 24

*United States v. Lopez,*
   514 U.S. 549 (1995)....................................................................... 11, 16

*\*United States v. S.E. Underwriters Ass'n,*
   322 U.S. 533 (1944) ...................................................................... 12, 16

*United States v. Sage,*
   92 F.3d at 101 (2d Cir. 1996)............................................................... 13

*United States v. Sanchez,*
   340 U.S. at 44...................................................................................... 20

*Virginia ex rel. Cuccinelli v. Sebelius,*
   Case No. 3:10-cv-188 (E.D. Va. Aug. 2, 2010).................................... 6

*Wilmac Corp. v. Bowen,*
   811 F.2d 809 (3d Cir. 1987).................................................................. 4

*Woods v. Cloyd W. Miller Co.,*
   333 U.S. 138 (1948)............................................................................. 19

*Yamaha Motor Corp. v. United States,*
   779 F. Supp. 610 (D.D.C. 1991) ........................................................... 7

## FEDERAL STATUTES AND REGULATIONS

6 U.S.C. § 443(a)(1)...................................................................................... 14

16 U.S.C. § 1441(c)(4)................................................................................... 14

18 U.S.C. § 228(a) ............................................................................................. 13

26 U.S.C. § 5000A ..................................................................................... passim

26 U.S.C. § 6651 .............................................................................................. 22

26 U.S.C. § 7421(a) ............................................................................................ 7

30 U.S.C. § 1257(f) ........................................................................................... 14

42 U.S.C. § 2210(a) ........................................................................................... 14

42 U.S.C. § 2243(d)(1) ...................................................................................... 14

42 U.S.C. § 2458c(b)(2)(A) ............................................................................... 14

42 U.S.C. § 4012a(a) ......................................................................................... 14

42 U.S.C. § 9601 ............................................................................................... 14

45 U.S.C. § 358(a) ............................................................................................. 14

49 U.S.C. § 13906(a)(1) ..................................................................................... 14

Pub. L. No. 111-148, 124 Stat. 119 (2010)

 § 1201 ........................................................................................................ 10

 § 1501(a) .............................................................................................. passim

 § 1501(b) ................................................................................................. 5, 24

## LEGISLATIVE MATERIALS

Congressional Budget Office, *How Many Lack Health Insurance
 and For How Long?*, at 4, 9 (May  2003) ............................................................ 12

Congressional Budget Office, *2008 Key Issues in Analyzing
 Major Health Proposals* (Dec. 2008) .................................................................. 12

*Health Reform in the 21st Century: Insurance Market Reforms: Hearing Before the
 H. Comm. on Ways and Means*, 111th Cong. 118-19 (Apr. 22, 2009) ................................ 10

## PRELIMINARY STATEMENT

Plaintiffs ask this Court to step beyond the proper role of the Judiciary, to proceed without subject-matter jurisdiction, to ignore the explicit command of the Anti-Injunction Act, and to devise sweeping new constitutional rules to strike down the Patient Protection and Affordable Care Act ("ACA").  The irreducible prerequisite for plaintiffs to assert a claim in federal court is standing, and the irreducible prerequisite to standing is injury.  Yet plaintiffs can allege none, because, as the U.S. District Court for the Southern District of California found as to similar claims, "it is impossible to know now whether or not Plaintiff[s] will be subject to or compliant with the Act in 2014," when it goes into effect.  *Baldwin v. Sebelius*, Civ. No. 3:10-cv-01033, Dkt. No. 37, at 5 (S.D. Cal. Aug. 27, 2010).  The Anti-Injunction Act bars any suit "for the purpose of restraining the assessment or collection of any tax."  Yet plaintiffs seek to prevent the collection of the tax penalty imposed under the minimum coverage provision.  The established tests under the Commerce Clause and Necessary and Proper Clause defer to Congress's judgment that a provision regulates matters substantially affecting interstate commerce, or is integral to a larger regulation of interstate commerce.  Yet plaintiffs ask the Court to ignore Congress's judgment on these matters in favor of their own policy views.  And the well-worn touchstone of congressional taxing power under the General Welfare Clause is whether the provision produces revenue.  Yet plaintiffs revive a distinction between regulatory and revenue-raising taxes which the Supreme Court used in the 1920's to strike down the child labor laws and which it has long since "abandoned."  *Bob Jones Univ. v. Simon*, 416 U.S. 725, 741 n.12 (1974).

Plaintiffs' as-applied RFRA challenges are no more substantial.  Plaintiffs' allegation of a "conflict" between government action and religious belief does not state a claim under RFRA, particularly when plaintiffs fail to explain the importance of their alleged belief to their religious

scheme or indicate whether they would be unable to qualify for one of the Act's religious exemptions.

In *Gulf Restoration Network v. Nat'l Marine Fisheries Serv.*, --- F. Supp. 2d ---, 2010 WL 3184327 at *8 (D.D.C. Aug. 12, 2010), this Court rejected speculative allegations of adverse effects that "'may' occur at some point in the future," finding that the limitations of Article III preclude consideration of such claims. Plaintiffs' claims here are at least as premature and speculative, and cannot draw an Article III Court into a policy dispute regarding the legislative judgments Congress reached in addressing a spiraling healthcare crisis.

## ARGUMENT

## I. PLAINTIFFS LACK STANDING TO CHALLENGE THE OPERATION OF THE MINIMUM COVERAGE PROVISION IN 2014

Plaintiffs concede, as they must, that the minimum coverage provision of the ACA will not take effect until 2014. *See also* Order on Defs.' Mot. to Stay, Dkt. No. 20, at 2 ("It should be noted that the ACA will not go into effect until 2014."). In *Gulf Restoration Network*, this Court noted the D.C. Circuit's repeated conclusion that "an injury is not 'actual, imminent, or 'certainly impending'' for standing purposes where a party 'can only aver that any significant adverse effects . . . 'may' occur at some point in the future.'" 2010 WL 3184327 at *8 (quoting *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 478 (D.C.Cir.2009)); *id.* ("Plaintiffs' claims in the instant case are equally general and attenuated since they describe possible future harms instead of concrete present injury."); *see also Pub. Citizen v. NHTSA*, 489 F.3d 1279, 1298 (D.C. Cir. 2007). Plaintiffs' allegations of future injury from the operation of the minimum coverage provision in 2014 therefore do not establish the type of injury that satisfies the requirements of Article III.

Resorting to the case law of prudential ripeness[1], plaintiffs first assert that "they are compelled to adjust their financial affairs now to prepare" for 2014. Opp. at 4-5. It is clear that such "injury" does not satisfy the requirements of Article III. Plaintiffs allege only that they have chosen to allocate their money differently than in the past. Whether that means that they have shifted the amount of the penalty that they anticipate paying in 2014 from checking to savings, or began investing in stocks rather than bonds, the fact remains that these funds remain theirs until at least 2014. Plaintiffs' financial planning on account of the supposed financial uncertainty that they face simply does not establish imminent injury or current hardship. *See, e.g.*, *Sanner v. Bd. of Trade*, 62 F.3d 918, 923 (7th Cir. 1995) ("We have little difficulty concluding that the soybean farmers who refrained from selling soybeans due to the depressed price of the cash market lack standing under Article III."); *Am. Fed'n of Gov't Employees v. United States*, 104 F.Supp.2d 58, 68 (D.D.C. 2000) (possible future diminution in salary and benefits from government action was insufficient to establish injury-in-fact). To hold otherwise would do away with the requirement of imminent harm. A plaintiff with a 10 percent chance of incurring a liability in five years could allege standing now based on the need to prepare for that financial contingency. It is thus not surprising that this Court, and others, have routinely found

---

[1] Rather than address the imminence requirement of Article III head on, plaintiffs conflate the discussion with their analysis of ripeness. *See* Opp. at 4-11. As this Court has explained, ripeness shares a constitutional element with Article III, in that both require a plaintiff to demonstrate that he or she has suffered "present or imminent injury in fact." *Gulf Restoration Network*, 2010 WL 3184327 at *10-11. However, prudential ripeness concerns go beyond the requirements of Article III to permit a court to evaluate the "fitness of the issue for judicial decision" and "the hardship to the parties of withholding court consideration." *Id.* at 11. It is these prudential concerns on which plaintiffs focus in their Opposition, and which the cases they cite address. *See Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190 (1983) (analyzing prudential factors); *Riva v. Commonwealth of Mass.*, 61 F.3d 1003 (1st Cir. 1995) (same); *Triple G Landfills Inc. v. Bd. of Comm'rs of Fountain Cnty., Indiana*, 977 F.2d 287, 289 (7th Cir. 1992) (same). Even assuming plaintiffs could demonstrate that these prudential factors weigh against postponing judicial review, they still would have to meet the bedrock demands of Article III before these factors would be at issue.

allegations of "financial planning" inadequate to justify review even in the prudential ripeness context. *See, e.g.*, *Gulf Restoration Network*, 2010 WL 3184327 at *13 (rejecting plaintiffs' argument that they are suffering current hardship "because 'they are subject to regulation under the Gulf FMP and must change their own behavior to avoid aquaculture sites'"); *see also, e.g.*, *Tenn. Gas Pipeline Co. v. FERC*, 736 F.2d 747, 751 (D.C. Cir. 1984) ("The planning insecurity Tennessee advances does not set its case apart from the mine run of situations . . . ."); *Wilmac Corp. v. Bowen*, 811 F.2d 809, 813 (3d Cir. 1987) ("Mere economic uncertainty affecting the [plaintiffs'] planning is not sufficient to support premature review.").

Moreover, even if plaintiffs' allegation of an "adjustment of financial affairs" could constitute injury in fact, such an injury would be entirely of plaintiffs' own making. Plaintiffs here retain control over their finances. Accordingly, unlike cases plaintiffs cite such as *Triple G*, where government action rendered useless funds already spent, plaintiffs are the ones who have chosen to allocate their funds in the manner about which they now complain. Such an injury is not traceable to the operation of the minimum coverage provision. *See, e.g.*, *Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006) ("The supposed dilemma is particularly chimerical here because the association's asserted injury appears to be largely of its own making."); *Fair Employment Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1277 (D.C. Cir. 1994) ("[T]he Council and its programs would have been totally unaffected if it had simply refrained from making the re-allocation.").

Plaintiffs next assert that there is a "substantial probability that Plaintiffs will be required to pay thousands of dollars to the government in penalties" when the minimum coverage provision goes into effect. Opp. at 10. Putting aside the undisputed fact that, as in *McConnell v. FEC*, 540 U.S. 93, 226 (2003), this "substantial probability" of injury results from the operation

of a statute years in the future, it is untrue that such a probability necessarily exists on the face of

the Complaint.  As an initial matter, plaintiffs have no good answer to defendants' argument that

it is entirely speculative whether they would even be subject to a penalty if they were to choose

not to purchase insurance in 2014.[2]  In fact, as characterized in their Opposition, plaintiffs allege

only that they would be subject to the minimum coverage provision if it "were effective

immediately," and that the provision will apply to plaintiffs "for the *indefinite future*." Opp. at 4

(emphasis added).  Of course whether the provision would apply to plaintiffs if it were effective

now and whether it would continue to apply for some uncertain duration says nothing about

whether the provision *will injure* them in 2014 or any other time thereafter.  That fact, as the

Court found in *Baldwin,* is unknowable (and even unlikely), as plaintiffs do not dispute that

plaintiff Mead will be on Medicare by 2014 which puts her in compliance with the provision,

Opp. at 4 n.4, and that the remaining plaintiffs might, by 2014, find employment that provides

adequate health coverage, discover that their economic situation has deteriorated to the point

where they qualify for Medicaid or a financial exemption, *see* Pub. L. No. 111-148, § 1501(b)

(adding 26 U.S.C. § 5000A(e)), or change their minds about the necessity of health insurance

due to such possible life events as a serious illness.[3]  After all, three of the remaining four

---

[2] In both *Blanchette v. Connecticut Gen. Ins. Corps.*, 419 U.S. 102, 146 (1974), and *Pacific Gas,* on which plaintiffs rely, the Supreme Court refused to consider claims that depended on contingencies that rendered future harm speculative.  For example, in *Pacific Gas* the Supreme Court rejected a challenge to one section of the act in question because "we cannot know whether the Energy Commission will ever find a nuclear plant's storage capacity to be inadequate."  461 U.S. at 203 (internal quotation omitted).  *Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 506-07 (1972), is also inapposite.  The Court reached the merits of plaintiffs' challenge there because the law in question may have presently "conflict[ed] with other state regulations pending the promulgation and effective date of the federal standards."

[3] Nor is religious objection somehow a bridge over the speculation inherent in plaintiffs' allegations of future injury.  Plaintiffs do not dispute that, consistent with their alleged religious beliefs, they could join a group that qualifies for a religious exemption, qualify for a financial hardship exemption, or qualify and choose to take advantage of Medicaid benefits to pay for

plaintiffs admit that at some point in their lives—even as recently as five years ago—they had health insurance.  *See* Compl. ¶¶ 28, 40, 54, 66.

For these very reasons, the District Court in *Baldwin* dismissed a lawsuit brought by an individual challenging the minimum coverage provision, because "it is impossible to know now whether or not Plaintiff will be subject to or compliant with the Act in 2014."[4]  *Baldwin*, Civ. No. 3:10-cv-01033, Dkt. No. 37, at 5.  This Court, too, should reject plaintiffs' attempt to rush to a constitutional judgment on a critical provision of the health reform legislation years before its effective date.

## II.   PLAINTIFFS' CHALLENGES ARE NOT RIPE

The Court should also dismiss the Complaint because it is not ripe for review.  *See, e.g.*, *Nat'l Treasury Union v. United States*, 101 F.3d 1423, 1431 (D.C. Cir. 1996).  As the D.C. Circuit has held, "Article III courts should not make decisions unless they have to," *id.*, particularly when a case challenges the constitutionality of a federal statute, *Metzenbaum v. FERC*, 675 F.2d 1282, 1290 (D.C. Cir. 1982) (per curiam).  In balancing the harms to the respective parties in *Gulf Restoration Network*, this Court recognized the importance of the ripeness inquiry in Article III courts, as well as its intrinsic role in assessing the balance of harms:  "[p]laintiffs can bring their suit at a later time, after harm is more imminent and more certain.  Deferring consideration of the dispute until that point serves important interests both in avoiding interfer[ence] with the system that Congress specified . . ., and in judicial economy."

---

services provided by religious nonmedical healthcare institutions.  *See* Mem. in Supp. of Mot. to Dismiss at 12 n.5.

[4] The directly analogous claims in *Baldwin* provide a stark contrast with plaintiffs' strained attempt to invoke the decision of the district court in *Virginia ex rel. Cuccinelli v. Sebelius*, Case No. 3:10-cv-188 (E.D. Va. Aug. 2, 2010).  *See* Opp. at 7.  That case dealt only with the standing of Virginia to sue, not the alleged injuries of individual plaintiffs from the operation of a statute years in the future.

2010 WL 3184327 at *14 (internal quotations and citations omitted).  For despite plaintiffs' assertion that "'they are subject to regulation . . . and must change their own behavior . . .,' [p]laintiffs cannot establish that delaying suit would be sufficiently disadvantageous to their case because as of yet, they are 'not required to engage in, or to refrain from, any conduct.'"  *Id.* at *13 (internal citation omitted).  Accordingly, judicial review should be deferred until the point at which this Court is able to determine whether the harms alleged are actually "imminent or more certain."  *Id.* at *14 (internal quotation omitted).

## III.    THE ANTI-INJUNCTION ACT BARS PLAINTIFFS' CLAIMS

As discussed in defendants' opening brief, plaintiffs' claim, if successful, would enjoin the government from collecting the penalty set forth in 26 U.S.C. § 5000A(b) and is therefore barred by the AIA, 26 U.S.C. § 7421(a).  To evade this statutory bar, plaintiffs claim to challenge only the requirement to obtain insurance, set forth in 26 U.S.C. § 5000A(a), and not the penalty set forth in § 5000A(b).  Opp. at 41; *but see* Opp. at 30 (arguing that Congress linked the minimum coverage provision and the penalty such that the penalty would become "meaningless and unenforceable" if the requirement were invalidated).

The plain statutory language of the AIA defeats this argument.  However plaintiffs characterize their claim, the simple fact is that if they win the order they seek—"a permanent injunction against the enforcement of the individual mandate provisions contained in the Patient Protection and Affordable Care Act," Am. Compl. at 26—the government will be barred from collecting the penalty under the minimum coverage provision.  The AIA expressly precludes any suit "for the purpose of restraining the assessment or collection of any tax."  26 U.S.C. § 7421(a).  This includes any suit that, if successful, would restrain government activities "'which are intended to, or may culminate in the assessment of taxes.'"  *Yamaha Motor Corp. v. United*

*States*, 779 F. Supp. 610, 613 (D.D.C. 1991) (quoting *Smith v. Rich*, 667 F.2d 1228, 1230 (5th Cir.1982)); *accord Church of Scientology v. United States*, 920 F.2d 1481, 1486 (9th Cir. 1990) (recognizing that "[t]o hold otherwise would enable ingenious counsel to so frame complaints as to frustrate the policy or purpose behind the [AIA]") (internal quotation omitted).  Here, the minimum coverage provision "may culminate in the assessment of taxes," *Yamaha*, 779 F. Supp. at 613, and enjoining the provision necessarily restrains that assessment.  In short, plaintiffs' "frequent reiteration that this is a non-tax suit does not make it so."  *Graham v. United States*, 573 F. Supp. 848, 850 (E.D. Pa. 1983).

Plaintiffs also appear to suggest that the AIA does not apply because individuals who choose to comply would be left "without an effective remedy."  Opp. at 41.  However, the relevant exception, as set forth in *South Carolina v. Regan*, 465 U.S. 367 (1984), applies only where Congress "has not provided an alternative remedy."  *Id.* at 378.  Plaintiffs here have an alternative remedy, a refund suit.  That some people will choose to purchase insurance rather than paying the penalty and then filing suit does not render the remedy inadequate.  *See Alexander v. Americans United*, 416 U.S. 752, 762 (1974); *Ross v. United States*, 460 F. Supp. 2d 139, 148 & n.5 (D.D.C. 2006).

Finally, plaintiffs assert throughout their Opposition that the AIA is not implicated where there is no "current assessment or collection of any tax" or any tax "alleged to be currently or past due."  Opp. at 42-45.  This argument that the AIA should not apply here because of the lack of imminent injury or a ripe claim given the 2014 effective date of the minimum coverage provision,  *see, e.g.*, *id.* at 42, 44, collides with plaintiffs' argument elsewhere that they have suffered imminent injury and that their claim is ripe.  They cannot have it both ways.  Moreover, this argument ignores the broad language and purpose of the AIA, which focuses on the effect of

the relief sought.  Thus, in *Bob Jones*, the Supreme Court held that the AIA barred a plaintiff

from challenging the revocation of its non-profit status under section 501(c)(3) of the Internal

Revenue Code—a decision that primarily affected the collection of revenues from third-parties

who might choose in the future to contribute to plaintiff.  *See* 416 U.S. at 738-39; *see also*

*Alexander*, 416 U.S. at 760-61 ("The obvious purpose of respondent's action was to restore

*advance* assurance that donations to it would qualify as charitable deductions under § 170 that

would reduce the level of taxes of its donors.") (emphasis added).  Plaintiffs here would restrain

the collection of revenues more directly, and the AIA bars their effort to do so.

## IV.    PLAINTIFFS FAIL TO STATE A CLAIM FOR RELIEF

### A.    The Minimum Coverage Provision Is a Valid Exercise of Congress's Commerce Power

If this Court reaches the merits of plaintiffs' challenge to the minimum coverage

provision, it should dismiss for failure to state a claim.  Congress acted within its broad power

under the Commerce Clause in including the minimum coverage provision as part of

comprehensive health reform legislation.  Under well-established Commerce Clause

jurisprudence, Congress's commerce power includes the power to regulate even noncommercial

intrastate activity where doing so is essential to a broader regulatory scheme, such as the ACA's

broad scheme designed to increase the affordability and availability of health care.  *Gonzales v.*

*Raich*, 545 U.S. 1, 18 (2005).  Congress may also regulate economic decisions—including the

decision whether to finance future health care costs through insurance or to attempt to pay for

them out-of-pocket as they arise—where it determines that those decisions, in the aggregate,

substantially affect interstate commerce.  *Id.* at 17.  Congress's judgments on these matters are

"entitled to a strong presumption of validity."  *Id.* at 28.

Specifically, as discussed in defendants' opening brief, Congress determined that the minimum coverage provision is essential to the ACA's other insurance market reforms, which, among other things, bar insurance companies from refusing to cover, or charging higher premiums to, individuals because of pre-existing medical conditions.  Pub. L. No. 111-148 § 1201.  Those reforms are intended to regulate interstate markets by eliminating practices that unfairly burden consumers and restrict the availability and affordability of health insurance and, as a result, health care.  Yet, without the minimum coverage provision, Congress determined, these reforms would not work.  Instead, they would amplify incentives of individuals to forgo insurance until they become sick or injured.  *Id.* §§ 1501(a)(2)(I), 10106(a).  This would result in a smaller insurance risk pool, which would accelerate the current upward spiral of health care and health insurance costs.  *Health Reform in the 21st Century: Insurance Market Reforms: Hearing Before the H. Comm. on Ways and Means*, 111th Cong. 118-19 (Apr. 22, 2009) (Am. Academy of Actuaries).  Thus, Congress found the minimum coverage provision "essential" to its broader effort through the ACA to increase the availability and affordability of health care.  Pub. L. No. 111-148 §§ 1501(a)(2)(C), (F), (G), (H), (I), (J), 10106(a).

In addition, Congress determined that individual decisions about whether to pay for health care services through insurance, or attempt to pay later out of pocket, have an aggregate effect of shifting billions of dollars in costs to governments, health care providers, insurance companies, and insured individuals.  *See id.* §§ 1501(a)(2)(F), 10106(a) (finding that this cost rose to $43 billion in 2008).  Congress found that such individual decision-making, when considered against the backdrop of federal laws effectively guaranteeing emergency screening and stabilization regardless of ability to pay, not only "increases financial risks to households and medical providers" on an individual basis, *id.* §§ 1501(a)(2)(A), 10106(a), but also on the

whole substantially affects the interstate markets in health care and health insurance, *id.* §§ 1501(a)(2)(E)-(G), 10106(a).

In arguing that the provision exceeds Congress's enumerated powers, plaintiffs not only misread the four seminal Supreme Court cases concerning the Commerce Clause, but also largely ignore how the Court of Appeals for this Circuit has interpreted those cases.[5]  Thus, plaintiffs argue that the Supreme Court's decisions in *Lopez* and *Morrison* allow Congress to regulate only "a commercial or economic activity that substantially affects interstate commerce." Opp. at 16, 19, 20.  The D.C. Circuit, however, has explicitly addressed and rejected the argument that Congress may regulate only conduct that is itself economic or commercial in nature.  In *Navegar, Inc. v. United States*, 192 F.3d 1050, 1056 (D.C. Cir. 1999), the Court of Appeals held that plaintiffs had "badly misread" the Court's decision in *Lopez* in making such an argument, as a "close examination of *Lopez* reveals that it supports" the Circuit's prior holding that "a 'regulated activity . . . need not be commercial, so long as its effect on interstate commerce is substantial.'"  *Id.* (quoting *Terry v. Reno*, 101 F.3d 1412, 1417 (D.C. Cir. 1996)).

Here too plaintiffs badly misread the case law and compound the error by asserting that the minimum coverage provision is unconstitutional because "[l]awful presence in the United States, without more, is not an economic class of activities akin to the production and distribution of a marketable commodity."  *Id.* at 23.  Even if economic or commercial activity were in fact a prerequisite of regulation under the Commerce Clause, the ACA would plainly satisfy it.  Far from regulating mere "presence in the United States," the Act instead regulates a vast interstate market consuming an estimated 17.6 percent of our gross domestic product, Pub.

---

[5] Of course, as defendants' Memorandum in Support of their Motion to Dismiss demonstrates, defendants disagree with plaintiffs' characterization of the Court's holdings in these cases and their effect on the present litigation.  *See* Mem. in Supp. at 17-19.

L. No. 111-148, §§ 1501(a)(2)(B), 10106(a)—a market that Congress has authority to regulate, *see United States v. S.E. Underwriters Ass'n*, 322 U.S. 533, 553 (1944). Section 1501, like the Act as a whole, regulates decisions about how to pay for services in the health care market—a market in which virtually everyone participates. These decisions are quintessentially economic, and within the traditional scope of the Commerce Clause. As Congress recognized, "decisions about how and when health care is paid for, and when health insurance is purchased" are "economic and financial" and thus "commercial and economic in nature." Pub. L. No. 111-148 §§ 1501(a)(2)(A), 10106(a). In addition, these decisions have substantial effects on interstate commerce, as it is undisputed that care for uninsured individuals cost $43 billion in 2008, or about 5 percent of overall hospital revenues. *See* CBO, *2008 Key Issues in Analyzing Major Health Proposals* 114 (Dec. 2008); Pub. L. No. 111-148, §§ 1501(a)(2)(F), 10106(a).

Plaintiffs also contend that the "Commerce Clause does not authorize Congress to 'regulate' inactivity by requiring individuals to buy a good or service (such as health insurance) as a condition of their lawful residence in the United States." Opp. at 12. As defendants explained in their Memorandum in Support of their Motion to Dismiss, plaintiffs misunderstand both the nature of the regulated activity and the scope of Congress's power. Individuals who make the economic choice to finance their medical needs without insurance have not opted out of the health care market. Individuals constantly make economic decisions as to whether to finance their medical needs through insurance, or to attempt to do so out-of-pocket with the backstop of free emergency room care. Indeed, a substantial majority of those without insurance coverage at any point in time in fact move in and out of coverage, and have had coverage at some point within the same year. CBO, *How Many Lack Health Insurance and For How Long?*, at 4, 9 (May 2003); *see also* CBO, *Key Issues* at 11. The decision whether to purchase health

insurance on the open market is accordingly an active economic decision about how to finance

health care consumption during a particular time period.[6]

Even if plaintiffs were correct in describing these economic decisions as "inactivity"—

which they are not—regulating them would not be beyond the bounds of Congress's Commerce

Clause authority so long as Congress determined the inactivity substantially affects interstate

commerce.  Courts have rejected, for example, challenges to the Child Support Recovery Act, 18

U.S.C. § 228(a), which affirmatively requires child support payments in interstate commerce.

*See, e.g.*, *United States v. Sage*, 92 F.3d 101, 105-06 (2d Cir. 1996) (rejecting claim that the Act

exceeds the commerce power "because it concerns not the sending of money interstate but the

failure to send money"); *United States v. Collins*, 921 F. Supp. 1028, 1034 (W.D.N.Y. 1996)

(rejecting plaintiff's argument that Congress exceeded its authority under the Commerce Clause

by regulating his "inaction within California").  And Congress may regulate the "failure to

register" as a sex offender pursuant to the Commerce Clause.[7]  *See United States v. Gould*, 568

F.3d 459, 471-72 (4th Cir. 2009) (collecting cases upholding the constitutionality of SORNA).

Also, despite plaintiffs' "first time in our Nation's history" hyperbole, Opp. at 24, it is

also well-settled that Congress may require private parties to enter into insurance contracts where

---

[6] Plaintiffs' criticism of defendants' analogy to a method of payment for services is a *non
sequitur.*  Plaintiffs suggest that the minimum coverage provision cannot be compared to the
regulation of the choice between paying for something by credit card or check because "[a]n
insured person is still responsible to pay deductibles" and other costs.  Opp. at 24 n.14.  This
objection is irrelevant.  With a credit card, an individual faces interest payments that can add
later costs to the purchase price.  That does not mean that a credit card is not a method of
payment similar to a check.  Moreover, plaintiffs do not suggest that, as with the billions in
uncompensated care that results from the actions of the uninsured, co-payments and deductibles
contribute in a similar manner to the spiraling costs of health care.

[7] These examples illustrate that the scope of the commerce power does not turn on whether a
creative plaintiff can describe his own behavior as "active" or "passive."  And for good reason;
such a standard would be arbitrary and unworkable, as courts would have to determine when
"passivity" ends and "activity" begins.

the failure to do so would impose costs on other market participants.  Under the National Flood

Insurance Program, for example, an owner of property—including an owner of a residence or

other non-commercial property—in a flood hazard area must obtain flood insurance in order to

be permitted to obtain a mortgage or other secured loan from any regulated financial institution.

42 U.S.C. § 4012a(a), (b), (e).  Similarly, interstate motor carriers must obtain liability insurance

in order to ensure that the carriers do not shift the financial burden to other parties for any

accidents they may cause.[8]  49 U.S.C. § 13906(a)(1).

Congressional authority to protect interstate commerce, both by prohibiting and requiring

conduct, has also been found in the context of environmental regulation.  Under the Superfund

Act, or CERCLA, 42 U.S.C. §§ 9601 *et seq*., "covered persons," including property owners

(whether or not they are engaged in commercial activity), are deemed to be responsible for

environmental damage from the release of hazardous substances, even if an owner simply

permitted waste to leak on to his property "passive[ly]," "without any active human

participation."  *Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 845 (4th Cir. 1992).

Nor is this Congressional power a recent creation. To the contrary, Congress has used

similar powers for more than a century.  For example, it has long been understood that Congress

may exercise the power of eminent domain—that is, the power to compel an otherwise "passive"

private party to enter into a transaction—in furtherance of its enumerated powers, including its

---

[8] These are not isolated examples.  Congress routinely requires market participants to obtain
insurance to prevent them from imposing costs on other parties. *See, e.g.*, 6 U.S.C. § 443(a)(1)
(sellers of anti-terrorism technology); 16 U.S.C. § 1441(c)(4) (entities operating in national
marine sanctuary); 30 U.S.C. § 1257(f) (surface coal mining and reclamation operators); 42
U.S.C. § 2210(a) (operators of nuclear power plants); 42 U.S.C. § 2243(d)(1) (uranium
enrichment facility operators); 42 U.S.C. § 2458c(b)(2)(A) (aerospace vehicle developers); 45
U.S.C. § 358(a) (railroad unemployment insurance).

Commerce Clause authority. *See Berman v. Parker*, 348 U.S. 26, 33 (1954); *Luxton v. North River Bridge Co.*, 153 U.S. 525, 529-30 (1894) (collecting cases).

The minimum coverage provision similarly effectuates Congress's Commerce Clause authority. The ACA regulates a class of individuals who almost certainly have participated, and will participate, in the health care market, who have decided to finance that participation in one frequently unsuccessful way, and whose economic activities impose substantial costs on other participants in that market. Despite any claim by plaintiffs that the subjects of the minimum coverage provision stand apart from the health care market, their economic actions have a substantial effect on the larger market for health care services. That empowers Congress to regulate.

Plaintiffs' slippery-slope arguments ignore the factors unique to the health care market that distinguish the exercise of Congress's commerce power in that context. Plaintiffs suggest that, if the minimum coverage provision were deemed constitutional, then Congress could mandate that individuals "buy a gym membership, maintain a specific body weight, or eat a healthier diet." Opp. at 18. Putting aside questions whether these hypotheticals are plausible or implicate other constitutional provisions, such policies, unlike the minimum coverage provision, would not merely regulate the method of payment for services that necessarily will be rendered. Moreover, to contend that the subject of regulation has substantial effects on interstate commerce would require a chain of inferences—for example, that obese people use more health care; that increased demand for health care raises costs; that those costs fall on people who are not obese or on the interstate market generally; that Weight Watchers programs substantially reduce costs; and so on. Here, Congress found that the effects of being uninsured are direct—people who do not have insurance incur billions in health care costs for which they do not pay. Congress did

not need to "pile inference upon inference" to link the regulated activity and interstate commerce. *United States v. Lopez*, 514 U.S. 549, 567 (1995).

Nor is plaintiffs' argument correct that upholding the ACA would empower Congress to mandate the purchase of a car. Opp. at 28-29. In the health care market, not only does everyone ultimately use medical services, but health care providers are required to treat them, whether or not they can pay. Not everyone inevitably will appear on the doorstep of a car dealership, and if they do appear, they are not entitled to a new car if they cannot pay for it. Unlike the uninsured in the health care market, they will not shift their costs to other participants in the market for automobiles. In any event, the closer analogy to the minimum coverage provision is not a mandate to buy a car, but a regulation of how the purchase is financed. Congress has authority to enact that regulation, and it has authority to enact this one.

**B.     The Minimum Coverage Provision Is Valid Under the Necessary and Proper Clause**

As explained in defendants' opening brief, the minimum coverage provision is also a valid exercise of Congress's authority under the Necessary and Proper Clause. Mem. in Supp. of Mot. to Dismiss at 23-24. Indeed, Congress made express findings that the minimum coverage provision is in various ways "essential to creating [the] effective health insurance markets" that the ACA's insurance market reforms are intended to achieve. Pub. L. No. 111-148 §§ 1501(a)(2)(H)-(J), 10106(a).

Plaintiffs do not deny that Congress may regulate the health insurance industry under the Commerce Clause. *See S.E. Underwriters*, 322 U.S. at 553. But they fail to appreciate what that means. In *S.E. Underwriters*, the Supreme Court held that the antitrust prohibitions of the Sherman Act applied to fire insurance companies, and in so holding, explained that Congress's

16

goal in the Sherman Act was to "restrain[] trust and monopoly agreements" in order to make "a competitive business economy." *Id.* at 558-59.

Congress's enactment of the ACA, including the minimum coverage provision, is no different, in the sense that once again Congress sought to address a market crisis, this time in the health care and health insurance markets. The ACA's reforms are intended to increase the availability and affordability of health care and health insurance by, for example, preventing insurance companies from raising rates or denying coverage based on pre-existing medical conditions. It was also intended to protect consumers from unfair insurance industry practices. These goals are indisputably within Congress's commerce power, and plaintiffs do not contend otherwise. Under the Necessary and Proper Clause, the question is therefore whether the minimum coverage provision is "reasonably adapted" to further that legitimate end. *Sabri v. United States*, 541 U.S. 600, 605 (2004); *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819). As discussed in defendants' opening brief, Congress deemed the minimum coverage provision not only reasonably adapted but "essential" to achieving the key reforms that it adopted in the ACA because without the provision, the limitations that other parts of the Act place on insurance companies would create new incentives for healthy individuals to forgo insurance coverage until after they require health care, knowing that, because of those other reforms, they could not be denied coverage or charged higher rates once their health care needs arise. *See supra* at 10.

Plaintiffs argue that the "five considerations" listed by the Supreme Court in *United States v. Comstock*, 130 S. Ct. 1949, 1965 (2010), weigh against the provision's validity under the Necessary and Proper Clause. However, the Court in *Comstock* did not list these considerations as a "test" that must in every instance be satisfied. *See id.* To the contrary, far

17

from overruling *sub silentio* nearly 200 years of jurisprudence, *Comstock* affirmed the Court's long-standing application of "means-end" rationality review in the Necessary and Proper Clause context. *Id.* at 1956-57. The five considerations listed in *Comstock* represented the reasons that, in that particular case, the Court determined that the provision at issue was reasonably adapted to a legitimate end and have no automatic application here.

As set forth in defendants' opening brief, Congress in the ACA pursued the same goals— health care affordability and availability—that it had previously pursued for decades through legislation such as Medicare, Medicaid, ERISA, COBRA, HIPAA, and numerous other measures. *See* Mem. in Supp. of Mot. to Dismiss at 20 n.9. Congress had "sound reasons" for doing so, *Comstock*, 130 S. Ct. at 1965, and for including the minimum coverage provision as an essential part of its insurance market reforms. Thus, the provision is reasonably adapted in furtherance of a legitimate legislative end, and is therefore valid under the Necessary and Proper Clause.

**C.     The Minimum Coverage Provision Is Independently Justified Under the General Welfare Clause**

**1.      The Regulatory Effect of the Minimum Coverage Provision Does Not Remove It from the Reach of the General Welfare Clause**

In addition to its authority under the Commerce Clause, Congress's passage of the minimum coverage provision is also justified by its authority under the General Welfare Clause. Plaintiffs raise several objections to this conclusion that are without merit. First, plaintiffs contend that, because Congress did not specifically invoke the General Welfare Clause in enacting the minimum coverage provision, instead making findings about its effect on commerce, the provision may not now be upheld on that basis. Opp. at 29, 30. To begin, plaintiffs' assertion rests on an incorrect assumption, as "[t]he question of the constitutionality of

18

action taken by Congress does not depend on recitals of the power which it undertakes to exercise." *Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 144 (1948).

In any event, that Congress made findings relating to the Commerce Clause in no way suggests that the minimum coverage provision was not also an exercise of authority under the General Welfare Clause. *Cf. Network Project v. Corp. for Pub. Broad.*, 561 F.2d 963, 969 (D.C. Cir. 1977) (recognizing that the Public Broadcasting Act could be justified under both the Commerce and General Welfare Clauses). Indeed, it is not surprising that Congress would make findings relating to the Commerce Clause, but not the General Welfare Clause. The effect of a statute on interstate commerce is partly an empirical determination, as to which legislative findings may be helpful. *See Raich*, 545 U.S. at 21. Whether the statute furthers the general welfare, by contrast, is a policy judgment committed to Congress, as to which findings, particularly in this instance, are unnecessary.

Plaintiffs next assert that the minimum coverage provision cannot be considered a "tax" because it is referred to as a "penalty" in the ACA.[9] Opp. at 31. Plaintiffs hedge on this argument in the same paragraph in which they introduce it, however, suggesting that "the 'practical operation' of a provision is more informative than 'the precise form of descriptive words which may be applied to it.'" Opp. at 31 (citing *Nelson v. Sears, Roebuck & Co.*, 312 U.S. 359, 363 (1941)). The actual holding by the Supreme Court in *Nelson* is decidedly unhelpful to plaintiffs—that in "passing on the constitutionality of a tax law [the Court is] concerned *only* with its practical operation, not its definition or the precise form of descriptive

---

[9] As noted by the bipartisan Joint Committee on Taxation, the penalty under the minimum coverage provision is "assessed through the Code and accounted for as an additional amount of Federal tax owed," JCX-18-10, at 33, pursuant to "IRS authority to assess and collect taxes . . . generally provided in subtitle F, 'Procedure and Administration' in the Code." *Id.* at 33 n.68.

words which may be applied to it." *Nelson*, 312 U.S. at 363 (emphasis added) (internal quotation omitted).  Accordingly, plaintiffs' argument is plainly without merit.[10]

Finally, plaintiffs argue that because the minimum coverage provision is "primarily regulatory in nature" rather than "in the nature of a true tax," it falls outside of Congress's authority under the General Welfare Clause.  Opp. at 32.  In other words, plaintiffs would have this Court return to pre-New Deal case law which turned on whether a tax was regulatory or revenue-raising in nature.  *See, e.g.*, *Child Labor Tax Case*, 259 U.S. 20 (1922).  But the Supreme Court has long since "abandoned" its earlier "distinctions between regulatory and revenue-raising taxes" that it used to invalidate child labor laws.[11]  *Bob Jones Univ.*, 416 U.S. at 741 n.12; *see, e.g.*, *City of Pittsburgh v. Alco Parking Corp.*, 417 U.S. 369, 375 (1974) ("[E]ven if the revenue collected had been insubstantial, or the revenue purpose only secondary, we would not necessarily treat this exaction as anything but a tax * * *") (internal citations omitted); *Minor v. United States*, 396 U.S. 87, 98 n.13 (1969) ("A statute does not cease to be a valid tax measure because it deters the activity taxed, because the revenue obtained is negligible, or because the activity is otherwise illegal."); *United States v. Sanchez*, 340 U.S. 42, 44 (1950) ("It is beyond serious question that a tax does not cease to be valid merely because it regulates, discourages, or even definitely deters the activities taxed").

Even if those earlier cases had any lingering validity, they would not bring the constitutionality of the minimum coverage provision into question.  At most, they suggested that

---

[10] Plaintiffs also suggest that Congress's declaration about which enforcement measures may be used in collecting the penalty is somehow relevant to whether it is a tax in the first place.  Opp. at 32.  However, plaintiffs' citation to the fact that Congress, in devising the minimum coverage provision, saw fit to analyze the specific enforcement mechanisms that would be used following the collection of the penalty emphasizes its nature as a tax.

[11] Plaintiffs disagree with the Supreme Court's analysis in *Bob Jones* of its own holding in *Sonzinsky*.  Opp. at 33 n.17.  Even if plaintiffs were allowed to overrule the Supreme Court, their alternative reading is inconsistent with the long line of cases cited above.

a court may invalidate punitive or coercive penalties, and even then, only those penalties that coerce the taxpayer into a separate administrative scheme with detailed enforcement mechanisms not allowable under the Commerce Clause. *See, e.g.*, *Child Labor Tax Case*, 259 U.S. at 38; *Hill v. Wallace*, 259 U.S. 44, 68-69 (1922); *Carter v. Carter Coal Co.*, 298 U.S. 238, 289 (1936). Here, the minimum coverage provision is neither punitive nor coercive; the maximum penalty is no greater than the cost of obtaining insurance. Moreover, the penalty under the minimum coverage provision does not operate coercively to force individuals into a separate regulatory regime. The regulatory effect is from the operation of the provision itself.

### 2. The Minimum Coverage Provision Is Not a Direct or Capitation Tax

Plaintiffs assert, in the alternative, that if the minimum coverage provision is justified under the General Welfare Clause, it constitutes an unconstitutional direct or capitation tax. This is an extraordinary challenge, as such taxes are exceedingly rare, and the Supreme Court has expressly cautioned not to expand upon the historical understanding of these categories. *See Hylton v. United States*, 3 U.S. (3 Dall.) 171, 178 (1796) (opinion of Paterson, J.); *Murphy v. IRS*, 493 F.3d 170, 183 (D.C. Cir. 2007) (quoting opinion). That understanding recognizes only three types of direct taxes: (1) a capitation tax, (2) a tax upon real property, and (3) a tax upon personal property. *Murphy*, 493 F.3d at 181.

Of course the minimum coverage provision is not a capitation tax, which is one imposed "simply, without regard to property, profession, or any other circumstance." *Hylton*, 3 U.S. at 175 (opinion of Chase, J.); *see also Pac. Ins. Co. v. Soule*, 74 U.S. 443, 444 (1868) (adopting Justice Chase's definition). Even plaintiffs cannot plausibly assert otherwise, as they have now defaulted to arguing in a footnote that the provision "has *key aspects* of a capitation tax," rather than that it *is* a capitation tax. Opp. at 35 n.19 (emphasis added). However, even that qualified

characterization is wrong, as plaintiffs' assertion that "many Americans will end up having to pay simply because they exist," ignores multiple aspects of the Act, including its exemptions, its evaluation of personal income to determine payment amounts, and, above all else, the fact that people pay *nothing* if they have qualifying insurance. *See* Mem. in Supp. of Mot. to Dismiss at 34.

Thus, plaintiffs are left with the argument that the provision is a direct tax upon real or personal property. Plaintiffs cannot shoehorn the minimum coverage provision into these traditional categories, and therefore assert that the categories should be expanded to include the provision because it "penalizes individuals because they 'are 'there'' and *have not taken the affirmative step of buying health insurance*." Opp. at 35 (emphasis added). Plaintiffs' characterization is important because it demonstrates their recognition that the provision is not tied to the value of any property held by a non-exempted individual, and instead imposes a penalty on the choice of a method to finance the future costs of one's health care. *See* Mem. in Supp. of Mot. to Dismiss at 33. This choice is far much more "active" than the one at issue in *Murphy*, where the D.C. Circuit held that even a tax on the "involuntary conversion" of an individual's human capital for money would not be a direct tax, despite the fact that the individual had no choice but to engage in that transaction. 493 F.3d at 185; *see also* 26 U.S.C. §§ 6651 (penalizing the failure to file a return or to pay taxes when due); 2001 (taxing the estate of the deceased); 4942 (taxing private foundations that fail to distribute a sufficient proportion of their income).

### D.     The Allegations of Plaintiffs Mead, Lee, and Seven-Sky Are Insufficient to State a Claim Under the Religious Freedom Restoration Act ("RFRA")

Plaintiffs' Opposition gives short shrift to their as-applied RFRA claims, arguing that he minimum coverage provision violates RFRA by requiring plaintiffs Mead, Seven-Sky and Lee to

"choose between adhering to their religious beliefs about relying on God for their continued health and well-being and paying significant penalties to the government." Opp. at 36. This characterization misstates the actual allegations of the Amended Complaint, where each plaintiff states that he or she holds the sincere religious belief that "God will provide for [plaintiffs'] physical, spiritual and financial well-being." *See* First Am. Compl. ¶¶ 16, 29, 43. Nothing in the operation of the minimum coverage provision compels plaintiffs to change this belief; they can purchase health insurance or pay the penalty (if they are not exempted from doing so) and still maintain this religious conviction. Plaintiffs instead allege that the purchase of health insurance (or the payment of a penalty) requires plaintiffs to take action that "conflicts" with this belief. *See* Opp. at 37. That is a significant characterization, as the mere fact that government action "conflicts" with religious belief does not establish a claim under RFRA, as such a conflict does not demonstrate a substantial burden on belief. *See, e.g.*, *Kaemmerling v. Lappin*, 553 F.3d 669, 680 (D.C. Cir. 2008); *Branch Ministries v. Rossotti*, 211 F.3d 137, 142 (D.C. Cir. 2000).

Even if plaintiffs' allegations of a religious "conflict" were sufficient to state a claim under RFRA, it is entirely uncertain whether plaintiffs will even be required to comply with the minimum coverage requirement in the first instance, as they have not alleged that their sincerely-held religious beliefs prevent them from joining an entity that falls within one of the minimum coverage provision's religious exemptions. *See* Mem. in Supp. of Mot. to Dismiss at 35-36. Plaintiffs state that they "have no reason to anticipate . . . finding a health care sharing ministry eligible for an exemption whose religious tenets match their own," and that they "object to being forced by the government to join a health insurance system against their will." Opp. at 38 n.21. However, that plaintiffs refuse to seek a religious exemption and "object" to doing so, does not establish that the exemption is somehow insufficient to accommodate plaintiffs' religious beliefs,

particularly when plaintiffs do not allege that their newly-stated "objection" is religious in nature.[12]

Finally, plaintiffs fail to respond to defendants' argument in the Motion to Dismiss regarding the absence of any allegation that plaintiffs' beliefs concerning health insurance are an important part of their religious scheme. *See, e.g.*, *Henderson v. Kennedy*, 265 F.3d 1072, 1074 (D.C. Cir. 2001); *Kaemmerling*, 553 F.3d at 678. Apparently, plaintiffs are not members of any particular religious sect with a focus on methods of healing, such as Christian Scientists. *See* Opp. at 37 n.20. Thus, there is no indication in the Amended Complaint that being required to purchase health insurance implicates an important part of plaintiffs' religion such that it imposes a substantial burden on belief. After all, plaintiffs do not dispute that they routinely pay, and have paid, taxes that support numerous federal health insurance programs, including Medicare, apparently without objection. *See* Mem. in Supp. of Mot. to Dismiss at 37. Plaintiffs' participation in these programs, like the minimum coverage provision, does not substantially burden their sincerely-held religious beliefs.[13]

---

[12] Plaintiffs may, of course, also qualify for one of the other exemptions in the Act, such as that for individuals who cannot afford coverage or suffer a financial hardship. *See* Pub. L. No. 111-148, § 1501(b) (adding 26 U.S.C. § 5000A(e)).

[13] In light of the scant attention paid by plaintiffs to their RFRA claims, defendants believe it unnecessary to reassert the government's compelling interests. But here, too, plaintiffs' assertions are misguided. Plaintiffs first argue that defendants have not demonstrated a compelling interest relative to "the particular claimant" in the case. Opp. at 38. However, that assertion ignores the fact that providing an exemption to all individuals who, like plaintiffs, assert a generalized religious objection to the purchase of health insurance would render achievement of the policy objective impossible. *See* Mem. in Supp. of Mot. to Dismiss at 40. Moreover, plaintiffs ignore defendants' proffer that the minimum coverage provision's objectives—including promoting the public health—are the compelling government interest at stake in this litigation. *See* Mem. in Supp. of Mot. to Dismiss at 39. In fact, the correlation between *United States v. Lee*, 455 U.S. 252 (1982), and its progeny and a mandatory system of health insurance has already been drawn by the Ninth Circuit in *Goehring v. Brophy*, 94 F.3d 1294, 1298 (9th Cir. 1996), *overruled on other grounds*, *City of Boerne v. Flores*, 521 U.S. 507 (1997). Despite plaintiffs' attempt to distinguish *Goehring*, the fact remains that the plaintiffs in

**CONCLUSION**

For the reasons stated, the government's motion to dismiss should be granted.

DATED:  September 24, 2010                     Respectfully submitted,

                                               TONY WEST
                                               Assistant Attorney General

                                               IAN HEATH GERSHENGORN
                                               Deputy Assistant Attorney General

                                               RONALD C. MACHEN JR.
                                               United States Attorney

                                               JENNIFER RICKETTS
                                               Director

                                               SHEILA LIEBER
                                               Deputy Director

                                               */s/ Eric R. Womack*
                                               ERIC R. WOMACK (IL Bar No. 6279517)
                                               Trial Attorney
                                               United States Department of Justice
                                               Civil Division, Federal Programs Branch
                                               20 Massachusetts Ave. NW
                                               Washington, DC 20530
                                               Eric.Womack@usdoj.gov
                                               Tel: (202) 514-4020
                                               Fax: (202) 616-8470

---

*Goehring* "allege[d] that the University's mandatory student registration fee violates their right to free exercise of religion because the fee is used, in part, to subsidize the University's health insurance program, which covers abortion services." *Id.* at 1297.  Defendants, of course, do not rely on the "substantial burden" portion of the decision in *Goehring* that has since been superseded by statute—a basis for the decision separate and apart from the compelling interest analysis. *See id.* at 1299-1300.

**CERTIFICATE OF SERVICE**

I hereby certify that on September 24, 2010, I caused a true and correct copy of the

foregoing Reply to be served on Plaintiffs' counsel electronically by means of the Court's ECF

system.

 */s/ Eric R. Womack*
ERIC R. WOMACK