### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

—————————————————————————
MARGARET PEGGY LEE MEAD,          )
et al.,                           )
                                  )
          Plaintiffs,             )
                                  )
     v.                           )     Civil Action No. 10-950 (GK)
                                  )
ERIC H. HOLDER, JR., et al.,      )
                                  )
          Defendants.             )
—————————————————————————)

### MEMORANDUM OPINION

Plaintiffs Margaret Peggy Lee Mead, Charles Edward Lee, Susan Seven-Sky, Kenneth Ruffo, and Gina Rodriguez bring this action against Defendants Eric H. Holder, Jr., Kathleen Sebelius, and Timothy F. Geithner in their official capacities and Defendants United States Department of Health and Human Services and United States Department of the Treasury. Plaintiffs seek a declaration pursuant to 28 U.S.C. §§ 2201-2202 that the individual insurance mandate of the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010), as amended by the Health Care and Education Reconciliation Act, Publ. L. No. 111-152, 124 Stat. 1029 (2010) ("Affordable Care Act" or "ACA") is unconstitutional on its face. Plaintiffs also seek injunctive relief against enforcement of the mandate.

This matter is presently before the Court on Defendants' Motion to Dismiss Plaintiffs' Amended Complaint [Dkt. No. 15]

pursuant to Federal Rule of Civil Procedure 12(b)(6).[1] On January 31, 2011, oral argument was heard on Defendants' Motion. Upon consideration of the Motion, Opposition, Reply, the arguments presented by the parties in open court, and the entire record herein, and for the reasons set forth below, the Motion to Dismiss is **granted**.

The present litigation is one of many similar lawsuits challenging the Affordable Care Act in United States District Courts around the country. The controversy surrounding this legislation is significant, as is the public's interest in the substantive reforms contained in the Act. It is highly likely that a decision by the United States Supreme Court will be required to resolve the constitutional and statutory issues which have been raised. Needless to say, this Court's personal views on the

---

[1]    In their August 20, 2010, Motion to Dismiss, Defendants also moved for dismissal under Federal Rule of Civil Procedure 12(b)(1), arguing that Plaintiffs lacked standing, that this case was not ripe for judicial review, and that this case was barred by the Anti-Injunction Act, 26 U.S.C. § 7421. See Defs.' Mot. at 9-16 [Dkt. No. 15]. On January 21, 2011, Defendants filed a Notice stating that they do not intend to pursue their Rule 12(b)(1) arguments. See Notice Regarding Mot. to Dismiss [Dkt. No. 34]. The Court therefore will deem the Defendants' arguments concerning the Anti-Injunction Act waived and will not consider them. However, because the parties cannot waive any defect in this Court's jurisdiction, the arguments concerning standing and ripeness will still be addressed. See Ashcroft v. Iqbal, 129 S.Ct. 1937, 1945, 173 L.Ed.2d 868 (2009) ("Subject-matter jurisdiction cannot be forfeited or waived and should be considered when fairly in doubt.") (citations omitted).

necessity, prudence, or effectiveness of the Affordable Care Act are of no moment whatsoever. The only issues concerning the ACA presently before this Court are those raised by the parties: namely, whether § 1501 passes muster under the Constitution of the United States, and whether it violates the Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb <u>et</u> <u>seq.</u> ("RFRA").

## I.  Background

On March 23, 2010, President Barack Obama signed the Affordable Care Act into law in an effort to curb rising health care costs and to provide greater coverage for the more than 45 million Americans who were uninsured during 2009. <u>See</u> Cong. Budget Office, Key Issues in Analyzing Major Health Insurance Proposals 1 (2008), <u>available</u> <u>at</u> http://www.cbo.gov/ftpdocs/99xx/ doc9924/12-18-keyissues.pdf. The ACA contains many provisions designed to improve access to the national health care market, reduce health care costs, and increase coverage for those who now lack protection. For example, the ACA (1) creates state-operated health benefit exchanges which enable individuals and small businesses to obtain price-competitive health insurance, see ACA §§ 1311, 1321, (2) expands Medicaid coverage, see ACA § 2001, (3) prohibits insurance companies from denying or increasing the price of coverage to individuals with pre-existing medical conditions, from limiting the amount of coverage available, and from rescinding

coverage when an individual becomes sick, see ACA §§ 1001, 1201, (4) requires that large employers offer health insurance to their employees, see ACA § 1511, and (5) waives all Medicare coinsurance and copayment fees for a multitude of preventive services, including screening for depression, colon cancer, breast cancer, and cervical cancer, see ACA § 4104.

Plaintiffs challenge § 1501 of the Affordable Care Act, entitled "Requirement to Maintain Minimum Essential Coverage." See ACA § 1501 (adding 26 U.S.C. § 5000A) ("individual mandate"); id. § 10106 (amending findings in § 1501). Section 1501 requires "individuals," as defined under the ACA,[2] "for each month beginning after 2013 [to] ensure that the individual, and any dependent of the individual who is an applicable individual, is covered under minimum essential coverage for such month." 26 U.S.C. § 5000A(a). If an individual fails to obtain such minimum essential coverage, he or she must include with their annual federal tax payment a

---

[2]     Under the ACA, the term "individual" excludes those who qualify for a religious conscience exemption under § 1311(d)(4)(H), are members of a health care sharing ministry, or are incarcerated. 26 U.S.C. § 5000A(d). In addition, § 1501 exempts from its penalty provision those individuals for whom the annual cost of the required coverage exceeds eight percent of their household income, individuals whose household income falls below the poverty line, members of Indian tribes, and individuals deemed to have suffered a hardship with respect to their capability to obtain coverage. Id. § 5000A(e).

"shared responsibility payment," which is a "penalty" consisting of a fixed dollar amount. Id. §§ 5000A(b), (c).

In short, § 1501 establishes a requirement that, beginning in 2014, each individual obtain health care coverage or pay a monetary penalty. This individual mandate is a critical element in Congress's comprehensive plan to reduce the spiraling health care costs that this country has experienced and is expected to experience in the future. Indeed, Congress specifically concluded that "[t]he requirement is essential to creating effective health insurance markets in which improved health insurance products that are guaranteed issue and do not exclude coverage of preexisting conditions can be sold." ACA § 1501(a)(2)(I), as amended by § 10106. Thus, the individual mandate provision must be viewed not as a stand-alone reform, but as one piece of a larger package of reforms meant to revamp the national health care market by creating new procedures and institutions to reduce overall costs. See ACA § 1501(a)(2)(H), as amended by § 10106. Put differently, many of the reforms contained in the Affordable Care Act rely on the individual mandate--or, more specifically, the reduction in health insurance premiums that the mandate is intended to produce--to help support their own financial viability.

Plaintiffs are individual federal taxpayers who specifically allege that they can afford health insurance coverage, but that

they have chosen not to purchase it in the past and do not wish to purchase it in the future. Plaintiff Mead is a sixty-two year-old, self-employed resident of North Carolina who has not had health insurance for approximately eighteen years. Am. Compl. ¶¶ 11-14 [Dkt. No. 10]. Plaintiff Lee is a sixty year-old, unemployed resident of Texas who has not had health insurance for approximately twenty-two years, although he could obtain coverage under the plan held by his wife, who is employed. Id. ¶¶ 23-26. Plaintiff Seven-Sky is a fifty-three year-old, self-employed resident of New York who has not had health insurance for at least six years. Id. ¶¶ 37-39. Plaintiff Ruffo is a forty-nine year-old, self-employed resident of Texas who has not had health insurance for at least five years. Id. ¶¶ 51-54. Finally, Plaintiff Rodriguez is a thirty-six year-old resident of Texas who is a stay-at-home mother of three children and who has not had health insurance for approximately ten years. Id. ¶¶ 63-75.

According to Plaintiffs, they are all "generally in good health." Id. ¶¶ 12, 25, 39, 53, 65. While Plaintiffs Ruffo and Rodriguez do intend to consume medical services in the future, they object to § 1501 because they would prefer to pay for those services out of pocket. Plaintiffs Mead, Lee, and Seven-Sky, on the other hand, allege that they will continue to refuse all medical services for the remainder of their lives.

None of the Plaintiffs currently qualify for Medicare or Medicaid, and Plaintiffs Mead, Lee, and Seven-Sky have stated that they will not enroll in Medicare once they do qualify. Id. ¶¶ 11, 24, 38, 52, 64. Plaintiffs contend that they also do not qualify for any of the exemptions under the ACA, and that it is thus "highly likely" that they will be required to either purchase health insurance or make an annual shared responsibility payment beginning in 2014. Id. ¶¶ 14, 27, 41, 55, 67.

Plaintiffs strenuously object to the Act's individual mandate because they believe that the federal government lacks the constitutional authority to require them either to purchase health insurance or pay a substantial penalty. According to Plaintiffs, the individual mandate provision will impose annual shared responsibility payments through 2020 costing Plaintiffs Mead, Lee, Seven-Sky, and Ruffo a minimum of $3,895 each and Plaintiff Rodriguez a minimum of $11,685, for a total cost to Plaintiffs of $27,265 in this period. Plaintiffs claim that anticipation of these costs has compelled them to "adjust their fiscal affairs" in the present. Id. ¶ 4.

Plaintiffs also object to the individual mandate on religious grounds. Plaintiffs Mead, Lee, and Seven-Sky believe that God will provide for their physical, spiritual, and financial well-being, and that "[b]eing forced to buy health insurance conflicts with

[their] religious faith because [they] believe[] that [they] would be indicating that [they] need[] a backup plan and [are] not really sure whether God will, in fact, provide for [their] needs." Id. ¶¶ 16, 29, 43. Plaintiffs Ruffo and Rodriguez do not wish to purchase health insurance because it is contrary to their beliefs in a holistic approach to medicine. Id. ¶ 56, 68. Rodriguez specifically objects on the ground that health insurance would not cover many of the medical services and health products she currently pays for out of pocket.[3] Id. ¶ 69.

Based on these objections, Plaintiffs assert in their Amended Complaint that the Act's individual mandate and its related enforcement provisions exceed Congress's power under Article I of the Constitution and, consequently, that these provisions are unconstitutional and unenforceable. In the alternative, Plaintiffs argue that the individual mandate violates their rights as set forth in RFRA.

On August 20, 2010, Defendants filed the present Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6).[4] The Government argues that the Amended Complaint fails to state a claim

---

[3]     Plaintiff Rodriguez does not specify which services that she currently pays for out of pocket would not be covered by health insurance.

[4]     As noted earlier, Defendants have, for all practical purposes, withdrawn their Motion to Dismiss under Rule 12(b)(1). See supra n.1.

because Congress does have authority under the Commerce Clause and the General Welfare Clause of Article I of the Constitution to enact § 1501, and because § 1501 does not violate RFRA.

## II. Standard of Review

Under Rule 12(b)(6), a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face" and to "nudge[] [his or her] claims across the line from conceivable to plausible." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "[A] complaint [does not] suffice if it tenders naked assertions devoid of further factual enhancement." Iqbal, 129 S.Ct. at 1949 (internal quotations omitted) (citing Twombly, 550 U.S. at 557, 127 S.Ct. 1955). Instead, the complaint must plead facts that are more than "merely consistent with" a defendant's liability; "the pleaded factual content [must] allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 1940.

"[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Twombly, 550 U.S. at 563, 127 S.Ct. 1955. Under the standard set forth in Twombly, a "court deciding a motion to dismiss must . . . assume all the allegations in the complaint are true (even if doubtful in fact) . . . [and] must give

the plaintiff the benefit of all reasonable inferences derived from the facts alleged." Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc., 525 F.3d 8, 18 (D.C. Cir. 2008) (internal quotations marks and citations omitted); see also Tooley v. Napolitano, 586 F.3d 1006, 1007 (D.C. Cir. 2009) (declining to reject or address the government's argument that Iqbal invalidated Aktieselskabet). Of course, if a claim does not rest on sound legal conclusions, it does not state "a plausible claim for relief," regardless of the facts alleged. Iqbal, 129 S.Ct. at 1950.

## III. Analysis

The Court will first address its subject matter jurisdiction over this case, before turning to the parties' legal arguments concerning Plaintiffs' substantive claims.

### A.    Article III Subject Matter Jurisdiction

On January 21, 2011, Defendants gave notice to this Court of their intent not to pursue their arguments that the Amended Complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. Although Defendants have waived these arguments, every federal court must satisfy itself of its own subject matter jurisdiction, which is limited by Article III of the Constitution. See FW/PBS, Inc. v. Dallas, 493 U.S. 215, 230-31, 110 S.Ct. 596, 107 L.Ed.2d 603

(1990). Therefore, this Court must determine whether it has jurisdiction.

Article III of the United States Constitution limits federal jurisdiction to actual cases and controversies. "Three inter-related judicial doctrines--standing, mootness, and ripeness--ensure that federal courts assert jurisdiction only over" such disputes. <u>Worth v. Jackson</u>, 451 F.3d 854, 855 (D.C. Cir. 2006). Two of those doctrines formerly asserted by Defendants, standing and ripeness, have been the topic of extended discussion in the district court opinions deciding motions to dismiss in similar challenges to the ACA made across the country,[5] and will now be considered in the context of this case.

---

[5]     <u>See</u> <u>Goudy-Bachman v. United States Dep't of Health and Human Svs.</u>, No. 10-cv-763, 2011 WL 223010, at *4-8 (M.D. Pa. Jan. 24, 2011); <u>New Jersey Physicians, Inc. v. Obama</u>, No. 10-cv-1489, 2010 WL 5060597, at *3-8 (D.N.J. Dec. 8, 2010); <u>Liberty Univ., Inc. v. Geithner</u>, No. 6:10-cv-00015, 2010 WL 4860299, at *3-8 (W.D. Va. Nov. 30, 2010); <u>State of Florida ex rel. McCollum v. United States Dep't of Health and Human Servs.</u>, 716 F.Supp.2d 1120, 1144-50 (N.D. Fla. 2010); <u>Thomas More Law Ctr. v. Obama</u>, 720 F.Supp.2d 882, 887-90 (E.D. Mich. 2010); <u>United States Citizens Ass'n v. Sebelius</u>, No. 10-cv-1065, 2010 WL 4947043, at *3-5 (N.D. Ohio Nov. 22, 2010); <u>Baldwin v. Sebelius</u>, No. 10-cv-1033, 2010 WL 3418436, at *1-5 (S.D. Cal. Aug. 27, 2010); <u>see</u> <u>also</u> <u>Virginia ex rel. Cuccinelli v. Sebelius</u>, 702 F.Supp.2d 598, 602-08 (E.D. Va. 2010) (discussing standing and ripeness in challenge brought by Commonwealth of Virginia, rather than any individual plaintiffs).

## 1. Standing

In Lujan v. Defenders of Wildlife, the Supreme Court established the following three requirements for Article III standing:

> First, the plaintiff must have suffered an injury in fact-an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of--the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotations and citations omitted). In this case, the issues regarding standing relate only to the first element, namely the requirement that Plaintiffs suffer an injury in fact.

Plaintiffs allege two separate injuries arising from the individual mandate provision of the ACA in their Amended Complaint. First, Plaintiffs allege a future injury based on the Act's requirement that, beginning in 2014, they make annual shared responsibility payments for having failed to obtain minimum essential coverage. Second, Plaintiffs allege that the ACA is causing actual injury now by forcing them to rearrange their finances at this time in order to prepare for enforcement of the

-12-

individual mandate in 2014. The question before this Court is whether either of these claimed injuries establishes Plaintiffs' standing in this case.

### a. Future Injury

The Court will first consider whether Plaintiffs' alleged threat of future injury in the form of shared responsibility payments is "actual or imminent," and not "conjectural and hypothetical." Id. at 560, 112 S.Ct. 2130 (internal quotations and citations omitted). Specifically, the Court must decide whether Plaintiffs have demonstrated that the individual mandate will apply to them in 2014, given the possibility that intervening events could result in their exemption from the minimum coverage requirement. Of course, if Plaintiffs are found to be exempt from the minimum coverage requirement in 2014, their claimed injury-- payment of the penalty--will not occur.

For example, Plaintiff Mead may not be subject to the individual mandate in 2014 because she will likely be eligible for Medicare Part A by that time. See Defs.' Mot. at 11 ("Plaintiff Mead . . . will likely be subject to automatic entitlement to Medicare Part A by 2014, thus satisfying the minimum coverage requirement."). In addition, the other Plaintiffs "might find employment by 2014 that provides adequate health [care] coverage, find that their economic situation has deteriorated to the point

where they qualify for Medicaid or a financial hardship exemption, or discover that they have changed their minds about the necessity of health insurance due to such possible life events as a serious illness." Id. at 11-12 (internal citation and footnote omitted). In short, the argument is that the facts alleged in the Amended Complaint may change between now and 2014, and therefore this Court risks "deciding a case in which no injury would have occurred at all." Lujan, 504 U.S. at 564 n.2, 112 S.Ct. 2130.

Section 1501 of the ACA provides that Medicare Part A will satisfy the minimum coverage requirement. See 26 U.S.C. § 5000A(f)(1)(A). Thus, if Plaintiff Mead is covered under Medicare Part A in 2014, it appears that she would not be subject to the Act's penalty provision. However, Mead alleges that she will nevertheless refuse to enroll in Medicare once she qualifies.

The Social Security Act provides that "[e]very individual who has attained age 65 and is entitled to monthly [Social Security] benefits . . . shall be entitled to hospital insurance benefits under Part A of [the Medicare Act]." 42 U.S.C. § 426(a). To be entitled to Social Security benefits, Mead must file an application. See 42 U.S.C. § 402. If Mead does apply for Social Security benefits, her enrollment in Medicare Part A becomes automatic. In addition, she may not opt out of Medicare Part A and still maintain her Social Security benefits; if she chooses to

maintain her Social Security benefits, she will remain enrolled in Medicare Part A. <u>See</u> Social Security Administration, POMS Section HI 00801.002 Waiver of HI Entitlement by Monthly Beneficiary, <u>available</u> <u>at</u> http://policy.ssa.gov/poms.nsf/lnx/0600801002; <u>Hall v.</u> <u>Sebelius</u>, 689 F.Supp.2d 10, 15-16 (D.D.C. 2009) (rejecting in part a challenge to Social Security Administration requirement that individuals who receive Social Security benefits must also receive Medicare Part A coverage).

The Amended Complaint states that Mead will refuse to enroll in Medicare Part A, but it does not allege that she will forgo her Social Security benefits. <u>See</u> Am. Compl. ¶ 11. In the absence of such an allegation, the Court is not persuaded that there is a substantial probability that she will reject her monthly Social Security checks and therefore not be covered under Medicare Part A in 2014. Thus, it is unlikely that Plaintiff Mead will be subject to § 1501's penalty provision in 2014, which compels the conclusion that she lacks standing in this case.

Still, if just one of the other Plaintiffs has standing to raise the claims alleged in the Amended Complaint, this Court has subject matter jurisdiction. <u>Watt v. Energy Action Educ. Found.</u>, 454 U.S. 151, 160, 102 S.Ct. 205, 70 L.Ed.2d 309 (1981). As discussed above, the other Plaintiffs' circumstances could also change before 2014 so that they either are no longer subject to the

minimum essential coverage requirement or they satisfy it. However, this Court agrees with Judge Vinson in McCollum that:

> Such 'vagaries' of life are always present, in almost every case that involves a pre-enforcement challenge. If the defendants' position were correct, then courts would essentially never be able to engage in pre-enforcement review. Indeed, it is easy to conjure up hypothetical events that could occur to moot a case or deprive any plaintiff of standing in the future.

McCollum, 716 F.Supp.2d at 1147 (emphasis in original). Indeed, as our Court of Appeals has made clear, a plaintiff need only establish the elements of standing by a "substantial probability," not with certainty. Sierra Club v. EPA, 292 F.3d 895, 899 (D.C. Cir. 2002).

The possible changes in the facts of this case are by no means certain, or even likely to occur. By the same token, there is a substantial probability that Plaintiffs will remain subject to 26 U.S.C. § 5000A(a) in 2014. In addition, whether Plaintiffs will be subject to the individual mandate in the future does not depend on such future contingencies as third-party actions. This case is therefore distinguishable from cases in which the alleged future injuries are truly speculative. See, e.g., Public Citizen, Inc. v. NHTSA, 489 F.3d 1279, 1290 (D.C. Cir. 2007);[6] Gulf Restoration

_____

[6]     In Public Citizen, four individual tire manufacturers, a tire industry trade association, and an organization advocating for consumer safety challenged a National Highway Traffic Safety

Network, Inc. v. Nat'l Marine Fisheries Serv., 730 F.Supp.2d 157, 165-67 (D.D.C. 2010). Consequently, Plaintiffs have alleged facts sufficient to show a substantial probability that they will remain without health insurance coverage in 2014 and that they will thereafter be required by the ACA to make annual shared responsibility payments.

A separate issue, however, is whether Plaintiffs' alleged future injury is imminent. It first bears noting that, unlike the plaintiffs in Lujan, Plaintiffs in this case have given a definite point in time by which their injury will occur, namely 2014, the effective date of the Act's individual mandate provision. Thus, injury is not alleged at "some indefinite future time," which would indicate a lack of imminence. Lujan, 504 U.S. at 2139 n.2, 112 S.Ct. 2130.

---

Administration performance standard for tire pressure monitors. See 489 F.3d 1279. The standard imposed no requirements upon any of those petitioners, but only on automobile manufacturers, none of whom were a party to the lawsuit. The petitioners' claimed injuries instead arose from an alleged increased risk of car accidents. The court rejected the tire industry petitioners' "increased-risk-of-harm" claim, concluding that such injury was speculative because it turned on both the occurrence of an accident and the victim's subsequent decision to bring a product liability claim against tire manufacturers. However, the court did not close the door to the organization's increased-risk-of-harm claim, but sought further information that would demonstrate "at least both (i) a substantially increased risk of harm and (ii) a substantial probability of harm with that increase taken into account." Id. at 1296 (emphasis in original).

Still, Plaintiffs' alleged injuries are temporally remote. In McConnell v. FEC, the Supreme Court concluded that an FEC regulation which would not affect the plaintiff Senator until five years in the future was "too remote temporally to satisfy Article III standing." 540 U.S. 93, 226, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003); see also Shays v. FEC, 414 F.3d 76, 122-23 (D.C. Cir. 2005) (noting that directly regulated parties do not have automatic standing absent showing of imminent injury). Thus, McConnell suggests that an injury which is several years in the future may not be imminent, and therefore insufficient to establish standing.

As the Court noted in Lujan, however, imminence is an "elastic concept" that does not lend itself to mathematical precision. Lujan, 504 U.S. at 564 n.4, 112 S.Ct. 2130. In addition, it is significant that our Circuit held, in a case decided shortly after McConnell,[7] that temporal remoteness alone does not automatically defeat standing. In Village of Bensenville v. FAA, our Court of

_____

[7]     Although the threatened injury in Village of Bensenville was significantly more remote than that in McConnell, the court never cited McConnell in its opinion. See Village of Bensenville v. FAA, 376 F.3d 1114 (D.C. Cir. 2004). It is hard to believe that the Court of Appeals was not fully aware of that decision. One possible reason for this omission is that, in Village of Bensenville, the FAA had made a final decision to approve the challenged fees. Thus, the fee's application to plaintiffs was nearly certain, although it was many years in the future. Id. at 1119. In contrast, in McConnell, it was not as clear that the challenged regulation would apply to the plaintiff, as its application depended on a number of factors such as the plaintiff's decision to seek re-election. 540 U.S. at 226, 124 S.Ct. 619.

Appeals found standing where the plaintiffs were challenging a fee scheduled to be collected thirteen years in the future because "[t]he FAA's order is final and, absent action by us, come 2017 Chicago will begin collecting the passenger facility fee; accordingly, 'the impending threat of injury [to the municipalities] is sufficiently real to constitute injury-in-fact and afford constitutional standing.'" 376 F.3d 1114, 1119 (D.C. Cir. 2004) (quoting Wyo. Outdoor Council v. United States Forest Serv., 165 F.3d 43, 51 (D.C. Cir. 1999)). In this case, the ACA's individual mandate provision is similarly final and, absent action by the courts or Congress, the federal government will begin to impose penalties on qualifying individuals who refuse to obtain minimum essential coverage in 2014.

Although it cannot be said with absolute certainty that Plaintiffs will qualify as individuals subject to the minimum essential coverage requirement in 2014, such a conclusion is not required. All that is required is that Plaintiffs allege a substantial probability that they will be subject to the ACA's requirement to maintain minimum essential coverage in 2014. Sierra Club, 292 F.3d at 899 (stating that plaintiff need not prove merits of case, but only demonstrate that there is a "substantial probability that local conditions will be adversely affected and thereby injure a member of the organization") (citation and

internal quotations omitted). Because the Court finds that Plaintiffs have met this standard, it concludes that they have demonstrated a concrete, particularized, and imminent future injury: payment of a penalty under 26 U.S.C. § 5000A(b) for having failed to satisfy section § 5000A(a)'s requirement.

### b. Actual Injury

As noted above, in addition to alleging future injury, Plaintiffs also allege actual injury: the requirement that they adjust their finances now by setting aside money to pay the anticipated penalties. It is established that the taking of current measures to ensure future compliance with a statute can constitute an injury: "The present or near-future costs of complying with a statute that has not yet gone into effect can be an injury in fact sufficient to confer standing." Liberty Univ., 2010 WL 4860299, at *5 (discussing Virginia v. Am. Booksellers Ass'n, Inc., 484 U.S. 383, 392-93, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988)).

Indeed, as Plaintiffs allege in their Amended Complaint, being forced to set aside money now prevents them from using that money for discretionary spending, charitable donations, or paying debts, thus requiring them to "adjust [their] lifestyle[s] accordingly." Am. Compl. ¶¶ 20, 34, 48, 60, 73. For example, Plaintiff Rodriguez specifically alleges that she is prevented from saving money for her children's college education because she must set aside funds

now in order to pay the Act's penalties. Id. ¶ 73. As this example demonstrates, a burden is placed on those individuals who anticipate being subject to the Act's individual mandate penalty. Plaintiffs have therefore suffered an injury in fact.

To summarize, then, Plaintiffs have alleged two distinct injuries: (1) a future injury fairly traceable to the enforcement of the ACA beginning in 2014, when they are forced to make annual shared responsibility payments, and (2) a present injury resulting from their needing to rearrange their finances now in anticipation of those mandatory payments. Plaintiffs therefore have demonstrated their Article III standing to bring this challenge to the ACA.

### 2. Ripeness

Next, this Court will consider whether it lacks subject matter jurisdiction over Plaintiffs' challenge because the case is not yet ripe for review. Like the Article III case and controversy requirements for standing, a plaintiff must suffer present or imminent injury in fact to establish Constitutional ripeness. See Wyo. Outdoor Council, 165 F.3d at 48 ("Just as the constitutional standing requirement for Article III jurisdiction bars disputes not involving injury-in-fact, the ripeness requirement excludes cases not involving present injury."). "If a threatened injury is sufficiently 'imminent' to establish standing, the constitutional requirements of the ripeness doctrine will necessarily be

satisfied. At that point, only the prudential justiciability concerns of ripeness can act to bar consideration of the claim." Nat'l Treasury Employees Union v. United States, 101 F.3d 1423, 1428 (D.C. Cir. 1996).

Having found both a present injury and a sufficiently imminent threatened injury to establish Plaintiffs' standing in this case, the Court next considers the doctrine of prudential ripeness. Courts apply a two-pronged balancing test to determine whether a case is ripe for adjudication. See Abbott Laboratories v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). First, a court must evaluate the "fitness of the issue for judicial decision." Id. Second, a court must consider "the hardship to the parties of withholding [its] consideration." Id.

A case is fit for judicial resolution when it does not depend upon "contingent future events that may not occur as anticipated, or indeed may not occur at all." Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 580-81, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985). The possibility of intervening changes in Plaintiffs' circumstances which would exempt them from the individual mandate provision has been noted, but once again it does not persuade this Court that Plaintiffs' case is nonjusticiable:

> [A] litigant seeking shelter behind a ripeness defense must demonstrate more than a theoretical possibility that harm may be averted. The demise of a party or the repeal

-22-

> of a statute will always be possible in any
> case of delayed enforcement, yet it is well
> settled that a time delay, without more, will
> not render a claim of statutory invalidity
> unripe if the application of the statute is
> otherwise sufficiently probable.

Riva v. Com. of Mass., 61 F.3d 1003, 1011 (1st Cir. 1995)
(citations omitted). For the reasons already given, the application
of the individual mandate to at least one of the Plaintiffs is
sufficiently probable that the delay in its enforcement does not
render their claims unripe.

In addition, Plaintiffs have also alleged a ripe, actual
injury consisting of the impact on their current financial
decision-making. That injury is being felt now, and is therefore
not subject to contingent future events. Finally, the issues
presented in this case are overwhelmingly legal, and it is well
established that cases involving only purely legal issues are more
fit for immediate review than those with key unresolved factual
issues. Abbott Laboratories, 387 U.S. at 149, 87 S.Ct. 1507.

In short, the facts as alleged show that "there is a
substantial controversy, between parties having adverse legal
interests, of sufficient immediacy and reality to warrant the
issuance of a declaratory judgment." Maryland Cas. Co. v. Pacific
Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826
(1941). The Court therefore concludes that this case is fit for
judicial resolution.

With respect to the hardship prong, it is clear that the individual mandate provision has "a direct effect on the day-to-day business" of Plaintiffs. Abbott Laboratories, 387 U.S. at 152, 87 S.Ct. 1507. Plaintiffs must restructure their finances either to buy unwanted health insurance or to put aside money for future penalties. Pls.' Opp'n at 7. Thus, if this Court were to delay consideration of Plaintiffs' challenge, they would have to choose between using their money for other purposes now and risking their inability to pay future penalties under the Affordable Care Act, or needlessly saving money in the interim that could have been put to different uses. See Riva, 61 F.3d at 1012 (concluding that hardship prong was satisfied when plaintiff challenging future pension reduction would be forced, in absence of judicial review, to guess whether his benefits would not be reduced--thus finding himself inadequately prepared if they were--or whether they would be --thus needlessly "depriv[ing] himself in the intervening seven years").

For these reasons, the Court concludes that the present case is fit for judicial review and that delaying its review would result in further hardship to Plaintiffs.[8] Consequently, the Court

---

[8]     Apart from the hardship which delaying resolution of this case would impose on Plaintiffs, "it certainly appears that the government has an interest in knowing sooner, rather than later, whether an essential part of its program regulating the national health care market is constitutional, although in this case it is not the government asking for the review." Thomas More Law Ctr., 720 F.Supp.2d at 890. In addition, as a practical matter, other

holds that it has subject matter jurisdiction over Plaintiffs' case.

## B.   Congress's Authority for Enacting the Individual Mandate

Having determined that it has subject matter jurisdiction, the Court now turns to the parties' substantive arguments concerning the constitutionality of the ACA. Article I of the Constitution establishes that the legislative branch of the federal government shall be one of enumerated--and therefore limited--powers. See U.S. Const. art. I, § 8. Pursuant to the Tenth Amendment, any powers not granted to the federal government and not prohibited to the states by the Constitution are reserved to the states and to the people. U.S. Const. amend. X. By maintaining this separation between the federal government and the states, the far-seeing Framers of our Constitution intended to "'reduce the risk of tyranny and abuse from either front.'" United States v. Lopez, 514 U.S. 548, 552, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (quoting Gregory v. Ashcroft, 501 U.S. 452, 458, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991)).

Plaintiffs seek a declaration that § 1501 is unconstitutional on the basis that Congress exceeded its constitutional powers when it required individuals to either purchase health insurance or pay

---

actors in the health care market who are not parties to this litigation but must take significant steps to adapt to the ACA's reforms--including hospitals, doctors, and, of course, insurance companies--have a substantial interest in knowing whether the ACA passes constitutional muster.

a penalty. Because Plaintiffs are mounting a facial challenge to the ACA, they must satisfy the demanding requirement to demonstrate that "no set of circumstances exist under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). The Government moves for dismissal of Plaintiffs' challenge on the basis that it fails to state a claim because Article I, § 8 delegates to Congress the power to enact the individual mandate provision under the Commerce Clause, the Necessary and Proper Clause, and the General Welfare Clause. The Court will consider each of these claimed authorities for § 1501 in turn.

### 1. Commerce Clause

Article I, § 8 of the Constitution delegates to Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." The earliest judicial pronouncement setting forth the breadth of the Commerce Clause was issued by Chief Justice Marshall in Gibbons v. Ogden, 9 Wheat. 1, 196, 6 L.Ed. 23 (1824), where he described it as "the power to regulate; that is, to prescribe the rule by which [interstate] commerce is to be governed."

Since Chief Justice Marshall's pronouncement, the Commerce Clause has greatly evolved as the country's economic system has become ever more dominated by commerce "among the several States."

In the first century of the United States's history, Congress used its Commerce Clause power primarily to ensure the survival of the federal republic by preventing the states from engaging in economic competition with one another. Thus, the earliest judicial decisions focused "almost entirely [on] the Commerce Clause as a limit on state legislation that discriminated against interstate commerce." Lopez, 514 U.S. at 553-54, 115 S.Ct. 1624. However, by the turn of the 20th century the Court's focus shifted to examining the extent of Congress's positive power to regulate, beginning with the enactment of--and subsequent challenges to--two major pieces of legislation: the 1887 Interstate Commerce Act, 24 Stat. 379, and the 1890 Sherman Antitrust Act, 26 Stat. 209, as amended, 15 U.S.C. § 1 et seq. See id.; State of Florida ex rel. Bondi, 2011 WL 285683, at *14-15.

Following this shift in focus, the Supreme Court's interpretation of Congress's Commerce Clause power began to evolve in a line of cases decided in the 20th century. Because these cases established a number of basic principles applicable to this case, a brief discussion of them is necessary before turning to an analysis of the parties' specific arguments.

> **a.   Long-Standing Principles of Commerce Clause Jurisprudence**

In the early 20th century, when the focus of Commerce Clause jurisprudence was only beginning to shift toward Congress's power

to regulate, the Court's interpretation of this power was quite narrow. Famously, in <u>A.L.A. Schechter Poultry Corp. v. United States</u>, 295 U.S. 495, 550, 55 S.Ct. 837, 79 L.Ed. 1570 (1935), the Court struck down regulations determining employee hours and wages because such intrastate employment related only "indirectly" to interstate commerce.

However, beginning with a case decided in 1937, <u>NLRB v. Jones & Laughlin Steel Corp.</u>, the Court's interpretation of the Commerce Clause power expanded to include regulation of those purely intrastate activities which have a substantial effect, whether direct or indirect, on interstate commerce. 301 U.S. 1, 36-37, 57 S.Ct. 615, 81 L.Ed. 893 (1937); <u>see also</u> <u>United States v. Darby</u>, 312 U.S. 100, 119-21, 61 S.Ct. 451, 85 L.Ed. 609 (1941) (reaffirming that Congress may regulate intrastate activities which affect interstate commerce); <u>Lopez</u>, 514 U.S. at 559, 115 S.Ct. 1624 (clarifying that activities must "substantially" affect interstate commerce to fall within the Commerce Clause power). In the seminal case of <u>Perez v. United States</u>, the Court therefore identified three strands of Commerce Clause power: (1) the power to regulate the channels of interstate commerce, (2) the power to protect the instrumentalities of interstate commerce and persons or things in its stream, and (3) the power to regulate activities substantially affecting interstate commerce. 402 U.S. 146, 150, 91 S.Ct. 1357,

1359, 28 L.Ed.2d 686 (1971). Defendants rely on this third category--the power to regulate activities substantially affecting interstate commerce--to argue that § 1501 falls within the well established parameters of the Commerce Clause.

In the wake of Jones & Laughlin Steel and Darby, several Commerce Clause cases have further explained this third strand of Congress's power. The earliest relevant case is Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), where a plaintiff wheat farmer challenged a penalty imposed on him pursuant to the Agricultural Adjustment Act of 1938 for harvesting wheat in excess of the amount allotted to him. The farmer alleged that the excess wheat was grown only for his personal consumption, and thus Congress lacked power under the Commerce Clause to impose the penalty because his activity was both local and non-commercial in nature.

The Supreme Court disagreed, concluding that the wheat "supplies a need of the man who grew it which would otherwise be reflected by purchases in the open market . . . ." Id. at 128, 63 S.Ct. 82. In other words, the wheat grown for personal consumption was found to distort the interstate wheat market by eliminating the demand of the farmer, who would otherwise be forced to purchase it on the open market. This effect was sufficient for Congress to step

in and prevent the farmer from harvesting wheat for personal consumption under its Commerce Clause power.

In reaching this conclusion, <u>Wickard</u> established two basic principles which are particularly applicable to this case. First, the Court held that "even if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce . . . ." <u>Id.</u> at 125, 63 S.Ct. 82. <u>Wickard</u> therefore signals that the prime focus of the Commerce Clause inquiry is the activity's effect on interstate commerce, not whether it is local or commercial.

Second, the Court held that the fact "[t]hat appellee's own contribution to the demand for wheat may be trivial by itself is not enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial." <u>Id.</u> at 128, 63 S.Ct. 82. Put differently, an individual's activities may fall within the reach of Congress's Commerce Clause power even if, when considered alone, the effect on interstate commerce is negligible, so long as such activities, in the aggregate, have a substantial effect on such interstate commerce. Thus, courts may not "excise, as trivial, individual instances of the class," but must look to whether the larger class of activities regulated by Congress

substantially affects interstate commerce. <u>Perez</u>, 402 U.S. at 154, 91 S.Ct. 1357 (citation and internal quotations omitted); <u>see</u> <u>also</u> <u>Gonzales v. Raich</u>, 545 U.S. 1, 23, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005).

In two other cases decided more than fifty years after <u>Wickard</u>, the Court examined the outer bounds of Congress's power under the third strand of the Commerce Clause by focusing on whether the activity being regulated was "economic" in nature. In <u>Lopez</u>, the plaintiff challenged the Gun-Free School Zones Act of 1990, 18 U.S.C. § 922(q)(1)(A) (1988 ed., Supp. V), which criminalized the possession of a firearm in a school zone. The Court held that Congress had exceeded its authority in enacting the law because possession of a firearm "ha[d] nothing to do with 'commerce' or any sort of economic enterprise"; because the law itself was "not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated"; and because the law contained no jurisdictional element to ensure it would affect only interstate, and not intrastate, commerce. 514 U.S. at 561, 115 S.Ct. 1624.

The Court also noted the lack of any congressional findings showing that handgun violence substantially affects interstate commerce. Finally, the Court refused to "pile inference upon

inference" to connect handgun violence with interstate commerce because it concluded that upholding a law on the basis of such a logical stretch would erode the constitutional limits on Congress's power. Id. at 563-65, 115 S.Ct. 1624.

Ten years later, in Morrison, the Court reinforced Lopez's emphasis on the "economic" nature of the activity allegedly affecting interstate commerce when it struck down a section of the 1994 Violence Against Women Act ("VAWA"), 42 U.S.C. § 40302, which provided a federal civil cause of action for victims of gender-motivated violence. United States v. Morrison, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000). Reviewing its decision in Lopez, the Court concluded that "the noneconomic, criminal nature of the conduct at issue was central to our decision in that case." Id. at 610, 120 S.Ct. 1740. The Court further stated that "[w]hile we need not adopt a categorical rule against aggregating the effects of any noneconomic activity in order to decide these cases, thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature." Id. at 613, 120 S.Ct. 1740.

Because VAWA regulated activity--gender-motivated crimes of violence--that was not economic in nature, and because the statute did not include a jurisdictional element, the Morrison Court concluded that the law did not fall within Congress's Commerce

Clause power. Although Congress did include in VAWA some findings on the impact of gender-motivated violence on the economy, the Court did not regard them as dispositive. Instead, the Court considered the link which Congress found between gender-motivated violence and interstate commerce to be too attenuated, and feared that upholding the law on such a basis could lead Congress to "use the Commerce Clause to completely obliterate the Constitution's distinction between national and local authority . . . ." Id. at 615, 120 S.Ct. 1740.

Lopez and Morrison establish additional principles which must guide this Court's analysis. Most importantly, Lopez and Morrison make clear that Congress may not rely on its Commerce Clause power to regulate purely non-economic activities when the effect on interstate commerce is shown only by "pil[ing] inference upon inference." Lopez, 514 U.S. at 563-65, 115 S.Ct. 1624. Significantly, however, Lopez stated that a regulation may be upheld if it is "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." Id. at 561, 115 S.Ct. 1624.

Morrison also made clear that courts undertaking constitutional review must determine whether Congress had a rational basis that is not overly attenuated for concluding that

the class of activity substantially affects interstate commerce. See Gonzales, 545 U.S. at 22, 125 S.Ct. 2195. In doing so, congressional findings regarding the regulated activity's impact on interstate commerce must be considered, although they are not necessarily dispositive. Morrison, 529 U.S. at 614-15, 120 S.Ct. 1740.

Finally, the most recent Commerce Clause case of significance to this lawsuit, Gonzales v. Raich, reaffirmed the continuing vitality of Wickard. Gonzales, 545 U.S. 1, 125 S.Ct. 2195. In Gonzales, two plaintiffs who were producing and consuming marijuana for their own medical treatment pursuant to California law challenged the Controlled Substances Act ("CSA"), a federal regulatory scheme which prohibits the intrastate manufacture and possession of marijuana. The Court upheld the CSA, noting the striking similarity of the facts in Gonzales to those in Wickard.

In Gonzales, the Court emphasized that the "case law firmly establishes Congress' power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." Id. at 17, 125 S.Ct. 2195. The Court therefore distinguished Gonzales from Lopez and Morrison on the basis that the production and consumption of marijuana for medical treatment was a "quintessentially economic"

activity, unlike the possession of a firearm or gender-motivated violence. Id. at 25, 125 S.Ct. 2195.

The Court also rejected the argument that, although the larger regulatory scheme contained in the CSA was constitutional, its particular application to the California plaintiffs' intrastate, non-commercial activities was not:

> We have never required Congress to legislate with scientific exactitude. When Congress decides that the total incidence of a practice poses a threat to a national market, it may regulate the entire class.

Id. at 17-18, 125 S.Ct. 2195. In sum, the Court held that Congress may regulate an entire class of activities if, in the aggregate, that class has a substantial effect on interstate commerce, even if particular instances of the activity do not. Id.

When considered together, as they must be, Wickard, Lopez, Morrison, and Gonzales establish three major lines of inquiry. See id. at 15, 125 S.Ct. 2195 ("[N]one of [the] Commerce Clause cases can be viewed in isolation."). First, the Court must consider whether the decision not to purchase health insurance is an "economic" one, like the activities in Wickard and Gonzales, or a "non-economic" one like those in Lopez and Morrison. Second, if the decision is economic, the Court must determine whether Congress had a rational basis for concluding that such decisions, when taken in the aggregate, substantially affect the national health care

market. Third, the activity may be found to be within the reach of Congress's Commerce Clause power if it is "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." Lopez, 514 U.S. at 561, 115 S.Ct. 1624.

### b. Application of Long-Standing Principles of Commerce Clause Jurisprudence to Plaintiffs' Claim

With these principles in mind, the Court now turns to its analysis of Defendants' 12(b)(6) Motion. In undertaking this analysis, the Court is mindful of the proper balance of power among the different branches of the federal government and, in particular, of its duty to apply a presumption of constitutionality when reviewing laws passed by Congress. See Morrison, 529 U.S. at 606, 120 S.Ct. 1740 ("Due respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds."). At the same time, this Court must also be mindful of the Supreme Court's consistent warning that the outer limits of the Commerce Clause must be respected, lest "the distinction between what is national and what is local" be "obliterate[d]," resulting in "a completely centralized government." Jones & Laughlin Steel, 301 U.S. at 37, 57 S.Ct. 615.

When it enacted § 1501 of the Affordable Care Act, Congress made several findings, chief among them the general finding that "[t]he individual responsibility requirement provided for in this section . . . is commercial and economic in nature, and substantially affects interstate commerce." ACA § 1501(a)(1). Thus, there can be no doubt that it was the intent of Congress to invoke its Commerce Clause power in enacting § 1501.[9]

Congress's authority under the Commerce Clause to regulate the interstate insurance markets has long been established. United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 552-53, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944). In addition, there is nothing extraordinary about Congress's use of its Commerce Clause power to rein in the price of health insurance policies. "It is well established by decisions of this Court that the power to regulate commerce includes the power to regulate the prices at which commodities in that commerce are dealt in and practices affecting such prices." Wickard, 317 U.S. at 128, 63 S.Ct. 82. The question before this Court, then, is whether Congress's conclusion that §

---

[9]     While such congressional findings are not dispositive of this Court's inquiry into the constitutionality of § 1501, they can help to clarify the purpose of the statutory scheme. See Gonzales, 545 U.S. at 21, 125 S.Ct. 2195 ("[C]ongressional findings are certainly helpful in reviewing the substance of a congressional statutory scheme, particularly when the connection to commerce is not self-evident, and [] we will consider congressional findings in our analysis when they are available.").

1501 was within the reach of its Commerce Clause powers is in accord with the principles which have been well established in the Commerce Clause cases discussed above.

> **(1)  An Individual's Decision to Purchase or Not to Purchase Health Insurance Is an "Economic" One**

The first question which must be answered is whether Plaintiffs' decisions not to purchase health insurance are "economic" in nature. As noted above, Congress has clear authority under the Commerce Clause to regulate the insurance markets because insurance policies are "commodities" in the flow of interstate commerce. <u>South-Eastern Underwriters Ass'n</u>, 322 U.S. at 552-53, 546-47, 64 S.Ct. 1162. Both the decision to purchase health insurance and its flip side--the decision not to purchase health insurance--therefore relate to the consumption of a commodity: a health insurance policy.

It therefore follows that both decisions, whether positive or negative, are clearly economic ones. <u>See</u> <u>Gonzales</u>, 545 U.S. at 25-26, 125 S.Ct. 2195 ("'Economics' refers to 'the production, distribution, and consumption of commodities.'") (quoting Webster's Third New International Dictionary 720 (1966)). Thus, unlike <u>Lopez</u> and <u>Morrison</u>, which involved non-economic activity such as the possession of a firearm or gender-motivated violence, this case

involves an economic activity: deciding whether or not to purchase health insurance.

> **(2)   In the Aggregate, the Decisions of Individuals to Forgo Health Insurance Substantially Affect the National Health Care Market**

Next, the Court must determine whether Congress had a rational basis for concluding that such decisions, when considered in the aggregate, substantially affect the national health insurance market. The findings on this subject could not be clearer: the great majority of the millions of Americans who remain uninsured consume medical services they cannot pay for, often resulting in personal bankruptcy. In fact, the ACA's findings state that "62% of all personal bankruptcies are caused in part by medical expenses." ACA § 1501(a)(2)(G), as amended by § 10106. Of even greater significance to the national economy is the fact that these uninsured individuals are, in fact, shifting the uncompensated costs of those services--which totaled $43 billion in 2008--onto other health care market participants, as well as federal and state governments and American taxpayers. See ACA §§ 1501(a)(2)(F), (G), as amended by § 10106; Thomas More Law Ctr., 720 F.Supp.2d at 894.

Because of this cost-shifting effect, the individual decision to forgo health insurance, when considered in the aggregate, leads to substantially higher insurance premiums for those other individuals who do obtain coverage. According to Congress, the

uncompensated costs of caring for the uninsured are passed on by health care providers to private insurers, which in turn pass on the cost to purchasers of health insurance. "This costshifting increases family premiums by on average over $1,000 a year." ACA § 1501(a)(2)(F), as amended by § 10106. Thus, the aggregate effect on interstate commerce of the decisions of individuals to forgo insurance is very substantial.[10]

Further, the effect on insurance premiums is not at all attenuated, as were the links between the regulated activities and interstate commerce in Lopez and Morrison. In this case, the link is strikingly similar to that described in Wickard: individuals are actively choosing to remain outside of a market for a particular commodity, and, as a result, Congress's efforts to stabilize prices for that commodity are thwarted. As Wickard demonstrates, the effects of such market-distorting behavior are sufficiently related to interstate commerce to justify Congress's efforts to stabilize the price of a commodity through its Commerce Clause power.

---

[10]   To put it less analytically, and less charitably, those who choose--and Plaintiffs have made such a deliberate choice--not to purchase health insurance will benefit greatly when they become ill, as they surely will, from the free health care which must be provided by emergency rooms and hospitals to the sick and dying who show up on their doorstep. In short, those who choose not to purchase health insurance will ultimately get a "free ride" on the backs of those Americans who have made responsible choices to provide for the illness we all must face at some point in our lives.

For the foregoing reasons, the Court finds that Congress had a rational basis for its conclusion that the aggregate of individual decisions not to purchase health insurance substantially affects the national health insurance market. Consequently, Congress was acting within the bounds of its Commerce Clause power when it enacted § 1501 in order, as Chief Justice Marshall said, "to prescribe the rule by which [interstate] commerce is to be governed." Gibbons, 9 Wheat. at 196, 6 L.Ed. 23. Thus, Defendants' Motion to Dismiss on the basis that Plaintiffs have failed to state a constitutional claim is **granted**.

### (3)  Necessary and Proper Clause

The Necessary and Proper Clause delegates to Congress the power "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const., art. I § 8. This clause is best understood as "a caveat that the Congress possesses all the means necessary to carry out the specifically granted 'foregoing' powers of § 8 'and all other Powers vested by this Constitution,'" Kinsella v. United States ex rel. Singleton, 361 U.S. 234, 247, 80 S.Ct. 297, 4 L.Ed.2d 268 (1960) (quoting U.S. Const., art. I § 8), rather than as an independent source of congressional power.

As the Supreme Court recently noted, the Necessary and Proper Clause "grants Congress broad authority to enact federal legislation." United States v. Comstock, 130 S.Ct. 1949, 1956, 176 L.Ed.2d 878 (2010). "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." McCulloch v. Maryland, 4 Wheat. 316, 421, 4 L.Ed. 579 (1819). Courts look to see whether the challenged statute constitutes a means that is "rationally related to the implementation of a constitutionally enumerated power" when determining whether it falls within Congress's power under the Necessary and Proper Clause. Comstock, 130 S.Ct. at 1956. In the specific context of the Commerce Clause, the Supreme Court held in Lopez that regulation of intrastate economic activity may be upheld if it is found to constitute "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." Lopez, 514 U.S. at 561, 115 S.Ct. 1624.

As noted above, the individual mandate is best viewed not as a stand-alone reform, but as an essential element of the larger regulatory scheme contained in the ACA. For example, without the individual mandate, § 1001 of the ACA, which prohibits insurance

companies from denying or limiting coverage on the basis of pre-existing conditions, would otherwise create incentives for people to wait until they are sick or injured to obtain insurance. Not only might this increase the incidence of sickness by discouraging such individuals from obtaining preventive care, but insurance premiums would rise for all other individuals as a result. See Thomas More Law Ctr., 720 F.Supp.2d at 895 ("As a result, the most costly individuals [the sick] would be in the insurance system and the least costly [the well] would be outside it. . . . aggravat[ing] current problems with cost-shifting and lead[ing] to even higher premiums."). Thus, without § 1501's individual mandate, the ACA's efforts to end discrimination in insurance on the basis of pre-existing conditions would be financially untenable.

For this reason, the individual mandate provision is an appropriate means which is rationally related to the achievement of Congress's larger goal of reforming the national health insurance system. In other words, § 1501 is a clear-cut example of "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." Lopez, 514 U.S. at 561, 115 S.Ct. 1624. Thus, the Court reaffirms its conclusion that Congress acted within the bounds of its Commerce Clause power, especially when

considering the Necessary and Proper Clause, when it enacted §
1501.

As this analysis makes clear, the principles established by
the Supreme Court in its Commerce Clause jurisprudence, which of
course must guide this Court's analysis, compel the conclusion that
§ 1501 was enacted pursuant to Congress's Commerce Clause power.
Defendants' Motion to Dismiss for failure to state a claim on the
basis that the Commerce Clause, when considered together with the
Necessary and Proper Clause, delegates to Congress the power to
enact § 1501's individual mandate is therefore **granted**.

### (4) Plaintiffs' Arguments Attempting to Distinguish this Case from <u>Wickard</u> and <u>Gonzales</u> Are Unpersuasive

Despite the clear application of long-established Commerce
Clause principles to this case, Plaintiffs attempt to distinguish
it from <u>Wickard</u> and <u>Gonzales</u> in two ways. Specifically, Plaintiffs
argue (1) that § 1501 is not a valid exercise of the Commerce
Clause power because it reaches economic decision-making, which is
"passive activity" not subject to regulation under the Commerce
Clause case law, and (2) that, in any event, Congress cannot
regulate the entire class of individuals included under § 1501
because some, including Plaintiffs, will either continue to pay out
of pocket for medical services, rather than shift those costs onto
others, or will refuse medical care altogether.

> **(a) Economic Decision-Making Is an Activity Subject to Congress's Commerce Clause Power**

First, Plaintiffs define the conduct regulated by § 1501 as "being lawfully present in the United States without health insurance," which they contend is not activity at all, but rather "abstract economic decision-making." Pls.' Opp'n at 17. The core of Plaintiffs' challenge is that Congress may not, under the auspices of its Commerce Clause power, regulate such economic inactivity. See id. at 12-13.

As previous Commerce Clause cases have all involved physical activity, as opposed to mental activity, i.e. decision-making, there is little judicial guidance on whether the latter falls within Congress's power. See Thomas More Law Ctr., 720 F.Supp.2d at 893 (describing the "activity/inactivity distinction" as an issue of first impression). However, this Court finds the distinction, which Plaintiffs rely on heavily, to be of little significance. It is pure semantics to argue that an individual who makes a choice to forgo health insurance is not "acting," especially given the serious economic and health-related consequences to every individual of that choice. Making a choice is an affirmative action, whether one decides to do something or not do something. They are two sides of the same coin. To pretend otherwise is to ignore reality.

More importantly, the premise underlying Plaintiffs' activity/inactivity distinction--that individuals can, in the absence of § 1501's individual mandate, remain outside of the health care market altogether--is erroneous.

First, this Court agrees with the two other district courts which have ruled that the individuals subject to § 1501's mandate provision are either present or future participants in the national health care market. See Liberty Univ., 2010 WL 4860299, at *15 ("Nearly everyone will require health care services at some point in their lifetimes, and it is not always possible to predict when one will be afflicted by illness or injury and require care."); Thomas More Law Ctr., 720 F.Supp.2d at 894 ("The health care market is unlike other markets. No one can guarantee his or her health, or ensure that he or she will never participate in the health care market. . . . The plaintiffs have not opted out of the health care services market because, as living, breathing beings . . . they cannot opt out of this market."). Thus, the vast majority of individuals, if not all individuals, will require some medical care in their lifetime.

Second, in contrast to other markets for goods and services, if an individual is sick or injured, medical providers may not refuse basic medical services under federal law, regardless of the

individual's ability to pay.[11] <u>See</u> Emergency Medical Treatment and
Active Labor Act of 1986, 42 U.S.C. § 1395dd (requiring all
hospitals participating in Medicare and offering emergency services
to stabilize any patient who arrives, regardless of whether the
patient has insurance). In addition to this federal requirement,
most hospitals "have some obligation to provide care for free or
for a minimal charge to members of their community who could not
afford it otherwise" and "[f]or-profit hospitals also provide such
charity or reduced-price care." Cong. Budget Office, Key Issues in
Analyzing Major Health Insurance Proposals 13 (2008).

---

[11] This second aspect of the health care market
distinguishes the ACA from Plaintiffs' hypothetical scenario in
which Congress enacts a law requiring individuals to purchase
automobiles in an attempt to regulate the transportation market.
Even assuming that all individuals require transportation in the
same sense that all individuals require medical services,
automobile manufacturers are not required by law to give cars to
people who show up at their door in need of transportation but
without the money to pay for it. Similarly, food and lodging are
basic necessities, but the Court is not aware of any law requiring
restaurants or hotels to provide either free of charge.

It should be emphasized that this distinction is not merely a
useful limiting principle on Congress's Commerce Clause power.
Rather, it is a basic, relevant fact about the operation of the
health care market which is critical to understanding the ACA's
efforts to reform the health care system. The requirement placed
upon medical providers by federal law to care for the sick and
injured without recompense is part of the cost-shifting problem
that Congress sought to redress by enacting the ACA. When a
supplier is obligated by law to produce goods or services for free,
there is bound to be a substantial effect on market prices if
consumers' behavior results in that obligation's frequent
invocation.

The combined effect of these two unique aspects of the health care market--the inevitability of individuals' entrance into that market and the obligation of providers to serve those who do enter--is to guarantee that nearly all individuals, rich or poor, are or will be consumers of medical services. This effect distinguishes the present case from Plaintiffs' hypothetical scenario in which Congress "could not have dealt with the issue of low wheat prices [in Wickard] by declaring that all Americans must buy a specific amount of wheat or pay a penalty for failing to do so." Pls.' Opp'n at 13. Plaintiffs' argument that the Commerce Clause power does not extend to regulations which require individuals to enter a market they would otherwise choose to remain outside of is irrelevant to this case. Here, Congress enacted § 1501 based on its understanding that (1) all individuals inevitably consume medical services and (2) when they do consume those services, the way in which they pay for them substantially affects market prices.

Thus, as inevitable participants in the health care market, individuals cannot be considered "inactive" or "passive" in choosing to forgo health insurance. Instead, as Defendants argue, such a choice is not simply a decision whether to consume a particular good or service, but ultimately a decision as to how health care services are to be paid and who pays for them. See ACA § 1501(a)(2)(A), as amended by § 10106 ("The requirement [of

minimum essential coverage] regulates activity that is commercial and economic in nature: economic and financial decisions about how and when health care is paid for, and when health insurance is purchased."). In choosing not to purchase health insurance, Plaintiffs are actively arranging their circumstances (whether to save for their children's education or buy a new car) so that they must, in the future, rely on either their own resources or on federal law requiring medical providers to care for the sick and injured. There is no question, as Congress noted, that such mandatory care often goes uncompensated, although ultimately paid for by other market participants and the taxpayer. See ACA § 1501(a)(2)(F), as amended by § 10106. For these reasons, the Court concludes that a decision not to purchase health insurance is an "activity."

>                     **(b)   Congress May Regulate the Class of Individuals   Who   Forgo   Health Insurance**

Next, the Court turns to Plaintiffs' argument that § 1501 is unconstitutional because it reaches individuals who will either pay for future medical services out of pocket or who will refuse medical services altogether.

As stated above, Plaintiffs Ruffo and Rodriguez admit that they will consume medical services in the future, but allege that they will pay for all services out of pocket as they have in the

past. As an initial matter, the Court notes that Plaintiffs have no way of predicting what their future medical costs will be. In 2008, the average hospital stay in the United States lasted 4.6 days and included total charges of $29,046. See U.S. Dep't of Health and Human Servs., Agency for Healthcare Research and Quality, Healthcare Cost and Utilization Project (HCUP), available at http://www.ahrq.gov/data/hcup/. If Plaintiffs Ruffo and Rodriguez or dependents in their care were to become seriously ill, necessitating hospital stays in excess of 4.6 days, one can only be skeptical about how long they would be able to continue to pay out of pocket for such costly medical services. Such skepticism seems especially warranted in light of Plaintiffs' admissions that their concern about their ability to make the far less costly shared responsibility payments in 2014 is already leading them to adjust their current finances. Am. Compl. ¶¶ 60-62, 73. In fact, over 62% of personal bankruptcies in this country are attributable in part to medical expenses, a fact which Congress relied upon in enacting § 1501. See ACA § 1501(2)(G), as amended by § 10106.

In any event, even assuming that Plaintiffs will be able to pay for their future medical expenses, the question is whether Congress has the power to regulate the _class_ of individuals participating in the health care market, which includes Ruffo and Rodriguez because they concede they will use health care services

in the future. This Court has already concluded that Congress's regulation of that class is within the limits of the Commerce Clause power. Thus, § 1501 is constitutional regardless of whether Plaintiffs Ruffo and Rodriguez, by paying out-of-pocket for every medical charge accrued, will individually avoid the cost-shifting effect which § 1501 is meant to ameliorate. See Gonzales, 545 U.S. at 17-22, 125 S.Ct. 2195 (refusing to "excise individual components of th[e] larger scheme"); Perez, 402 U.S. at 154-55, 91 S.Ct. 1357 ("Where the class of activities is regulated and that class is within the reach of federal power, the courts have no power to excise, as trivial, individual instances of the class.") (internal quotations and citation omitted).

In contrast to Plaintiffs Ruffo and Rodriguez, Plaintiffs Lee and Seven-Sky[12] allege that they will remain passive, meaning they will not enter the national health care market in the future to consume services no matter what their circumstances are. Similar avowals that "non-commercial" activity would remain as such were viewed with some skepticism in both Wickard and Gonzales. See Wickard, 317 U.S. at 128, 63 S.Ct. 82 (stating that home-consumed wheat could have a substantial influence on price and market conditions because "being in marketable condition such wheat

---

[12]    It should be remembered that Plaintiff Mead, who made the same allegation, was dismissed for lack of standing. See supra Part III.A.1.

overhangs the market and if induced by rising prices tends to flow into the market and check price increases"); <u>Gonzales</u>, 545 U.S. at 31-32, 125 S.Ct. 2195 ("[T]he danger that excesses [of marijuana produced for personal consumption] will satisfy some of the admittedly enormous demand for recreational use seems obvious."). It is worth noting that, like the farmer and marijuana user in <u>Wickard</u> and <u>Gonzales</u>, respectively, individuals like Plaintiffs who allege now that they will refuse medical services in the future may well find their way into the health care market when they face the reality of illness or injury.

Indeed, for the reasons discussed above, this Court has rejected the premise that individuals can opt out of the health care market indefinitely. <u>See</u> supra Part III.B.1.b(4)(a). The Court therefore likewise rejects Plaintiffs' argument that Congress cannot subject them to regulation under § 1501 because they will never consume medical services.[13]

---

[13]     It is correct that, for the purposes of deciding a Rule 12(b)(6) motion, this Court must accept the factual allegations in Plaintiffs' Amended Complaint as true. <u>Iqbal</u>, 129 S.Ct. at 1949-50. However, Plaintiffs' allegations as to their future conduct are purely speculative and therefore unprovable. As such, they are not entitled to an assumption of truth. <u>See</u> <u>Sprewell v. Golden State Warriors</u>, 266 F.3d 979, 988 (9th Cir. 2001) (explaining that a court reviewing a 12(b)(6) motion is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences").

Even assuming for the purposes of this Motion, however, that Plaintiffs Lee and Seven-Sky do remain committed to refusing medical care throughout their lives, Congress may still regulate the larger class of individuals when it "decides that the total incidence of a practice poses a threat to a national market." Gonzales, 545 U.S. at 17, 125 S.Ct. 2195. Consequently, the Court looks not to Plaintiffs' particular situation, but must ask instead whether the practice of the broader class of uninsured individuals threatens the national health care market. However, "when it is necessary in order to prevent an evil to make the law embrace more than the precise thing to be prevented it may do so.'" Perez, 402 U.S. at 154-55, 91 S.Ct. 1357 (quoting Westfall v. United States, 274 U.S. 256, 259, 47 S.Ct. 629, 71 L.Ed. 1036 (1927)). Because this Court has determined that the practices of the broader class of uninsured individuals substantially affects the health care market, Plaintiffs' own individual activity may be regulated pursuant to Congress's Commerce Clause power.

In addition, as this Court has explained, § 1501's individual mandate is "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." Lopez, 514 U.S. at 561, 115 S.Ct. 1624. Because excepting individuals like Plaintiffs from § 1501 would create a "gaping hole" in the ACA, this Court declines

to do so. Gonzales, 545 U.S. at 22, 125 S.Ct. 2195 (refusing to excise individual components involving only intrastate activity from Congress's larger regulatory scheme in part because exclusion of such components would leave a "gaping hole" in the CSA).

For all these reasons, the Court finds Plaintiffs' arguments against dismissal of their constitutional claim unpersuasive. The crux of Plaintiffs' arguments is that § 1501 is an unprecedented attempt by Congress to regulate individual behavior, and therefore threatens individuals' freedom of choice. Appealing as this emotionally charged argument may sound, the ACA is not as unprecedented as Plaintiffs claim: as already discussed, Congress's broad power to regulate individual behavior under the Commerce Clause is well established. See Gibbons, 9 Wheat. at 196, 6 L.Ed. 23; Wickard, 317 U.S. at 118-29, 63 S.Ct. 82; Gonzales, 545 U.S. at 15-33, 125 S.Ct. 2195.

In addition, the mere fact that a case presents a novel set of facts is not cause for viewing an act of Congress with skepticism or doubt. See, e.g., Liberty Univ., 2010 WL 4860299, at *14 ("While the unique nature of the market for health care and the breadth of the Act present a novel set of facts for consideration, the well-settled principles expounded in [Gonzales] and Wickard control the disposition of this claim."); Florida ex rel. McCollum, 715 F.Supp.2d at 1164 ("[T]o say that something is "novel" and

"unprecedented" does not necessarily mean that it is "unconstitutional" and "improper."). On the contrary, as noted above, this Court is bound to grant congressional action a presumption of constitutionality. Morrison, 529 U.S. at 606, 120 S.Ct. 1740 .

Finally, Plaintiffs argue that upholding § 1501 under the Commerce Clause will eviscerate any limits on Congress's power. First, this Court emphasizes that its task is only to determine whether this particular statute is constitutional, and not to speculate about other Commerce Clause challenges presenting different factual scenarios which may arise in the future. Second, there is a straightforward response to the "parade of horribles" claim: the limits on Congress's Commerce Clause power are spelled out clearly in Lopez, 514 U.S. 549, 115 S.Ct. 1624, and Morrison, 529 U.S. 598, 120 S.Ct. 1740. These two cases establish that (1) the activity subject to regulation under the Commerce Clause must be economic in nature, (2) the link between the activity and interstate commerce must not be too attenuated, and (3) other activities may be upheld if they are an essential part of a larger regulatory scheme. Because § 1501 satisfies these requirements, this Court sees no danger of granting Congress limitless power by concluding that § 1501 was enacted pursuant to the Commerce Clause.

## 2.   General Welfare Clause

As an alternative to their Commerce Clause arguments, Defendants argue that the General Welfare Clause, also called the Taxing and Spending Clause, in Article I, Section 8 of the Constitution grants Congress the power to enact the shared responsibility payment provision, 26 U.S.C. § 5000A(b). The General Welfare Clause states that "[t]he Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States." U.S. Const. art. I, § 8. Under this Clause, Congress must have intended 26 U.S.C. § 5000A(b) as a tax if it is to be deemed constitutional.

Therefore, we must first consider whether § 5000A(b), which uses the term "penalty," operates as a tax. See Helwig v. United States, 188 U.S. 605, 613, 23 S.Ct. 427, 47 L.Ed. 614 (1903). ("[I]n the absence of any declaration by Congress affecting the manner in which the provision shall be treated, courts must decide the matter in accordance with their views of the nature of the act."). In reaching its decision, the Court notes that, to date, every court which has considered whether § 1501 operates as a tax has concluded that it does not. See Goudy-Bachman, 2011 WL 223010, at *10-12; Liberty Univ., 2010 WL 4860299, at *9-11; State of

<u>Florida</u>, 716 F.Supp.2d at 1130-41; <u>United States Citizens Ass'n</u>, 2010 WL 4947043, at *5; <u>Virginia ex rel. Cuccinelli v. Sebelius</u>, 728 F.Supp.2d 768, 786-88 (E.D. Va. 2010).

"In construing a statute, the court begins with the plain language of the statute." <u>United States v. Braxtonbrown-Smith</u>, 278 F.3d 1348, 1352 (D.C. Cir. 2002). As already noted, Congress chose to label the shared responsibility payment in § 5000A(b) as a penalty, although it chose to label several other assessments required under the ACA as taxes. <u>Compare</u> 26 U.S.C. § 5000A(b) (labelling the shared responsibility payment a "penalty") <u>with</u> ACA §§ 1405, 9001, 9015, 10907 (imposing "taxes").

Because "[w]e must strive to interpret a statute to give meaning to every clause and word," this choice of language obviously suggests that Congress did not intend the mandatory payment in § 5000A(b) to act as a revenue-raising tax, but rather as a punitive measure. <u>Donnelly v. FAA</u>, 411 F.3d 267, 295 (D.C. Cir. 2005); <u>see also</u> <u>Dep't of Revenue v. Kurth Ranch</u>, 511 U.S. 767, 779-80, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994) ("Whereas fines, penalties, and forfeitures are readily characterized as sanctions, taxes are typically different because they are usually motivated by revenue-raising, rather than punitive, purposes."); <u>Russello v. United States</u>, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) ("Where Congress includes particular language in one section of a

statute but omits it from another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

This conclusion is bolstered by the Congressional findings in support of § 5000A. First, Congress makes clear that it is invoking its regulatory authority under the Commerce Clause, not its power to lay and collect taxes. See ACA § 1501(a), as amended by § 10106. Second, the findings demonstrate that the goal of § 5000A is not to raise revenue, but to achieve near-universal health care coverage by giving individuals the incentive to maintain their health insurance under threat of penalty:

> [I]f there were no requirement [to maintain minimum essential coverage], many individuals would wait to purchase health insurance until they needed care. By significantly increasing health insurance coverage, the requirement, together with the other provisions of this Act, will minimize this adverse selection and broaden the health insurance risk pool to include healthy individuals, which will lower health insurance premiums. The requirement is essential to creating effective health insurance markets in which improved health insurance products that are guaranteed issue and do not exclude coverage of preexisting conditions can be sold.

Id. at § 1501(a)(2)(I), as amended by § 10106.

Finally, as Judge Vinson of the United States District Court for the Northern District of Florida discusses in great detail, the legislative history of § 1501 makes clear that Congress did not

intend the provision to operate as a tax. See State of Florida, 716
F.Supp.2d at 1130-41. To the contrary, the legislative history
indicates that Congress specifically rejected the term "tax" in
favor of "penalty." Id. As Judge Vinson notes, "'[f]ew principles
of statutory construction are more compelling than the proposition
that Congress does not intend sub silentio to enact statutory
language that it has earlier discarded in favor of other
language.'" Id. at 1134 (quoting INS v. Cardoza-Fonseca, 480 U.S.
421, 442, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)).

For these reasons, the Court concludes that Congress did not
intend § 1501 to operate as a tax, and therefore Defendants cannot
rely on the General Welfare Clause as authority for its enactment.
Consequently, Defendants' Motion to Dismiss on the basis that §
1501 was constitutionally enacted pursuant to the General Welfare
Clause is **denied**.

### C.    Religious Freedom Restoration Act

Finally, Defendants move under Rule 12(b)(6) for dismissal of
Plaintiffs Lee and Seven-Sky's claim that § 1501 violates RFRA.
RFRA prevents the federal government from substantially burdening
a person's exercise of religion, "even if the burden results from
a rule of general applicability." 42 U.S.C. § 2000bb-1(a). The only
exception to this rule is when the burden "(1) is in furtherance of
a compelling governmental interest; and (2) is the least

restrictive means of furthering that compelling governmental interest." Id. § 2000bb-1(b); see also Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 424, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006).

To survive Defendants' Motion to Dismiss, the Amended Complaint must allege sufficient facts showing that § 1501 imposes a substantial burden on Plaintiffs' exercise of religion. Under RFRA, "religious exercise" includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7). When considering a RFRA claim, the focus is therefore not on the centrality of the religious exercise to the adherent's own religion, but on whether the adherent's sincere religious exercise is substantially burdened. Kaemmerling v. Lappin, 553 F.3d 669, 678 (D.C. Cir. 2008) (citing Levitan v. Ashcroft, 281 F.3d 1313, 1321 (D.C. Cir.2002)). "A substantial burden exists when government action puts 'substantial pressure on an adherent to modify his behavior and to violate his beliefs, Thomas v. Review Bd., 450 U.S. 707, 718, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) . . . . An inconsequential or de minimis burden on religious practice does not rise to this level, nor does a burden on activity unimportant to the adherent's religious scheme." Id.

The Amended Complaint states that:

> [Lee and Seven-Sky] believe[] in trusting in God to protect [them] from illness or injury, and to heal [them] of any afflictions, no matter the severity of the health issue, and [they] do[] not need, or want to be forced to buy, health insurance coverage . . . In addition, [Lee and Seven-Sky have] a sincerely held religious belief that God will provide for [their] physical, spiritual, and financial well-being. Being forced to buy health insurance conflicts with [their] religious faith because [they] believe[] that [they] would be indicating that [they] need[] a backup plan and [are] not really sure whether God will, in fact, provide for [their] needs. . . . Because [Lee and Seven-Sky] believe[] in relying on God to preserve [their] health and provide for [their] physical, spiritual, and financial needs, and object[] to participation in the health insurance system, the Act imposes direct and substantial religious and financial burdens upon [them] by requiring [them] to either 1) purchase and maintain minimum essential coverage, without any consideration of [their] individual needs, Christian faith, and financial situation, or 2) pay an annual shared responsibility payment.

Am. Compl. ¶¶ 15-18, 28-33, 42-45. In essence, then, Plaintiffs allege that § 1501's minimum essential coverage requirement conflicts with their Christian faith because it requires them to perform an act that implies that they doubt God's ability to provide for their health.

Accepting these allegations as true, the conflict alleged between § 1501's requirements and Plaintiffs' Christian faith does not rise to the level of a substantial burden. First, Plaintiffs have failed to allege any facts demonstrating that this conflict is

more than a de minimus burden on their Christian faith. Second, it is unclear how § 1501 puts substantial pressure on Plaintiffs to modify their behavior and to violate their beliefs, as it permits them to pay a shared responsibility payment in lieu of actually obtaining health insurance. See 42 U.S.C. § 5000A(b). In fact, Plaintiffs specifically allege in the Amended Complaint that they view this shared responsibility payment as "the lesser of two evils" and therefore intend to pay it rather than purchase health insurance. Am. Compl. ¶¶ 19, 33, 46. Finally, as Defendants point out, Plaintiffs routinely contribute to other forms of insurance, such as Medicare, Social Security, and unemployment taxes, which present the same conflict with their belief that God will provide for their medical and financial needs. See Defs.' Mot. at 37.

Even if § 1501 does substantially burden the exercise of Plaintiffs' Christian faith, Plaintiffs have failed to state a claim for relief under RFRA because the individual mandate provision serves a compelling public interest and is the least restrictive means of furthering that interest. 42 U.S.C. § 2000bb-1(b); see Kaemmerling, 553 F.3d at 680. First, the Government clearly has a compelling interest in safeguarding the public health by regulating the health care and insurance markets. See, e.g., Olsen v. Drug Enforcement Admin., 878 F.2d 1458, 1462 (D.C. Cir. 1989) (noting compelling interest in protecting individual health

and social welfare). RFRA requires that this compelling interest apply specifically to the "particular claimant whose sincere exercise of religion is being substantially burdened." O Centro Espirita, 546 U.S. at 430-31, 126 S.Ct. 1211. In this case, Congress has made clear that the goal of § 1501 is to achieve near-universal health insurance coverage. ACA § 1501(a)(2). Thus, Congress's compelling interest--reforming the health care market by increasing coverage--applies to Plaintiffs, just as it applies to all individuals.

Second, the individual mandate, as enacted in § 1501, is the least restrictive means of furthering this compelling interest. Congress found that, "[i]n the absence of the requirement, some individuals would make an economic and financial decision to forego health insurance coverage and attempt to self-insure, which increases financial risks to households and medical providers." ACA § 1501(a)(2)(A), as amended by § 10106. In addition, § 1501 includes a number of exemptions on the basis of religious conscience, membership in a health care sharing ministry, incarceration, poverty or inability to afford coverage, membership in an Indian tribe, and hardship. 26 U.S.C. §§ 5000A(d), (e). Finally, when pressed at oral argument to name a less restrictive means of lowering health insurance premiums or otherwise improving access to health care, Plaintiffs could not do so.

Consequently, the Court concludes that (1) § 1501 does not place a substantial burden on the exercise of Plaintiffs' Christian faith, and (2), even assuming that it does, it is the least restrictive means of serving a compelling governmental interest. Defendants' Motion to Dismiss Plaintiffs' RFRA claim is therefore **granted**.

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss is **granted**. An Order will accompany this Memorandum Opinion.


February 22, 2011

/s/
Gladys Kessler
United States District Judge


Copies to: attorneys on record via ECF